FILED

2003 NOV -4 P 1: 42

 DISTRICT COURT
HARTFORD CT

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CATHERINE SANTOSSIO, ET AL                    :

V.                                            :    NO. 3:01CV1460 (RNC)

CITY OF BRIDGEPORT, ET, AL                    :

                                              :    NOVEMBER 3, 2003

## DEFENDANTS LOCAL RULE 56(1)(a) STATEMENT

1. Catherine Santossio is the Director of Planning at the Bridgeport Police
   Department and has held that position since 1996. (Exhibit A Santossio
   Deposition page 9).

2. Plaintiff Sgt. Glenn Prentice is a sergeant in the Bridgeport Police Department
   and has been so employed as a police officer in the Department for over 18
   years. (Exhibit B Prentice Deposition page 4-5).

3. The defendant Pablo Otero is a sergeant in the Bridgeport Police Department
   and has been so employed as a police officer since 1983. (Exhibit C Otero
   Deposition page 25).

1

4.  Thomas Sweeney was the Chief of Police at the Bridgeport Police
    Department from    1990 until he left the position in July 1999.He is white.
    (Exhibit D Sweeney Deposition Page 21 lines 8-16).

5.  Hector Torres was employed by the Bridgeport Police Department from 1970
    to August 2000. From July 1999 to his retirement in August 2000 Torres
    served as Acting Chief of Police. (Exhibit E Deposition of Hector Torres pages
    12-18).

6.  Robert Studivant was employed by the Bridgeport Police Department from
    1974 until his retirement in 2001. In 1993 he became supervisor of the Office
    of Internal Affairs (OIA) and held that position until October 2000. (Exhibit F
    Studivant Deposition pages 10-16, 260-262).

7.  Arthur Carter was employed as a Bridgeport Police Officer from 1974 until his
    retirement on June 15, 2001. When he retired he held the rank of Deputy
    Chief of Police serving in that position from January 2000 until his retirement.
    The Bridgeport Guardians is a fraternal organization of police officers to
    ensure that all citizens have equal access to job employment. It consists of
    primarily of minority members. (Exhibit G Carter deposition page 32 and 5-6
    and Exhibit H Carter Affidavit).

8.  On August 5, 1998 an incident occurred between Santossio and Sgt. Otero
    on the fourth floor in the new file room. Santossio claims that Otero physically
    assaulted and exposed himself to her and made a demand for oral sex.
    (Exhibit A Santossio Deposition pages 318-324 and paragraph 14 of
    complaint).

9.  Pablo Otero denies that the incident was an assault but claims that it was
    consensual. (Exhibit C Otero Deposition page 99-101 lines13-13 and see
    Otero's answer to the complaint).

10. In late August or around Labor Day 1998 Santossio went to Chief Sweeney
    wanting to speak to Chief Sweeney "off-the-record" about a problem she had
    with Otero. She was visibly upset and when she began to discuss what was
    bothering her Sweeney stopped her and advised her that he could not
    discuss such a matter with her off the record and she was advised that if the
    allegations she raised fell within the purview of sexual harassment that
    Sweeney would be obligated to investigate the matter. (Exhibit A Deposition
    of Santossio page 254 – 257; Exhibit I investigation report from Chief
    Sweeney dated October 15, 1998 page 1).

11. Upon being advised that he could not discuss the matter off the record Santossio terminated the conversation without providing any specific facts. (Exhibit A Deposition of Santossio page 254 – 257; Exhibit I investigation report from Chief Sweeney dated October 15, 1998 page 1).

12. Santossio had no problem with Sweeney indicating to her that he could not discuss the matter off the record. (Exhibit A Deposition Santossio page 260 line 8-13).

13. On September 16, 1988 Santossio delivered to Sweeney a memorandum dated September 11, 1998, which was accompanied by two separate reports that document incidents that occurred between her and Sgt Otero on August 5, 1998. (Exhibit A Deposition of Santossio page 260; Exhibit I investigation report from Chief Sweeney dated October 15, 1998 page 1 and Attachment A attached thereto).

14. Chief Sweeney's investigation of the August 5, 1998 incident began when Santossio delivered to him her September 11, 1998 memorandum with attached statements on September 16, 1998 approximately six (6) weeks after the incident with Otero. (Exhibit A Deposition of Santossio page 260-261 lines 21-2).

15. On September 16, 1998 Chief Sweeney called Santossio into his office and advised her that he would interview her the next day September 17, 1998. On September 16, Sweeney asked Santossio to show him where on the fourth floor the incident occurred which in fact happened. Sweeney drew a diagram of the fourth floor. (Exhibit A Deposition of Santossio page 260 –263 lines 7; Exhibit I investigation report from Chief Sweeney dated October 15, 1998 page 2 and attachments).

16. After reading Santossio's memorandum with attached statements that she submitted to Chief Sweeney on September 16, 1998, Sweeney interviewed Captain Arthur Carter about what, if anything, he saw with respect to the August 5, 1998 encounter between Santossio and Otero. Sweeney requested that Carter come-up with his own report, which he did, dated September 21, 1998. (Exhibit A Deposition of Santossio page 263 and Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 2, Attachment D Carter's report September 21, 1998 report).

17. Carter went up to the fourth floor some time in August and he observed that Santossio and Otero where standing in the area where personnel records are stored. Carter does not recall the date that he witnessed this. Carter went to

the fourth floor looking for Santossio, Otero or Sgt. Glenn Prentice but he does not recollect the exact reason why he went up to the fourth floor. While on the fourth floor he observed Otero and Santossio standing in the doorway at the far end of the hallway at the doorway thresh panel. Sgt. Otero was slightly ahead of Santossio. They both seemed to have appeared from around the enclosed storage area and it appeared that one or both of them may have been smoking cigarettes but Carter was not sure. (See Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 2, Attachment D Carter's report September 21, 1998 report; See Exhibit J Arthur Carter's testimony at the Bridgeport Board of Police Commissioners Board of Inquiry on the Otero matter pages 17-18 dated November 29, 1999; See Exhibit G Deposition testimony of Arthur Carter dated December 3, 2002 pages 109-116).

