Later on in her testimony on this issue she states: "Yes" to the question that she wanted a female to interview her for the comfort level. (Exhibit A Santossio Deposition pages 185 lines 6-19). Simply put, the evidence proffered by plaintiff- that Studivant would not assign a female investigator on the case because he wanted to protect Otero a fellow guardian member- is wholly insufficient, as a matter of law, to support her claim that Studivant intentionally violated her right to equal protection. Moreover, plaintiff's claim that she would have been more comfortable having a female investigator investigate the matter is not evidence that Studivant's refusal to appoint a female was an intentional act on his part to violate her right to equal protection to be free from a sexual harassment/discrimination in the workplace. As indicated above, the Supreme Court has repeatedly emphasized that Title VII is not to serve as a general civility code for the American workplace and that the conduct at issue must be extreme to amount to a change in the terms and condition of employment. _Faragher v. City of Boca Raton_, 524 U.S. 775 (1998).  The fact that Santossio might have been more comfortable with a female investigator is simply not actionable.

Additionally, on this issue plaintiff claims that Studivant wanted to keep this case himself because he was a member of the Guardians but recites no facts to

31

support this claim other then the fact that when she requested a female investigator

he said no that he wanted to keep the matter for himself. (Exhibit A Santossio

Deposition pages 183-184). Plaintiff went on to testify that Studivant wanted the

case for reasons other then his investigative abilities apparently claiming that since

Studivant and Otero were both Guardians, Studivant wanted to be the sole

investigator in this case so that he could protect Otero, and the thing that he did to

protect him was the failure to copy the tapes. The evidence that plaintiff relies on to

support this claim is because Studivant was a Guardian. (Exhibit A Santossio

Deposition pages 183-184).  When asked what evidence she has that he wanted the

case because he was a Guardian she testified that under his watch the tapes were

destroyed, implying that Studivant wanted to keep the investigation himself so that

he could help/protect Guardian member Otero. (Exhibit A Santossio Deposition 186-

188). This argument makes no sense for several reasons and there exists no

genuine issue of material fact that plaintiff cannot sustain this claim.  First at the time

Studivant assumed control of the investigation he was not even a member of the

Guardians, which is the entire basis of plaintiff's claim. On July 22, 1996 Studivant

resigned from the Guardians. (Statement of Facts 57-58).  He did not rejoin the

Guardians until April 17, 2000. (Statement of Facts 57-58).   Studivant's investigation

into the Otero matter occurred in late 1998 into February 1999 when he was not even a member of the Guardians. Also Studivant did not know that Otero was a member of the Guardians in 1998-2000. (Statement of Facts 56). For these reasons alone the argument must fail. Secondly, even if Studivant was a member of the Guardians this claim must fail because, as stated above, it assumes that when Studivant sent the tapes to the FBI he knew that they were not going to be able to be cleaned-up and that they were going to be destroyed. As demonstrated above, the plaintiff has no evidence to prove such a claim.

Finally with respect to Studivant, plaintiff claims that he violated her equal protection rights by conducting a deficient OIA investigation because he did not interview and/or canvass all of the employees on the third floor where Santossio worked. (Exhibit A Santossio Deposition Pages 403-406). In her deposition testimony plaintiff contends that Studivant should have interviewed two of the Department's payroll employees Andrea Hubiscka and Candy Morales, Irene Sagalsky of accounts payable /receivable and Glen Prentice. (Exhibit A Santossio Deposition Pages 403-406). When asked how this would have changed anything with respect to the investigation she states that she does not know. (Statement of Facts 140). Therefore plaintiff offers no testimony on how the failure to interview

these individuals violates her rights to equal protection of the laws by being an intentional act on behalf of Studivant to harass and discriminate against her based on her sex. Part of the proof in a δ1983 claim is that plaintiff must prove that the defendant's acts were a proximate cause of the injuries sustained. Proximate cause means that there must be a sufficient casual connection between the act or omission of a defendant and any injury or damage sustained by the plaintiff. *Grivhan v. Western Line Consolidated School District* 439 US 410 (1979). There is no evidence in this matter that interviewing these individuals would have changed anything with respect to the OIA investigation or how such an act injured the plaintiff. The underlying event, which spawned this suit, was the incident that occurred between Otero and Santossio on the fourth floor of the police department, which occurred on August 5, 1998. The individuals who were interviewed by Studivant (Santossio, Otero, Carter, Sweeney, Panullo) presumably had information about the event or events that occurred shortly thereafter. Moreover, Santossio herself never asked Studivant to interview those individuals whom she believed might have had knowledge of the events. (Statement of Facts 140).