18. At the time that Chief Sweeney interviewed Carter about his observations and ordered him to come-up with a statement of what he witnessed when he observed Santossio and Otero on the fourth floor, he had no knowledge that Santossio had filed a complaint with Chief Sweeney about an incident which occurred between Otero and Santossio, on the fourth floor on August 5, 1998.

(See Exhibit J Arthur Carter's testimony at the Bridgeport Board of Police

Commissioners Board of Inquiry on the Otero matter page 16 lines 4-7 dated

November 29, 1999; Exhibit G Carter's deposition pages 117-120 dated

December 3, 2003).

19. Carter never testified that Otero walked out of the storage room first at the

Board of Inquiry. (See Exhibit I Investigative report of Chief Sweeney dated

October 15, 1989, page 2, Attachment D Carter's report September 21, 1998

report; See Exhibit J Arthur Carter's testimony at the Bridgeport Board of

Police Commissioners Board of Inquiry on the Otero matter pages 17-18

dated November 29, 1999). Santossio admitted that any testimony from

Carter, which could be construed, to mean that Otero came out of the storage

room first ahead of Santossio could mean that Carter remembered the

incident differently and that he was not intentionally testifying falsely. (Exhibit

A Santossio deposition pages 221-223 lines 11-9).

20. Sweeney first interviewed Santossio on September 18, 1998 two days after

she officially reported the Otero incident to Sweeney. (Exhibit A Santossio

deposition pages 264 lines 4-10). Santossio tells Sweeney what occurred

between her and Otero when Sweeney interviews her on September 18,

1998. (Exhibit A Santossio deposition page 264 3-14).

21. Sweeney continued the interview of Santossio on September 24, 1998,

which is eight days after she officially reported the incident to Sweeney

(Exhibit A Santossio deposition pages 264, 265 lines 3-3).

22. Sweeney interviewed Charlene Panullo his Executive Secretary on

September 24, 1999 about an incident involving Otero and a trick or treat bag.

(Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page

7 and see Attachment E to the report).

23. After the August 5, 1998 incident between Santossio and Otero, Santossio

secretly tape recorded two conversations she had with Otero the first

occurring on September 3, 1998 and the second occurring on the Tuesday or

Wednesday after Labor Day 1998. The intent was to catch Otero saying

something, which would support Santossio's claims. (Exhibit I Investigative

report of Chief Sweeney dated October 15, 1989, page 5-6).

24. On September 3, 1998 Santossio tape-recorded a conversation she allegedly

had with Otero outside of the police department in the evening at

approximately 5:00 PM. (Exhibit A Deposition Santossio page 338-341 lines 6-6).

25.  Santosssio concealed the tape recorder in her right hand pocket. The recorder was a hand held rectangular one. (Exhibit A Deposition Santossio page 338-340 lines 6-17).

26.  City Hall is diagonally across the street and cars were driving on the streets outside of the police department and around City Hall when Santossio recorded the conversation she had with Otero. (Exhibit A Deposition Santossio page 341-434 lines 22-15).

27.  Santossio admitted that the tape had background noise but claimed that if one "trained" ones ears you could hear Otero say, "If they don't take me off the third floor, I'm going to rape your ass." (Exhibit A Deposition Santossio page 345-346 lines 20-5).

28.  Santossio recorded another conversation with Otero on the Tuesday after Labor Day, which occurred on the outside roof of the police department outside of the fourth floor. Santossio hid the recorder in her bra. (Exhibit A Deposition Santossio page 348-551 lines 5-14).

29. Santossio turned over the tapes to Sweeney and he preserved them by breaking the plastic prongs on the tapes so they could not be recorded over. Sweeney also placed the tapes in an evidence bag. Santossio has no evidence that Sweeney failed to preserve the tapes or that he intentionally failed to preserve the tapes. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 6; Exhibit A Deposition of Santossio page 163-164 lines 8-6; pages 180-181 lines 4-21).

30. On October 7, 1998 Sweeney and Deputy Chief Thomas Scanlon undertook a review of the micro-cassette tapes. The tapes were of generally poor quality and contained a high degree of background noise and static. The tapes until they could be effectively cleaned were largely unintelligible. From the tape which Santossio claims was made outside the police department record room Sweeney was able to hear references to a pager going off and red garment worn yesterday and the term "beaming." With respect to the second tape, which according to Santossio was recorded on the roof of the police department, Sweeney was able to discern that it contained some references by Santossio in conversation with Sgt. Otero where she referenced "what you said" and also "what you did" and Otero's conversation was less intelligible

but appears to contain references to an apology. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 7 and 8).

31. Sweeney testified to what he heard on the tapes in front of the Board of Police Commissioners during the Board's inquiry into the Otero mater. (Exhibit A Santossio deposition page 265-267 lines 4-4).

32. On October 8, 1998 Sweeney issued an order via a memorandum to Otero that by the end of the work day he was to prepare and submit a report detailing the facts and circumstances of an encounter between him and Santossio which occurred on August 5, 1998 on the fourth floor; the facts and circumstances or any subsequent conversations from August 5 to the present date between him and Santossio; the facts and circumstances of any conversations between him and Santossio since August 5 where the language of a sexually explicit nature or having a sexual connotation was used. Reference is made to terms such as "rape" and "beaming." And, Sweeney requested that he give the facts and circumstances regarding an encounter with Santossio involving a sliver trick or treat bag. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998, page 8 and Attachment F thereto).