    **c. Arthur Carter**

34

In support of her claim that defendant Arthur Carter violated her right to equal protection of the law by engaging in sexual harassment/ discrimination against her, plaintiff claims that Carter's retaliation for filing a complaint was that he treated her like a "Typist I" claiming that because she has a background in English and has a command of the English language she believed that she was capable of assisting the department in creating police policies that would go beyond the standards currently used in the department. (Exhibit A Santossio Deposition Pages 153-154 lines 10-3). Instead she claims that Carter only allowed her to make English and grammatical corrections to the policy and procedure manual rather then allowing her to get deeply involved in what the actual policy and procedure should be. (Exhibit A Santossio Deposition pages 153- 154 192-193). When asked what specific evidence plaintiff has that Carter reverted her to a Typist I she claims that was the only work that she was given, i.e. inputting policy and procedure into the computer. She claims that she was not allowed to attend meetings as part of the policy committee. (Exhibit A Santossio Deposition pages 189-190). Plaintiff contends that the committee was suppose to be made up of her, Captain Karen Krascicky and Carter and that the only meetings she was allowed to attend were actual typing procedure meetings. (Exhibit A Santossio Deposition page 190). When asked at her

deposition what experience or background she had that would allow her to give opinions on what specifically should be in a police procedure and policy manual she stated her ability to do research. However plaintiff admitted that she was not a trained police officer, that she never took any criminology courses while in college and that the only thing she had previously done in this area was study the International Association of Chiefs of Police on line policy and procedures and she has studied the New York Police Department Patrol Guide. (Statement of Facts 141).

Carter relied on plaintiff's ability to write clearly and relied on her to take what the professional officers did with respect to coming-up with a policy and procedure, and put it down on paper into clear concise English. (Statement of Facts 131). In fact plaintiff admitted that Carter relied on her ability to make the policy a better read because when she was given a policy/procedure draft, although she would not change the actual policy she would rearrange the words to make the policy more readable, Carter and Krascicky would review what she did and the would accept the changes. (Statement of Facts 131).

This complaint by the plaintiff does not support her claim that Carter intentionally violated her equal protection rights by engaging in sexual

discrimination/harassment against her. First the action of Carter, even if true, does not rise to a hostile work environment but is nothing more then a supervisor requesting that the employee he is supervising conduct her job a certain way. Carter recognized Santossio's writing strengths and requested that she take the policy and procedure that he and Krascicky came-up with and make it more readable. (Statement of Facts 131). Once again plaintiff has no evidence on this issue to support her claim that because of Carter's conduct she suffered an adverse employment action. Her job title, benefits, pay, and work conditions stayed the same. (Statement of Facts 134). Moreover, there can be no adverse employment action under this claim because by her own admission, plaintiff is not a police officer, has no training as a police officer and never took any classes in criminology while in college which might qualify her as one who had the expertise to draft police policy and procedure. (Statement of Facts 141). Simply put, only the plaintiff believed that she was qualified to create policy and procedure. One of the elements that the plaintiff must prove to show disparate treatment denying her equal protection is that she was qualified for the position at issue. _Annis v. County of Westchester_, 36 F. 3d 251, 254 (2nd Cir. 1994). By her own admission she was not qualified to draft a police policy and procedure manual because she had no background or expertise in

such an area. (Statement of Facts 141). Therefore, she cannot establish her claim

because she was not qualified to do the work she claims Carter prevented her from

doing. Moreover, plaintiff apparently is upset that Carter wanted her to do the job

that she was qualified to do, take what Carter and Krascicky did on the policy and

procedure manual and using her English background, make it readable and

grammatically correct.  This is not an actionable claim because Title VII is not

intended to serve as a general civility code for the American workplace (i.e. to

protect hurt feelings).  *Onacle v. Sundower Offshore Servs. Inc.* 523 US 75 (1998).

Plaintiff also claims that Carter violated her rights to equal protection of the

laws because when the two would pass each other on the third floor of the

department he would hold his arms and hands up in the air and back-up against the

wall, and that he did not want to be in the same room with her alone. (Exhibit A

Santossio Deposition pages, 27, 11-114, 195). Carter vehemently denies that these

things occurred (Statement of Facts 132); but assuming *arguendo* that they are true,

such conduct is not harassment that was sufficiently server or pervasive to alter the

conditions of plaintiff's employment and create an abusive working environment.