33. On October 8, 1998 Sweeney informed Santossio that he ordered Otero to submit his report and ordered him to refrain from any and all contact with her concerning "this issue." (Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 8).

34. Otero submitted his report by the end of business October 8, 1998. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998, page 8 and Attachment F thereto).

35. Sweeney obtained another report from Charlene Panullo his secretary detailing that Santossio told her that Otero exposed himself to her. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 8-9 and Attachment H thereto).

36. Sweeney completed his report and investigation on October 15, 1998 and turned it over to the Office of Internal Affairs, Captain Robert Studivant for further investigation. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998 and Exhibit K cover memorandum Sweeney to Studivant). Sweeney's investigation is completed in one month from the date Santossio officially filed a complaint with Sweeney. (Exhibit A Santossio deposition page 268 lines 17-20).

37. Santossio agrees that Sweeney did a lot of work in his investigation in that one-month period. (Exhibit A Santossio deposition page 268-269 lines 17-6).

38. Santossio has no problems with Chief Sweeney's investigation. (Exhibit A Santossio deposition page 268-269 lines 17-23).

39. Chief Sweeney had no control over the Office of Internal Affairs (OIA) investigation other then to refer the matter to OIA for investigation and he had nothing to do with the OIA investigation. (Exhibit A Santossio deposition page 269-270 lines 24-24)

40. Robert Studivant was head of OIA holding the position from 1993 until October 2000. (Exhibit F Deposition of Robert Studivant Pages 10-18)

41. The OIA is separate from the police department and was established by federal court order in the late 1970's early 1980's. OIA is removed from the chain of command in the department and the chain of command applicable to OIA is the Board of Police Commissioners and the Mayor. (Exhibit F Deposition of Robert Studivant Pages18-20 lines 7-5).

42. In conducting its internal affairs investigations OIA generally did not collect much evidence because most of its investigations centered on complaints that were filed against police officers. Whatever evidence kept would be

the nature of her complaint. (Exhibit F Deposition of Robert Studivant Page 56 lines 1-16; page 57-58 lines 14-1).

48. Prior to the OIA investigation Studivant knew Otero but he was a not friend with him. Studivant went to Otero's promotional party when he was made a sergeant; he met his wife on one occasion; he never ate lunch with him and he never socialized with Otero outside of work other then the one promotional party. (Exhibit F Deposition of Robert Studivant page 58-59 lines 2-1).

49. Prior to the matter being referred to OIA Studivant never heard any talk about the nature of the complaint against Otero. (Exhibit F Deposition of Robert Studivant Page 59 lines 8-11).

50. Studivant never discussed his investigation with Arthur Carter. (Exhibit F Deposition of Robert Studivant Pages 258-259 lines 25-10).

51. After the OIA investigation into the Santossio matter was complete and when the matter went to the Board of Police Commissioners Studivant never had any conversations with Carter about the matter. (Exhibit F Deposition of Robert Studivant Page 261 lines 5-11).

52. Studivant never spoke to Hector Torres about the Santossio matter nor did he speak to him about the suit brought by Santossio and Prentice. (Exhibit F Deposition of Robert Studivant Page 262, 263 lines 5-3).

53. Chief Sweeney gave Studivant his entire report into the Otero/Santossio matter, which also included the cassette tapes and Studivant kept the tapes in his office. (Exhibit F Deposition of Robert Studivant Page 59-60 lines 24-16).

54. When Sweeney turned over his report and documentation on the Otero/Santossio matter that was the only time that Sweeney actually gave Studivant any evidence in connection with a matter. (Exhibit F Deposition of Robert Studivant Page 60 lines 17-24).

55. Sweeney recommended to Studivant that because the tapes were poor quality that they should be sent to the FBI and he gave Studivant the name and number of FBI agent Steven Kives to contact. (Exhibit F Deposition of Robert Studivant Page 63 lines 7-25). Santossio admitted that she has no evidence that Sweeney believed or thought that Studivant was not capable of preserving evidence. (Exhibit A Santossio deposition pages 180-181 lines 4-21)

56. In a criminal investigation it is normal to log evidence in the property room of the police department. (Exhibit F Deposition of Robert Studivant Page 65 lines 10-20). That procedure was not utilized in OIA investigations. (Exhibit F Deposition of Robert Studivant Pages 65-66 lines 10-13).

57. Studivant did not know that Otero was a member of the Guardians in 1998-2000 although he knew at some point that he was a member but just does not know the time period. (Exhibit F Deposition of Robert Studivant Page 71-72 lines 18-9).

58. Studivant was not a member of the Guardians at the time he investigated the Santossio complaint. On July 22, 1996 he resigned from the Guardians and did not rejoin them until April 17, 2000. (See attached Exhibit N July 22, 1996 letter from Studivant to payroll requesting that deductions be stopped for Guardian dues and Dues Deductions Authorization dated April 17, 2000 authorizing that deduction dues for Guardian membership be started again).

59. Studivant decided to keep the Santossio matter himself for investigation rather then assign it to his staff because he felt that he should do it and because he kept controversial cases for investigation. The only other person that he thought could investigate the matter was Det Lynn Desarli but she

was already involved in a big case and she told Studivant that she did not

want the case because she was a friend with Otero. (Exhibit F Deposition of

Robert Studivant Pages 68-73 lines 11-15).

60. Studivant does not know whether or not there were other female officers in

the department that could have investigated the matter but the matter was

referred to OIA and had to be handled by OIA. Captain Karen Krasicky could

not have done the investigation because she was not assigned to OIA.

(Exhibit F Deposition of Robert Studivant Pages 73-74 lines 16-15).