*Harris v. Forklift System Inc.* 510 US at 21. At best such incidents were episodic and

the law requires that they must be more then episodic and must be sufficiently

continuous and concerted in order to be deemed pervasive. *Faragher* 118 St. Ct. at

2283. Occasional episodes of harassment will not merit relief under Title VII. *Id.*

*Tomika v. Selier Corp.* 66 F.3d 1295, 1305 n. 5 (2nd Cir. 1995).  Teasing, offhand

comments and isolated incidents, unless, extremely serious, will not amount to

discriminatory changes in the terms and conditions of employment.  Moreover,

based on her own testimony plaintiff did not perceive the conduct of Carter to be

pervasive because she never complained about them to either Chief Torres or the

City's Labor Relations Office. (Statement of Facts 133). In *Alfano v. Costello et, al*,

294 F. 3d 365 (2002), the Court held that the plaintiff's claim of twelve separate

incidents were insufficient as a matter of law to meet the threshold of severity or

pervasiveness required for a hostile environment claim. *Id.* at 376.  Four of the

twelve incidents were of no weight whatsoever and the Court determined that there

were only five sex-related incidents spanning over four years. *Id.* at 378. There is no

fixed number of incidents that a plaintiff must endure in order to establish a hostile

work environment; rather the court views the circumstances in their totality

examining the nature severity and frequency of the conduct. *Id.* However comparing

what plaintiff claims Carter did in this case (backing up against the wall throwing his

arms and hands in the air when the two passed each other in the hallway) with

recent case law where the courts have dismissed hostile work environment claims

for insufficiency of evidence it is clear that in the cases that were dismissed the acts

were more severe then the claims in the present case. In each of the following

cases, the evidence was held insufficient as a matter of law to alter the terms and

conditions of employment: _Quinn v. Green Tree Credit Corp._, 159 F.3d 759, 768 (2d

Cir. 1998)(an appreciative comment about plaintiff's buttocks and a

deliberate touching of her breasts); _Celestine v. Petroleos de Venezuella SA,_ 266

F.3d 343, 354 (5th Cir. 2001)(in a twenty-five-month period, eight incidents of

alleged racial harassment); _Shepherd v. Comptroller of Pub. Accounts_, 168 F.3d

871, 872-75 (5th Cir. 1999) (in a two-year period, co-worker made impertinent and

intimate observations about plaintiff's anatomy, attempted to look down her shirt, and

touched her multiple times); _Black v. Zaring Homes, Inc._, 104 F.3d 822, 823-24 (6th

Cir. 1997) (in a four-month period, repeated sexual jokes, and at least five other

sexually offensive remarks); _Baskerville v. Culligan Int'l Co._, 50 F.3d 428, 430-31

(7th Cir. 1995) (in a seven-month period, nine sexually offensive incidents, including

repeated references to plaintiff as a "pretty girl," grunting noises when she wore

leather skirt, and one episode of simulated masturbation); _Hocevar v. Purdue

Frederick Co._, 223 F.3d 721, 735-36, 738 (8th Cir. 2000)(in a three-year period,

several sexually derogatory remarks about women by one or more men, a sexual advance at a company dance, disruption of plaintiff's presentation by talking followed by comment on her legs, and a lascivious remark in a group setting by a company official predicting his sexual conquest of three female employees); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1365-66 (10th Cir. 1997)(in a sixteen-month period, five sexually offensive statements, including one made while harasser had his arm around the plaintiff and was peering down her dress); *Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1261-63 (10th Cir. 1998) (in a three-year period, harasser made remarks concerning plaintiff's bra strap, her underclothing, and whether she had sexual dreams; claimed sexual conquest of another woman employee; made pornographic architectural analogies; and took the plaintiff to a Hooter's restaurant on business travel (six total incidents)); *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1248-49 (11th Cir. 1999) (in an eleven-month period, harasser once made inappropriate physical contact, made one arguably offensive statement, and several times made disgusting noises while staring impertinently), cert. denied, 529 U.S. 1068, 146 L. Ed. 2d 483, 120 S. Ct. 1674 (2000);  see also *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 753-54 (4th Cir. 1996); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361-62 (7th Cir. 1998). Simply put, the conduct of Carter if

true, (which is denied) compared to the above cited cases, is insufficient as a matter of law to establish a hostile work environment that altered and changed the conditions of plaintiff's employment.