61. Studivant listened to the tapes he received from Sweeney and he could hear

people talking but could not discern what they were saying. There was static

and he could hear traffic. (Exhibit F Deposition of Robert Studivant Pages 75-

76 lines 24-7).

62. A.J. Perez was an officer in the Bridgeport Police Department and was

assigned to OIA during Studivant's investigation into the Santossio matter. He

listened to the subject tapes and could not discern what was being said on

them. (Exhibit O Affidavit of A.J. Perez).

63. Studivant sent the tapes to the FBI approximately a week or two after he received them. (Exhibit F Deposition of Robert Studivant Page 267 lines 7-17).

64. Prior to sending the tapes over to the FBI Studivant remembers having a telephone conversation with Agent Kives and requested of Kives if he could take the tapes, clean them up and transcribe them. (Exhibit F Deposition of Robert Studivant Page 268 lines 13-17).

65. Other then the Daniels case, Studivant never had occasion to turn tapes over to the FBI or an outside entity. (Exhibit F Deposition of Robert Studivant Page 270 lines 13-18).

66. Agent Kives never spoke to Studivant about the preservation of the original tapes. (Exhibit F Deposition of Robert Studivant Page 271 lines 19- 22).

67. Studivant did not know whether it was a customary practice to reproduce tapes prior to sending them out to the FBI or other outside agency for transcription or clean-up. (Exhibit F Deposition of Robert Studivant Page 272 lines 7-14).

68. After the tapes were sent to the FBI several weeks went by and Studivant called Kives to determine the status of the tapes. Studivant learned that the

tapes had been sent to Quantico to be cleaned-up but that the FBI was unable to clean the tapes and that the FBI could not get any information off of them. When Studivant asked that the tapes be returned he learned that they had been destroyed because in order to clean them up the FBI had to take the actual tape portion of the cassette tapes off of the reel. (Exhibit F Deposition of Robert Studivant Pages 273 274 lines 11-3).

69. Studivant was shocked that the tapes were destroyed. He had no idea that in order for the tapes to be attempted to be cleaned-up that they had to be taken off of the reel and/or destroyed. Kives never told Studivant or explained that such was the process. (Exhibit F Deposition of Robert Studivant Pages 273-274 lines 11- 16).

70. After his conversation with Kives and right when he was concluding his investigation Studivant attempted to contact Kives to get something in writing to document what happened to the tapes. He was told that Kives had been transferred. (Exhibit F Deposition of Robert Studivant Page 275-276 lines 20-23).

71. Studivant had no idea that the tapes would be destroyed in the "cleaning-up process" and he had no idea or knowledge of the process utilized by the FBI

in attempting to clean-up tapes like the subject cassette tapes. If he did he would have taken every step to try to get them copied. (Exhibit F Deposition of Robert Studivant Pages 278-279 lines 18-2).

72. With respect to his OIA investigation Studivant interviewed people who Santossio expressed would have information in regard to what had transpired or her demeanor after what had transpired between her and Otero. She never mentioned that Studivant should interview Glenn Prentice. (Exhibit F Deposition of Robert Studivant Page 281-282 lines 22-5).

73. As part of his investigation Studivant interviewed Santossio, Otero, Charleen Panullo and he requested and received a report from Sheryl Biroscak. (Exhibit P complete OIA Report dated February 16, 1999).

74. When Studivant completed his investigation he determined that Otero violated several departmental rules, which could lead to his suspension, demotion or discharge. (Exhibit P complete OIA Report dated February 16, 1999).

75. After the OIA Report was completed on February 23, 1999 Chief Sweeney referred the matter to the Board of Police Commissioners for disciplinary

proceedings. (See Exhibit Q Chief Sweeney's referral dated February 23, 1999).

76. Under the Bridgeport City Charter, and the collective bargaining agreement between the City of Bridgeport and the police union, the Board of Police Commissioners assumes jurisdiction of disciplinary matters of an officer when there is the possibility of discipline for more than a 15 day suspension without pay. (Exhibit R Collective Bargaining Agreement between the City and Police Union Article 6 Section 3).

77. Prior to the Board of Police Commissioners commencing hearings on the charges filed against Otero, but after the matter was referred to the Board, the City of Bridgeport's Labor Relations Office attempted to settle the matter with Otero's union by entering into a purported settlement agreement dated August 17, 1999. (Exhibit S attached hereto the purported settlement agreement dated August 17, 1999).

78. The purported settlement agreement imposed discipline on Otero in the amount of seventeen (17) holidays. (Exhibit S the purported settlement agreement dated August 17, 1999).

79. With respect to the settlement agreement Acting Chief Hector Torres had no part whatsoever in the negotiations and ultimately the terms of the final agreement. Labor Relations Officer Lawrence Osborne, Director of Labor Relations Edmund Winterbottom negotiated the agreement with the police union's attorney, Harry Elliot. (See Affidavit of Lawrence Osborne attached hereto as Exhibit T). Acting Chief Hector Torres had no knowledge that a settlement agreement was being negotiated and first learned about it when labor relations personnel were in his office having his secretary type up a memo to be signed by the chief which would publish to the department the discipline that Otero was being given, as outlined in the settlement agreement, for his conduct in the matter with Santossio. (Exhibit E Deposition of Hector Torres pages 52-60 line 23-17).

80. Torres signed two memoranda notices that published the discipline imposed on Otero; the first dated August 23, 1999 and the second, an amended notice dated August 25, 1999 which, also included the department rules that Otero was found to be in violation of.  Torres was the one to "publish" to the department the discipline that was to be imposed on Otero pursuant to the settlement agreement and therefore was the messenger of the purported

settlement. (Exhibit U Memorandum notices attached and Exhibit A Deposition of Santossio page 125-127 lines 12-25).