Plaintiff further contends that Carter violated her rights to equal protection by testifying falsely at the Board of Police Commissioner hearings on the Otero matter in an effort to protect Otero. (Exhibit A Santossio Deposition pages 92-94, 219, 222). Specifically, plaintiff claims that Carter testified that he went to the fourth floor of the police department at the time Santossio and Otero were in the storage room on the day of the incident and he testified that he saw Otero exit the storage room first. Plaintiff claims that this testimony protected Otero because she claims that at the time of the incident between her and Otero, Otero was in the process of pulling his pants up and putting his light blue shirt back into the zipper of his pants and it was at that point that she left him and got away; (Exhibit A Santossio Deposition pages 92-94, 91-94) and that there was no way that he exited the storage room first. This claim does not support plaintiff's claim that her rights to equal protection were violated by the creation of a hostile work environment for several reasons. First Captain Carter did not testify at the Board of Inquiry that Otero walked out of the

room first as plaintiff contends. When asked at the Board of Inquiry where did he first

see Otero and Santossio he testified:

> "In the doorway of the back hall. Kinda in the—right in the doorway. The
> thresh--- thresh panel. Sergeant Pablo, to the best of my recollection, was
> slightly forward of Miss Santossio."

> When asked was Otero closer to him he answered, "Yes." (Statement of
> Facts paragraph 19 referring to Carter's Board of Police Commissioners
> testimony Exhibit J).

What plaintiff claims Carter testified about is incorrect. He did not testify that

Otero walked out of the storage room first but testified that he saw Otero and

Santossio together and Otero was standing slightly ahead of her. For this reason

alone her claim has no merit because her premise, that Carter testified that Otero

walked out of the room first is not true.

Additionally assuming that Carter testified the way Santossio claims, the

plaintiff has no evidence that the testimony given by Carter was testimony that was

intentionally given for the purpose of violating the plaintiff's right to equal protection.

To establish a violation of the equal protection clause under a $\delta$ 1983 claim the

plaintiff must prove that there was a discriminatory intent or purpose. *Arlington

Heights v. Metropolitan Housing Dev. Corp.* 429 US 252, 265 (1977). Plaintiff

testified that she believed that Carter was lying on purpose to protect Otero and

when asked what she based this on she stated "I'm basing it on the truth" meaning

her testimony that she walked out of the storage room first. (Exhibit A Santossio

Deposition page 94, 95). This is the only evidence provided by the plaintiff that she

believed Carter intentionally lied to protect Otero. However, plaintiff admitted that if

in fact it was true that she came out of the storage room first and that Carter

remembered it differently that he could have been mistaken as opposed to

intentionally testifying falsely. In other words, plaintiff by her own testimony,

confirmed that she has no evidence that Carter intentionally testified falsely by virtue

of the fact that he may have been mistaken. In fact plaintiff admitted that there were

several inconsistencies with her own testimony in front of the Board of Police

Commissioners and that she did not testify that way on purpose. (Statement of Facts

19). Simply put by her own admission there is no evidence that Carter intentionally

testified falsely to protect Otero.

Additionally, this claim is not cognizable because Carter's testimony that he

gave at the Board of Inquiry on November 29, 1999 essentially mirrors what he told

Chief Sweeney in his statement to Sweeney dated September 21, 1998 and there is

no genuine issue of material fact that when he gave Sweeney his statement of what

he witnessed he had no idea that Santossio filed a complaint against Otero.

44

(Statement of Facts 17-20). Plaintiff's claim in this area is that Carter was aware that Santossio filed a complaint against Otero and testified falsely at the Board of Police Commissioners in November 1999 to protect Otero and that he fashioned his testimony in such a way to protect Otero. However, this claim fails by virtue of the fact that Carter gave the same version of what he witnesses in his statement to Chief Sweeney on September 21, 1998 when he had no idea that Santossio filed a complaint against Otero. (Statement of Facts 17-20). The first time that Carter gave his version of the events in question was at the request of Chief Thomas Sweeney in September 1998 when Sweeney was doing his investigation into the matter. (Statement of Facts 17-20). Chief Sweeney requested that Carter give a report on what he saw on the fourth floor on the day of the incident between Otero and Santossio and he submitted the report the day after the request. (Statement of Facts 17-20). The report is part of Chief Sweeney's investigation into the matter (Statement of Facts 17-20 and copy of the report dated September 21, 1998 Exhibit I). When asked at his deposition if Sweeney gave Carter any indication of why he was asking for a report of what he saw on the fourth floor Carter testified, "None, whatsoever, none." Further when he was asked if he was curious as to why Sweeney was asking him to submit a statement he testified that he was:

"Kind of curious and a little nervous too. First thing that came to my mind is what did I do? I was wondering why because he never asked me to do anything like that before. So I was wondering, was there something I did that he know about that I'm not aware of or I forgot? You know, that was the first thing. I had no idea what it was about." (Statement of Facts 17-20 Carter Deposition pages 117-120).