81. Santossio has no facts or evidence that Torres was a participant in reaching the settlement agreement nor does she have any facts that by signing the notice posting the discipline that he did it to protect Otero. (Exhibit A Deposition of Santossio page 125-127 lines 12-25; 133–134 lines 21-21)

82. A dispute arose between the Board of Police Commissioners and the Labor Relations Office on who had the authority to impose the discipline. The Board refused to accept the loss of 17-holidays as punishment and held hearings into the matter. In fact, the loss of 17 holidays was never imposed on Otero and the Board commenced hearings into the charges brought against Otero in November 1999. (Exhibit A Deposition of Santossio page 128 lines 1-15; See Exhibit V transcript cover pages and last pages of the Board of Police Commissioners Inquiry along with Witness and Exhibit designations into the charges against Otero).

83. The Board of Police Commissioners held hearings into the Otero matter on November 3, 9, 10, 16, 29,1999 and December 1 and 13, 1999. (See Exhibit V) The transcript of the hearing totals 750 pages and Cathy Santossio, Chief

Thomas Sweeney, Deputy Chief Michael Kozlowski, Charlene Panullo,

Captain Robert Studivant, Deputy Chief Arthur Carter, Sgt. Glenn Prentice,

Sheryl Birosack and Sgt. Pablo Otero all testified. (See attached Exhibit V).

84. After the hearings were completed the Board rendered a written decision

dated April 4, 2000. The Board imposed the following discipline: Otero failed

to use good judgment and follow acceptable practices and principles while on

duty. His conduct violated Rules 1.1, 1.2, 1.5 4.2 and his actions tended to

contribute to the creation of a hostile work environment violating the City of

Bridgeport's sexual harassment policy. The Board suspended Otero for sixty

(60) days and during his suspension he was required to undergo at his own

expense sexual harassment training sufficient to satisfy the provisions of

Connecticut Gen Stat. δ 46a-54(15)(B). Otero was ineligible for promotion

from the rank of sergeant for one year and was required to successfully

complete retraining as required by the decision and Civil Service Commission

approval of his fitness and suitability for promotion in light of the findings

made by the Board. (See Exhibit W Final Decision of the Board of Police

Commissioners dated April 4, 2000).

85. Acting Chief Hector Torres never ordered Santossio to be transferred from her office located at Police Headquarters to the training academy located on the University of Bridgeport campus. Santossio was going through a difficult time because the Board of Police Commissioners was in the middle of its hearings into the Otero charges and because she expressed to Torres that she thought that she was being treated differently throughout the department. Therefore, Torres suggested to her that if she wanted to she could work out of the training academy for a temporary period of time until the whole matter blew over. It was a decision totally up to Santossio and she never went to the training academy. (Exhibit E Deposition of Torres page 95-98 lines 24-22)

86. If he wanted to transfer her Torres, as acting chief, could have ordered her to go to the training academy and this never happened. (Exhibit A Santossio deposition pages 145-146 lines 20-23).

87. Torres never told Captain Robinson that he was "gunning" for Santossio shortly after he became acting chief. (Exhibit E Torres deposition page 73 lines 6-19 and page 78, 79 lines 19-1 and see Exhibit X Affidavit of Former Captain Robert Robinson)

26

88.  Torres never told former Council Woman Mary Bruce that he was "gunning for the two white bitches on the fourth floor" and Ms. Bruce never told Santossio that Torres was gunning for her. (Exhibit E Torres Deposition pages 78-79).

89.  When he was acting chief Torres does not remember Santossio coming to him and specifically using the word "stalking" in reference to her claim that Otero was stalking her. However, he does remember her coming to him upset on several occasions and he instructed Deputy Chief Kozlowski and Captain Robinson to make sure that Otero's contact with Santossio was limited and that his contact to police headquarters was limited which could be effectuated because Otero was stationed out of the burglary squad in the City's east end and therefore, he did not have to be at headquarters on a regular basis. (Exhibit E Deposition of Torres page 91-95; Exhibit X Affidavit of Captain Robert Robinson).

90. The only times Santossio claims that Otero allegedly "stalked" her was in the property room in January 2000, regarding an incident when she was trapped in her car for 40-45 minutes because Otero was standing outside of police headquarters; and about an incident which occurred near Christmas 1999.

After she reported these events to Torres there were no other "stalking" events until just before November 20, 2002 and she has no evidence to support her claim that Torres did nothing about her complaints. (Exhibit A Deposition of Santossio page 88-90; 196-200 lines13-12).

91. On January 19, 1999 Prentice, in the presence of Chief Sweeney, referred to a civilian female employee of the police department as a "bitch" thereby violating the department slur policy. (See Exhibit B Deposition of Glenn Prentice page 167 lines 3-13 and Exhibit Z Personnel Complaint Police Department Form completed by Chief Sweeney).

92. Pursuant to Article 6 of the CBA a hearing before the Chief of Police or his designee was scheduled for April 22, 1999 on the Prentice matter. (Please See Exhibit AA Notice of hearing from Sweeney to Prentice dated 4-14-99).

93. Because Chief Sweeney was a witness to the events he could not hear the matter and designated Deputy Chief Carter to hear the matter and recommend any discipline if Prentice was found guilty of the charged conduct. (Exhibit D Deposition of Sweeney pages 117-124; Exhibit G Deposition of Carter pages 222-226).

94. Carter heard the matter and recommended to Sweeney a 5-day suspension for violating the department slur-policy. Carter had no authority to issue discipline. Such authority rested with Sweeney and Sweeney issued the discipline on July 14, 1999. (Exhibit D Sweeney deposition page 123 lines 5-23; Exhibit BB May 23, 1998 memo from Carter to Sweeney RE: Disciplinary Hearing of Sgt. Glenn Prentice; Exhibit CC July 14, 1999 Memo from Chief Sweeney to All Commands indicating discipline imposed against Prentice).