Simply put, at the time Carter gave his initial report on what he witnessed he had no idea that Santossio filed a complaint. This is important because a year later at his Board of Inquiry testimony he testified about what he saw and that testimony essentially mirrors what he told Chief Sweeney in his initial statement in September 1998 therefore, there could be no fashioning of his Board testimony to protect Otero. Carter reported to Sweeney that when he first saw Santossio and Otero they were "standing in the doorway at the far end of the hall way." At the Board Carter testified that the two were together in the doorway thresh panel and Otero was slightly ahead of Santossio. These two accounts mirror each other and dispel plaintiff's claim that Carter lied to protect Otero. (Statement of Facts 17-20).

Finally plaintiff cannot prevail on this issue because a disparate treatment claim requires a showing of an adverse employment action; _Karibian v. Columbia University_ 14 F.3d 773, 778 (2nd Cir. 1994) and there is no evidence in this matter of any link between the claimed discrimination and some tangible job benefits. As

46

stated numerous times above the plaintiff incurred no loss in this area. (Statement of Facts 134).

Finally, Santossio claims that part of the harassment submitted upon her by Carter was that he would request that she turn in her time sheets and that she lost a week's vacation because he mishandled them. (Exhibit A Santossio deposition pages 97-104 147-150); and that he made her fill-out, on one occasion a sick report which she was not required to do so. (Santossio deposition pages 97, 104-108).

With respect to the time sheets plaintiff claims that Carter would ask her to turn in her time sheets and that she failed to do that in a timely fashion, which required Carter to remind her to turn in the sheets. (Statement of Facts paragraph135). In fact plaintiff admitted at her deposition that she did a poor job in turning in her time sheets in a timely manner and she admitted the fact that Carter requesting the time sheets was not part of the harassment, intimidation or retaliation claim. (Statement of Facts paragraph 135). To the extent that plaintiff pursues this claim summary judgment should enter because by her own admission Carter asking for the time sheets was not part of the harassment intimidation and retaliation.

Additionally with respect to the sick report claim this is not actionable because it only occurred on one occasion. It is true that Carter made Santossio fill out a sick

report because he thought that she was required to do so pursuant to department policy. However after having a meeting with her union representative Carter learned that civilian employees in the Department were not required to fill out sick reports and he never required her to do it again. (Statement of facts 136). This one fact, as a matter of law, even if done intentionally by Carter is not enough to establish a pervasive hostile work environment.

### d. Thomas Sweeney

The plaintiff Santossio alleges three claims against Thomas Sweeney to support her claim that he violated her rights to equal protection. The first is that he failed to make sure that the subject tapes that she turned over to him were preserved; the second claim is that once she filed a complaint against Otero Sweeney did not immediately remove him from the third floor; and finally that he conducted in an incomplete and untimely investigation. (Exhibit A Santossio Deposition pages 164, 180-181; 292-294; 182, 212-213, 279-280, 285 417-418; 165, 254).

First with respect to her claim that Sweeney performed an incomplete and untimely investigation the Court is referred to defendants Statement of Facts which document the steps Sweeney took to investigate the matter and Santassio's own

48

admission that she had no problems with his investigation. (Statement of Facts paragraphs 10-38). By her own admission Santossio admits that in a one month period Sweeney did a lot of work in his investigation and that she has no problems with what he did. (Statement of Facts paragraphs 38-39). To the extent that plaintiff pursues this claim summary judgment should be granted in favor of Sweeney.

Plaintiff also claims that Sweeney failed to preserve the subject tapes. This claim must fail because plaintiff has no evidence to support this claim and the evidence is undisputed that he turned the tapes over to Captain Studivant and in an effort to determine what was on the tapes suggested to Studivant that he turn the tapes over to the FBI to get them cleaned-up. (Statement of Facts Paragraph 55). When Sweeney received the tapes he broke the seal on them so that they could not be recorded over and by her own admission plaintiff saw him place the tapes in an evidence bag. (Statement of Facts paragraph 29). When asked what evidence she had to support her claim that Sweeney intentionally failed to preserve the tapes and did not take steps to make sure they were preserved she testified other then the fact that they no longer exit she has no evidence. (Statement of Facts paragraph 29). Moreover plaintiff admitted that she has no evidence that Sweeney believed or thought that Studivant was not capable of preserving evidence. (Statement of Facts

paragraph 29 and 55)  Simply put this is not enough to sustain her claim that Sweeney's conduct intentionally violated her right to equal protection by creating a hostile work environment.