95. The 5-day suspension discipline was based, in part, on a past similar incident Office Killian a male officer called a female officer a "black bitch" and a 5-day suspension was imposed, which is similar to the discipline imposed on Prentice. (Exhibit G Deposition of Carter page 224-226 lines 20-17; Exhibit B Deposition of Prentice pages 216-217 lines 23-22).

96. Prentice has no evidence other then his, "firm belief" and "gut feeling" and in his "heart" he believes that the discipline imposed of 5 days was recommended by Carter and imposed by Sweeney because they knew that Prentice knew what had transpired between Santossio and Otero and that they wanted him to keep his mouth shut. (Exhibit B Prentice Deposition pages 175-176 lines 14-17; 186-187 lines 21-9).

97. Prentice testified in front of the Board of Police Commissioners on November 16, 1999. (See Exhibit V hearing transcript pages for November 16 and witness designations on that day).

98. Carter was not present when Prentice testified in front of the Police Commissioners and to this day is not aware of the content of Prentice's testimony and he has never read his testimony (Exhibit G Carter deposition page 230-231 lines 10-8; Exhibit H Affidavit of Carter).

99. Torres was not present when Prentice testified in front of the Board of Police Commissioners although he did become aware that he testified. He does not know the date that he testified and does not know the nature of his testimony, and never has read the transcript of his testimony. (Exhibit E Torres Deposition page 43-44 lines 18-7 and Exhibit DD Torres Affidavit).

100.    Prentice has no evidence that Torres or Carter even knew what he testified to in front of the Board of Police Commissioners. (Exhibit B Prentice Deposition page 190-191 lines 16-8).

101.    Further with respect to his entire equal protection claim Prentice is comparing himself to the other officers who were disciplined for making a racial or ethnic slur. (Exhibit B Prentice deposition page 269-270 lines 20-8);

When asked with respect to his entire equal protection claim who else is he comparing himself to Prentice testified that, "Well, I think I said earlier I didn't - - couldn't come up with any other specifics at this time." Then he was asked, "So nobody else?" and he answered "Not at this time, no." Prentice's equal protection claim is limited to only his allegations that he was treated differently from other officers who uttered a slur. (Exhibit B Prentice deposition page 269-270 lines 20-8).

102.     With respect to a claimed incident involving Prentice and a civilian employee Sheryl Biroscak which occurred in October 1998, Prentice has no evidence that Carter knew at that time that Prentice would be a witness in the Santossio matter and has no evidence that Carter knew that Santossio had confided in Prentice at that time about her incident with Otero. (Exhibit B Prentice Deposition pages 201-204 lines 3-18).

103.     Prentice has no first hand knowledge nor was he a witness of the claimed slurs uttered by Studivant, Officers Lambert, Kozlowski and Killian. (Exhibit B Prentice Deposition pages 226-231 lines 8-15).

104.     Prentice has no evidence to support his claim that Sweeney treated members of the Bridgeport Guardians differently then white officers and in

particular treated guardian member Daniels differently. (Exhibit B Deposition
of Prentice pages 242-243 lines 3-25; pages 244-245 lines 1-1).

105.     Prentice has no evidence to support his claim that Sweeney did not
give Studivant the correct tapes testifying that his "evidence" is "It's an
assumption. It's a possibility;" and he admitted that he has no specific facts to
support that claim. (Deposition of Prentice pages 245-246 lines 2-10).

106.     In March 2000 Lt Frank Santoro was the officer in charge of the police
department's sick and injury office. His job duties were, in part, to monitor the
attendance of officers to make sure that they did not violate the department's
sick and injury policy. (Exhibit EE Affidavit of Santoro).

107.     The department's sick and injury policy defined excessive sick/injured
leave as an absence from duty due to sick/illness in excess of five (5)
occasions in a continuously rolling (12) twelve- month period. Additionally any
officer who reports off-duty sick/injury for any reason, except for an initial line
of duty injury or medically verified old injury or hospitalization at any time, in
excess of five (5) instances within a rolling twelve (12) month period shall be
identified as chronically absent and such officer so designated will forego all
supplemental and extra duty outside overtime opportunities for the first thirty

(30) consecutive calendar days of such chronic absentee designation. (See
Exhibit FF Sick and Injury Policy section G and H).

108.    Prior to October 21, 2000 the City/ Bridgeport Police Department and
Prentice never had an agreement, which exempted the plaintiff from the
Department's chronic sick designation policy. (Exhibit EE Affidavit of Santoro
and Exhibit T Affidavit of Lawrence Osborne, Labor Relations Officer).

109.    On March 8, 2000 Prentice was designated as chronically sick
because he was absent for seven (7) instances between February 1, 1999-
January 31, 2000. (Please see Exhibit GG March 8, 2000 Memorandum from
Frank Santoro designating Prentice as chronically sick and See Exhibit EE
Affidavit of Frank Santora).

110.    On March 14, 2000 Prentice appealed his designation of chronic sick
to Chief Torres claiming that it was his understanding that the chronic
absence control policy was put in place to curtail abuse of sick leave
privileges and that because he had a well-documented illness his absences
from work did not constitute an abuse of the policy. (Please see Exhibit HH
Prentice Appeal dated March 14, 2000).