Finally Santossio claims that Sweeney created a hostile work environment by failing to immediately transfer Otero from the third floor once she filed her complaint. The evidence in this case indicates that Sweeney removed Otero from his position approximately the second week of October 1998 shortly after Santossio's complaint was filed. (Statement of Facts paragraph 137). It is submitted to this court that this fact does not prove that Sweeney's action contributed a hostile work environment.

For the above stated reasons summary judgment must enter for the moving defendants on plaintiff's equal protection claim.

### 2. Free Speech claims

Plaintiff Santossio also claims that the defendants violated her rights to free speech by retaliating against her for filing the complaint against Otero and she cites to all the claimed facts that support her violation of her equal protection claim as the facts to support her free speech claim. (Exhibit A Santossio deposition page 175, 182-183; 189-195; 196).

The free speech claim must fail for all the reasons set-forth under the analysis of the claimed "facts" that plaintiff offers to support her equal protection claim. Simply put there is no genuine issue of material fact that most of the "facts" plaintiff relies upon did not happen as she claims.

Additionally, under the law, plaintiff does not have a free speech claim because the speech that she is complaining about-her filing a complaint with the Department on Otero's conduct is not protected speech under a free speech analysis.  To advance a claim that plaintiff was retaliated against for exercising her free speech rights she must prove: 1. That her speech was constitutionally protected; 2. That she suffered an adverse employment decision; and 3 a casual connection exists between her speech and the adverse employment determination against her so that it can be said that his speech was the motivation factor. *Morris v. Lindau,* 196 F.3d 102, 110 (2nd Cir 1999). In the present case the speech at issue is not protected speech and therefore, the plaintiff cannot prove the first element cited above.  A claim of first amendment retaliation by a public employee is only established when the plaintiff's speech can be fairly characterized as constituting speech on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983). The question of public concern is a matter of law for the judge to decide and its

resolution depends upon the time, place and context of the speech. *Id at 147- 148.*
*O'Brien v. City of Greers Ferry,* 873 F. 2$^d$ 1115 (8th Cir. 1989). Speech pertaining to
internal personnel disputes and working conditions ordinarily will not involve matters
of public concern. See *Connick* at 148; *Hellstom v. VA,* 46 Fed. Appx. 651; 2002
U.S. Lexis 18473 (2nd Cir. 2002).   The speech at issue here is Santossio's internal
complaint she filed with her employer about an event that happened at work, i.e. the
incident that she had with Otero on August 5, 1989. It therefore is not protected
speech under the First Amendment because it does not involve a matter of public
concern. As such her claim here is not actionable.

   Moreover even if it can be argued that the speech involved a matter of public
concern plaintiff did not suffer any adverse employment action as a result of the
claimed conduct. As stated above, during the whole time at issue she kept her job,
her pay and benefits did not change; she was provided the same work facilities that
she always had prior to her complaint and she was not denied any promotional
opportunities because the nature of her job does not offer her promotional
opportunities within the police department. (Statement of Facts paragraph 134).

   **3. Due Process**

It is entirely unclear based on the facts that plaintiff alleges how defendants have violated her rights to due process. Under the law, property interests are not created by the Constitution but, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents v. Roth* 408 US 564, 577 (1972). Under the law, ordinarily, due process requires that a state or local government afford persons some kind of hearing prior to depriving them of a significant liberty or property interest. *Hodel v. Va. Surface Mining & Reclamation Association*, 452 U.S. 264, 299 (1981). It is unclear what property right Santossio claims that defendants deprived her and moreover, it is unclear what in the way of a hearing that the defendants were required to give her to satisfy her rights to due process. It is clear from the evidence in this case that Santossio was a complainant and that she was not a target to any investigation. Summary judgment must enter on plaintiffs due process claims.