111.    Torres denied his appeal on May 8, 2000. (Exhibit II May 8, 2000 memo from Torres denying appeal).

112.    Prentice was designated as chronic sick once again on May 30, 2000. (See Exhibit JJ).

113.    Torres treated everyone the same under the sick and injury policy and he did not believe that there were any exemptions to the sick and injury policy for people who have certain medical conditions and that people with medical conditions were to be treated the same as healthy people under the policy. Some officers with health problems were being treated differently depending on who their immediate supervisor was. What the department was trying to do was to enforce the policy department wide, treat everyone the same way, remove decisions on the health conditions of officers from first line supervisors and have such decisions go through the grievance process as stated in the sick and injury policy and have decisions on these issues made by Labor Relations in conjunction with the Board of Police Commissioners. (See Exhibit E Torres deposition pages 176-183 lines 18-17; Exhibit EE Affidavit of Frank Santora and Exhibit DD Torres Affidavit).

114.     Officers Rudy Zaleta and Doris Carr both suffer from MS as does

Prentice and these officers, over the years, have been designated as chronic

sick under the department's sick and injury policy just like Prentice. (Exhibit

EE Affidavit of Frank Santora and Exhibit KK documents designating Officers

Carr and Zaleta as chronically sick).

115.     Prentice's grievance was settled October 31, 2000 and it was agreed

that the department would remove any and all discipline relating to his chronic

sick designation and to make him whole by paying him twenty hours of

departmental overtime that he missed. (Exhibit LL Settlement agreement).

116.     Part of Deputy Chief Carter's management style was that he would go

to and speak to all subordinates under his command  (from the top to the

bottom) and inquire about how things were going and if there were issues that

he should be made aware of.  He did not just do this with the individuals that

Sgt. Glenn Prentice supervised. (Exhibit H Affidavit of Carter).

117.     Acting Chief Torres made the decision to transfer Prentice from the

Clerk's Office to the Property Room where his position would be supervisor of

the property room. (Exhibit E Torres deposition pages 148-149 lines 13-13).

118.    When he made the decision to transfer Prentice into the property room Torres was not aware of the condition of the property room but was given information from Lt. Craw and Deputy Chief Kelly that the room needed immediate attention. (Exhibit E Torres deposition pages 149-150 lines 11-8)

119.    Torres became aware that in January 2000 Torres was asking for a transfer out of the property room because of a medical condition. Torres learned about this in January 2000 when Deputy Chief Kelly came to Torres explained to him that Prentice has MS and it would be in the Department's best interests not to keep him downstairs in the property room.  (Exhibit E Torres deposition page 152-153 lines 24-22).

120.    After Kelly came to Prentice Torres immediately accommodated Prentice and ordered that Prentice did not have to stay in the property room, that he could work out of the first floor with Sgt. Kirkland and that he could supervise his staff from upstairs to make sure they were completing their assigned tasks. (Exhibit E Torres deposition pages 152-154 lines 24-9).

121.    Lt Craw was Prentice's supervisor when Prentice supervised the property room and after Acting Chief Torres ordered that Prentice be given a work space on the first floor Lt Craw made certain that Prentice was provided

a work space in the records room located on the first floor of the department in a room that was well ventilated and one that had windows. (Exhibit NN Affidavit of Lt. Craw).

122.     Acting Chief Torres acted to remove Prentice even before he obtained any medical documentation on the issue. (Exhibit DD Affidavit of Torres).

123.     Moreover, in order to better clarify the situation and to make sure that Prentice was able to work certain hours and could go into the property room on occasion, Torres received medical documentation from his doctor, Dr. Peter McAllister and spoke to Dr. McAllister about Prentice's medical condition.  Torres was concerned about whether or not Prentice could have any contact with the property room and was concerned about the hours Prentice could work. After reviewing the medical letters and his conversation with Dr. McAllister Torres was assured that as long as Prentice's office was not located in the property room but was located in a well ventilated area, it would be alright to have Prentice supervise the two police officers in the property room and that the occasional entry into the room would be okay. (Exhibit DD Torres Affidavit; see attached hereto Exhibit MM medical reports from Dr. McAllister dated January 25, 2000 and February 17, 2000 and see

attached hereto Exhibit OO Memorandum from Torres to Deputy Chief Kelly dated February 28, 2000 clarifying Torres concerns and indicating that Prentices' doctor stated it was okay for Prentice to make occasional entry into the property room.)

124.     Plaintiff Santossio's deposition was taken in this case on November 20 and 22, 2002, and February 14, 2003. (See Exhibit PP Deposition cover sheets Santossio).

125.     Torres would speak to Santossio when the two were alone but when she spoke to him about Otero or the Board of Police Commission hearings he would have someone else with him. There were times when Cathy Santossio would come to Torres very upset at the events surrounding the Otero matter such as the hearings conducted by the Board of Police Commissioners. At those times he would have someone with him such as Charlene Panullo his secretary and a friend of Cathy to help console Cathy. He did not always have someone with him when he spoke to Cathy and Torres did not avoid her. There were times during a workday when Torres would have to speak with her alone  (Exhibit E Torres Depo pages 101-102; Exhibit DD Torres affidavit).

126.     Torres never witnessed Carter backing up against a wall and throwing his hands in the air when he walked past Santossio. (Torres deposition pages 100-101).

127.     Torres was aware that prior to assigning Santossio to Carter that the two did not have a good working relationship testifying that there were issues between the two, which arose long before he became chief. (Exhibit E Torres Depo pages 82-90). Torres recalled discussions between Carter, Chief Sweeney and Labor Relations about appropriate attire for civilian staff, which would include Santossio and that Carter had a concern about appropriate smoking areas in the department and that people were taking long periods of time to smoke and were disappearing from their work stations. These issues included Santossio because she was a smoker. These were the two "negatives" allegedly expressed by Carter to Torres, which would have included Santossio. (Exhibit E Deposition Santossio pages 82-90).