### B. Summary Judgment on Glenn Prentice Claims

Plaintiff Glen Prentice claims under δ 1983 that defendants engaged in retaliation against him because of testimony he gave in favor of Santossio and

because of his close relationship that he had with her thereby violating his constitutional rights to equal protection of the laws, free speech and due process of the laws. Under a δ 1983 claim a plaintiff must prove: 1. That the conduct complained of was committed by a person acting under color of state law; 2.That the conduct deprived the plaintiff of rights privileges or immunities secured by the Constitution or laws of the United States; and 3.That the defendant 's acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff. *Authority Parratt v. Taylor* 451 US 527 (1981); *Eagleston v. Guido* 41 F. 3d 865 (2nd Cir. 1994). Under a δ 1983 claim a plaintiff must also prove that the defendant acted intentionally or recklessly. If the acts were merely negligent then even if the plaintiff suffered injuries as a result of the acts, the defendant prevails. *Daniels v. Williams* 474 U.S. 327 (1986).

In this case there is no dispute that the defendants Torres, Carter, Studivant and Sweeney were acting under the color of state law as sworn police officers for the City of Bridgeport. However there exists no genuine issue of material fact that the defendants did not deprive Prentice of his constitutional rights to equal protection, free speech and/or due process. This is so because the claimed "facts" asserted by Prentice do not support his the legal claims.

In order for this Court to understand what Plaintiff Prentice claims are the "facts" that support his action, a review of those facts is necessary.

### 1. Claims Against Studivant

First Prentice claims that defendant Robert Studivant acted in a manner to destroy the micro-cassette tapes that Santossio made of Otero and that if the tapes had not been destroyed he claims that he would not have had to testify before the Board of Police Commissioners and that everything that happened to him thereafter (his claims of retaliation) would not have occurred. (See B Prentice Deposition page 81-82). (See Statement of Facts paragraphs 23-30,36,41,55,61,62-70 for the facts concerning Santossio tapes).  Prentice claims that this conduct by Studivant, his failure to preserve the tapes prior to sending them out to the FBI, was part of the retaliation inflicted against him by Studivant and if the tapes had been preserved he never would have had to testify in front of the Board of Police Commissioners.

### 2. Claims Against Torres

Prentice also claims that his rights were violated when Torres decided to transfer him to the property room and notified him of that decision shortly after he

gave testimony in favor of Santossio in front of the Board of Police Commissioners. (See Exhibit B Prentice deposition page 83-86). Plaintiff claims that the transfer to what he considered an undesirable assignment was nothing more then retaliatory action on the part of Torres and Carter to punish him because of his testimony. Prentice also claims that his rights were violated because when he was transferred to the property room he requested a reasonable accommodation because of his health which he claims was never acted on by Torres. (Exhibit B Prentice Deposition page 87, 99-107).

Prentice also claims Torres violated his rights because of Torres' alleged involvement in a settlement agreement on the Otero charges where Otero received discipline consisting of a loss of 17 holidays for his conduct with Santossio. After OIA completed its investigation into the matter, and wrote its February 23, 1999 report, Studivant determined that Otero violate several departmental rules which could lead to his suspension, demotion or discharge from the department. (See Statement of Facts paragraph 74). After receiving the final OIA report, Chief Sweeney referred the matter and charges over to the Board of Police Commissioners for disciplinary proceedings. (See Statement of Facts paragraphs 75-76). Under the Bridgeport City Charter and the Collective Bargaining Agreement (CBA) between the police union

and the City, the Board of Police Commissioners assumes jurisdiction of disciplinary matters on an officer when there is the possibility for more then a 15 day suspension without pay. (See Statement of Facts paragraph 76). Prior to the Board commencing its hearings but after the matter was referred to the Board, the City's Labor Relations's Office attempted to settle the matter by entering into a settlement agreement dated August 17, 1999 with Otero's union which purported to impose discipline on Otero in the amount of 17-holidays. (See Statement of Facts paragraph 77-78). As indicated above Torres had no part whatsoever, in the negotiations and ultimately the terms of the final settlement agreement. (Statement of Facts 79).  All that Torres did in this area was sign two memorandum notices that published to the department the discipline imposed on Otero for his conduct. (See Statement of Facts paragraph 80). Simply put he was not a participant or signatory to the agreement.

A dispute arose between the City's Labor Relations Department and the Board of Police Commissioners on who had the authority to impose the discipline. The Board refused to accept the 17-day holiday discipline and proceeded with its own hearings and in fact the 17-day holiday was never imposed. (See Statement of Facts paragraph 82-83). In this area Prentice claims that he brought the settlement agreement to the attention of the Board and that through his efforts the Board never

relinquished its rights on the matter and that this conduct angered Torres because he was part of the "conspiracy" of giving Otero only 17 holidays and therefore, Torres retaliated against him. (See Exhibit B Prentice deposition pages 89-94).