128.     When Torres became acting chief one of the reforms that he undertook was to create the deputy chief of planning position and reorganize the department so that all of the civilian positions, including Santossio's, would report directly to a deputy chief.  Carter assumed that position. Prior to the

reorganization many of the civilian employees who fell under the "planning" category in the department had been reporting to Carter when he was a captain. When Torres implemented the reorganization by creating the position of deputy chief of planning it made sense to him to have Santossio, a civilian employee who had been reporting directly to the Chief, be reassigned under the supervision of the deputy chief of planning, which was done. (Exhibit DD Torres Affidavit).

129.    The creation of the position of deputy chief of planning was undertaken after careful planning and was not done in anyway to retaliate against Santossio. In fact the plan took several months to implement. Torres was not authorized on his own to create the position of deputy chief of planning but was required to go through the proper approval procedures such as receiving the consent of the City's Chief Executive Officer, Dennis Murphy, the mayor's office, Office of Planning and Management approval and the City Council approval. Cathy Santossio's transfer to the supervision of Deputy Chief Carter was done as part of the reorganization plan implemented by Torres. (Exhibit DD Torres Affidavit).

130.    Although Torres knew that Carter and Santossio had issues with each other he believed that it was not personal but on an operating level. When he became chief he implemented the reorganization and therefore, not only did Santossio report to Carter so did the other civilian employees in payroll, the clerk's office, crime analysis and the training academy. (Exhibit DD Torres Affidavit).

131.    Carter recognized Santossio's contribution to the policy and procedure committee. Her input on the committee was as welcome as anyone else and she was very good with computers, she was very good with the English language and was good with putting down everything on paper making sure the verbiage and language was correct. (Exhibit G Carter deposition pages 91-94) . Santossio admitted that when she was given a policy/procedure draft, although she would not change the actual policy she would rearrange the words to make the policy more readable, Carter and Krascicky would review what she did and they would accept the changes. (Exhibit A Santossio deposition pages 191-192).

132.    Carter never held his arms and hands in the air and backed-up against the wall when he and Santossio would pass each other. (Exhibit H Carter Affidavit)

133.    Santossio never reported to Torres or to the City's Labor Relation office that Carter would hold his hands and arms up in the air and back up against the wall when the two would pass each other in the hallway. (Exhibit A Deposition of Santossio page 111-113).

134.    During the entire time from the date of the alleged incident between Otero and Santossio in August 1998 up until August 2000 Cathy Santossio did not suffer any loss of pay, benefits, change in job title, or loss of facilities for her to conduct her job.  Moreover she did not lose promotional opportunities because she was in a position that did not enable her to seek promotional opportunities within the police department; and her salary increases and benefits were determined by her union's collective bargaining agreement it had with the City. (Exhibit DD Torres Affidavit). Santossio never applied for another job after August 5, 1998 and she has no evidence that she lost career opportunities because of the defendants. (Exhibit A Santossio deposition pages 397-399 lines 8-9).

135.    Santossio admitted that she did a poor job in turning in her time sheets
in a timely manner and Carter asking for the time sheets was not part of the
harassment, intimidation or retaliation claim. (Exhibit A Santossio depositions
pages 97, 98; 227-228 lines 22-9).

136.    On one occasion Carter made Santossio fill out a sick report because
he believed that she was required to do so pursuant to department policy.
(Exhibit H Carter Affidavit). After having a meeting with Santossio's union
representative, Greg Osipow, Carter discovered that civilian employees
working in the police department were not required to fill out sick reports and
from that point on Carter never made Santossio fill out a sick report. (Exhibit
H Carter Affidavit).

137.    Sweeney removed Otero from the third floor approximately the second
week of October 1998 which is within a month of Santossio reporting the
matter to Sweeney. (Exhibit D pages 88-89 lines 25-25).

138.    Sgt. Pablo Otero did not supervise Cathy Santossio and held no
supervisory authority over her. (Exhibit DD Torres Affidavit).

139.    Prentice suffered no adverse employment action after he was
transferred to the property room. His rank in the department did not change

43

because he was still a sergeant and was still in a supervisory position. This is
so because like his assignment as department clerk where he supervised
employees he also supervised employees assigned to the property room.
When Prentice was transferred his salary remained the same and although
he may have lost some overtime opportunities after his transfer from the
clerk's office, he still could have requested the overtime in the property room.
Moreover, his benefits stayed the same after the transfer and he did not lose
any promotional opportunities after his transfer. (Exhibit DD Torres Affidavit)

140.     Santossio has no evidence that if Studivant interviewed other
employees on the third-floor it would have changed the results of the OIA
investigation. Santossio never asked Studivant to interview certain employees
located on the third floor. (Exhibit A Santossio Deposition pages 403-407).

141.     Santossio was not a trained police officer. She never took any
criminology courses while in college and the only research that she ever did
on police procedure and policy was to obtain from the Internet the
International Association of Chiefs of Police on line policy and procedures,
and she has studied the New York Police Department Patrol Guide. (Exhibit A
Santossio Deposition pages 191-194).

142.    Plaintiffs common law claim is based on intentional infliction of emotional distress. (Exhibit QQ).

143.    It is not City of Bridgeport policy to sanction sexual assault, harassment or discrimination and in 1998 the City had a sexual harassment policy that was distributed to all employees. (Affidavit of Edmund Winterbottom Exhibit RR)

THE DEFENDANTS

BY: _____
John R. Mitola
Associate City Attorney
Office Of The City Attorney
999 Broad Street
Bridgeport, Connecticut 06604
Telephone No.: (203) 576-7647
CT FED BAR NO.: 04017

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, to Susan King Shaw, Esq., King & Shaw, 94 Prospect Street, 1st floor, New Haven, Connecticut 06511 and Thomas W. Bucci, Esq., Willinger, Willinger & Bucci, 855 Main Street, Bridgeport, Connecticut 06604, on this 4th day of November, 2003.

_____
John R. Mitola
Commissioner of the Superior Court