Prentice also claims that after he was transferred to the property room he filed a grievance that the assignment to the property room was a biddable position and that Torres by placing him there ignored the bid procedures in the Collective Bargaining Agreement. Prentice claims that he was successful with his grievance but that he nevertheless stayed in the property room and that the position was never put out to bid. (See Exhibit B Prentice Deposition pages 88).

Prentice also claims that Torres retaliated against him by violating his rights to equal protection, due process, and free speech because Prentice suffered from a medical condition of multiple sclerosis and that he needed occasional time off yet the department classified him as chronic sick which caused him to lose overtime opportunities. Prentice filed a grievance on this, which was denied by Torres and Prentice claims that this was done because of the testimony he gave on behalf of Santossio. (Exhibit B Prentice Deposition pages 115-151).

### 3. Claims Against Carter

Prentice claims that Deputy Chief Arthur Carter violated his rights to equal protection, due process and free speech for essentially the same reasons claimed against Torres. (transfer to the property room) (Exhibit B Prentice Deposition page 165-166).  Additionally Prentice claims that Carter treated him differently with respect to discipline that was imposed upon Prentice for Prentice using the word "bitch" to describe a female civilian employee in the department. (Statement of Facts paragraph 91). With respect to this claim it is undisputed that on January 19, 1999 Prentice referred to a female civilian employee of the department as a "bitch" in the presence of Chief Sweeney violating the department slur policy. (Statement of Facts paragraph 91). Pursuant to Article 6 of the CBA a hearing before the Chief of Police or his designee was scheduled for April 22, 1999.  (Statement of Facts paragraph 94) Because Chief Sweeney was a witness to the events he could not hear the matter and designated Deputy Chief Carter to hear the matter and recommend any discipline if Prentice was found guilty of the conduct. (Statement of Facts paragraph 93). Carter heard the matter and on May 23, 1998 recommended to Sweeney a 5-day suspension for violating the department slur-policy. Carter had no authority to issue discipline because such authority rested with Chief Sweeney. (Statement of Facts paragraph page 94).  The 5-day suspension discipline was based, in part, on a

past similar situation where a male officer called a female officer a bitch and a 5-day suspension was imposed. (Statement of Facts paragraph 95-96). On July 14, 1999 Sweeney issued the discipline. (Statement of Facts paragraph 94)

Prentice claimed at his deposition that he believed that the 5-day suspension was totally out of line comparing himself to other officers who were given less discipline for conduct he believed was more egregious then his conduct and that it was given because as he stated, " . . . in my heart I believe that this excessive discipline was imposed because the Department – Sweeney at the time was Chief, Carter was the Captain. They knew that Prentice knew what had transpired between Santossio and Sergeant Otero in 1998." Prentice went on to testify that, "I believe that they imposed this severe discipline against me to keep my mouth shut." (See Exhibit B Prentice Deposition pages 174-176 lines 9-17). Prentice has no evidence to support this claim other then his "gut feeling" and that it is true based on his "heart."(Statement of Facts paragraph 96). In this area Prentice compared his situation to Officer Terry Lambert who allegedly blurted out a racial slur over the police airwaves believed to be the work "dago" and was given the loss of two holidays as punishment. (See Exhibit B Prentice Deposition pages 167-169 lines 17-10); and further compares himself to two police officers who were arrested for

assault: Sgt. Koskuba who he claims was arrested by Easton Police for assault and was given a loss of 4-holidays for his conduct and officer Anthony Armeno who was allegedly arrested for assaulting another police officer and was only given four holidays. (Exhibit B Deposition of Prentice pages 182-186 lines 23-8.) . He also claims that that there was unequal treatment compared to him when Deputy Chief Kozlowski called Sweeney a "bastard" and Studivant called a white officer a "boy" yet these two officers were not punished. (Exhibit B Deposition testimony of Prentice pages 211-215

Lines 8-25).

Prentice also claims that as part of the retaliation Carter met with and "surreptitiously" questioned civilian employees who worked under Prentice and Carter inquiring about how Prentice was doing with respect to his job. (Deposition of Prentice page 199-200 lines 11-22).

Prentice also claims that Carter (and Sweeney) further retaliated against him for his support of Santossio with respect to an incident involving a civilian employee, Sheryl Biroscak. Prentice claims that he asked her to complete an assignment and she became very upset and went to Carter to complain. Prentice claims that Carter believed her and never called Prentice about it. Prentice also claims that Carter used