it against him because Carter went to Sweeney and complained, and Sweeney

called him in and discussed the matter with Prentice. Prentice indicated that this

incident happened before his testimony in front of the Board of Police

Commissioners in October of 1998. (Exhibit B Prentice Deposition pages 201-203

lines 3-15). When asked what evidence Prentice had that Carter and Sweeney were

aware in October 1998 that Prentice would be involved in the Santossio/Otero

matter as a witness he states because of his working relationship with Santossio and

he assumes and believes that in his "heart" that Carter would have believed that

Santossio would have told Prentice about the Otero incident.  Simply put, Prentice

has no evidence that Carter knew that Santossio would have confided in Prentice

and is only assuming that because of the close working relationship he had with

Santossio that Carter must have known that Santossio confided in Prentice about

the Otero incident. (Statement of Facts paragraph102).


   **4. <u>Claims Against Sweeney</u>**

   Finally with respect to defendant Sweeney Prentice claims that his

constitutional rights were violated because of the 5-day suspension he received for

uttering a slur. (discussed under Carter) (Exhibit B Prentice Deposition page 241-

62

242 lines 13-2). He also claims that Sweeney treated white officers differently then members of the Bridgeport Guardians because he did not want any trouble with the special master and as an example states that Sweeney refused to discipline a black officer David Daniels regarding an incident, which occurred in 1996. When asked why Sweeney did not impose discipline on Daniels Prentice testified because he was a guardian and when asked what facts he has to support that he states that, "It's my firm belief." (Statement of Facts paragraph 104; Exhibit B Deposition of Prentice pages 242-243 lines 3-25). Prentice has no evidence that Sweeney treated white officers differently then members of the guardians. (Statement of Facts paragraph 104)

Prentice also claims that Sweeney violated his rights because he claims that Sweeney blundered the investigation into the Otero matter and he cites to the fact that the tapes were missing and if the tapes were preserved he would not have had to testify at the Board of Police Commissioners hearing. (Exhibit B Deposition of Prentice page 245 lines 2-23). Prentice then claims that he does not know whether Sweeney even gave the correct tapes to Studivant because he claims Studivant could not make out anything on those tapes. When asked what evidence he has to support his claim that Sweeney did not give Studivant the correct tapes he states:

63

"Its an assumption. It's a possibility;" and he admitted that he has no specific facts to support that claim. (Statement of Facts paragraph 105).

### a. Prentices' equal protection claim is not viable.

With respect to Prentice's equal protection claim he testified at his deposition that the claim is limited and based on comparing himself to the other officers who were disciplined for making a racial or ethnic slur meaning Officers Lambert, Kozlowski and Studivant. (Statement of Facts paragraph 101). When asked with respect to his entire equal protection claim that he is comparing himself to Prentice testified that,

> "Well, I think I said earlier I didn't - - couldn't come up with any other specifics at this time."

> Then he was asked, "So nobody else?" and he answered "Not at this time, no." (Statement of Facts paragraph 102).

Consequently all of the other claimed facts that he testified to that he submits supports his equal protection claim, other then his punishment for uttering a slur and his claimed "different" treatment on that, by his own admission, do not support his equal protection claim because he is not comparing himself to anyone else similarly situated.

The Equal Protection Clause requires that the government treat all similarly situated people alike. *Harlen Associates v. the Incorporated Village of Mineola*, et al, 273 F. 3d 494, 499 (2nd Cir. 2001) citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, courts have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials. *Harlen Associates v. The Incorporated Village of Mineola*, et al, 273 F. 3d at 499 (2001); LeClair *v. Saunders*, 627 F.2d 606, 608-10 (2d Cir. 1980). The Supreme Court has affirmed the validity of such "class of one" claims where the plaintiff alleges that he has been intentionally treated differently from others and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 145 L. Ed. 2d 1060, 120 S. Ct. 1073 (2000)(per curiam).

In the present case it appears that Prentice is asserting a selective equal protection claim because he does not allege in his complaint that he is a member of a vulnerable class. To prevail on a claim of selective enforcement, plaintiff must

show: 1. That he was treated differently from other similarly situated individuals; and

2 That such differential treatment was based on impermissible considerations such

as race, religion, intent to inhibit or punish the exercise of constitutional rights, or

malicious or bad faith intent to injure a person. _Harlen Associates v. The_

_Incorporated Village of Mineola_, et al, 273 F. 3d at 499 (2001). As a general rule

whether items are similarly situated is a factual issue that should be submitted to a

jury. _Id._ at 499. However this rule is not absolute and a court can properly grant

summary judgment where it is clear that no reasonable jury could find the similarly

situated prong met. _Id._ Obviously a plaintiff bringing such a claim must present

evidence that he or she was treated differently from others similarly situated. This is

a factual issue and by his own admission Prentice is unable to do this on most of the

claimed facts he asserts support his equal protection. (Statement of Facts paragraph

101). Therefore summary judgment is warranted on all of the claims, except the slur

punishment, based on the ground that Prentice is unable to offer evidence that he is

similarly situated to someone else because he cannot identify another person, group

etc whom he is comparing himself to.

    As indicated above Prentice claims that Studivant violated his right to equal

protection because by his actions the tapes were destroyed and consequently he

had to testify before the Board of Police Commissioners. Because by his own admission he does not compare himself to anyone on this allegation to show that he was treated differently from someone similarly situated, summary judgment must enter on Prentice's equal protection claim against defendant Studivant on this issue. (Statement of Facts paragraph 101).

Prentice also claims that his rights to equal protection were violated when Torres and Carter decided to transfer him to the property room because of the testimony he gave at the Board of Police Commissioners in favor of Santossio. In relation to this claim he claims that after his transfer he filed a grievance wherein he claimed that the property room assignment was a biddable position, which should have been put out to bid and that he won the grievance which was ignored by Torres. Once again based on his own admission, summary judgment must enter in favor of defendant Torres and Carter on these claims because Prentice cannot cite to anyone person he is comparing himself to on this equal protection claim. (Statement of facts paragraph 101).  However, assuming *arguendo* that Prentice cited a person or persons he claims were similarly situated to him on this claim, summary judgment is appropriate because there is exists no genuine issue of material fact that that Torres and Carter did not know during the time period he was

transferred what Prentice's testimony was in front of the Board of Police
Commissioners. (Statement of facts paragraph 98-100). Prentice' s whole claim in
this area is that he gave testimony favorable to Santossio and that Carter and Torres
retaliated against him for giving that testimony. (Exhibit B Prentice deposition pages
83-86). The undisputed facts in this case indicate that Carter was not present when
Prentice testified in front of the Police Commissioners, has never read the transcript
of Prentice's testimony and to this day does not know the content of Prentice's
testimony. (Statement of Facts paragraph 98). Likewise with Torres the facts in this
case indicate that he was not present when Prentice testified in front of the Board of
Police Commissioners and was not aware of what he testified to and never has read
the transcript of his testimony. (Statement of Facts paragraph 99). In his deposition
Prentice admitted that he has no evidence that Carter and Torres knew what he
testified to in front of the Board. (Statement of Facts paragraph 100). In fact when
asked what evidence that he has that Carter even knew what Prentice testified to at
the Board of Police Commissioners Prentice answers:

> "I don't have any specific evidence but once you take into account the totality
> of the circumstances, it would lead one to believe that's what happened."
> (Statement of Facts paragraph 100).

He also admitted the same about Torres and then stated that Carter and Torres would have had access to his transcript of his testimony but he has no evidence that either Carter or Torres read the transcript. (Statement of Facts paragraph 100). Simply put, there is no evidence that Torres or Carter knew what Prentice testified to and in fact the evidence is that they did not know what he testified to prior to and during the time of the transfer and to this day do not know the content of that testimony. (Statement of facts paragraph98-100), Obviously plaintiff's whole retaliation claim on this issue is premised on the fact that he was transferred to the property room because of favorable testimony that he gave on Santossio's behalf and that both Torres and Carter were aware of that testimony. However, the facts in this case support that they did not know what he testified to and Prentice has no evidence to support his claim that they in fact knew. Consequently, even if the plaintiff did identify "similarly situated individuals in support of this claim there exists no genuine issue of material fact that Torres and Carter did not know the nature of Prentices's testimony and therefore, there could be no retaliation imposed by defendants. Therefore summary judgment is appropriate.

Plaintiff Prentice also testified that his equal protection rights were violated by Torres because of Torres' alleged involvement in trying to settle Otero's matter for

only 17- holidays. Prentice claims that he alerted the Board of Police Commissioners about this and by doing so the Board acted and did not accept the imposed discipline. Prentice claims that this angered Torres and he therefore retaliated against Prentice. (See Exhibit B Prentice deposition testimony pages 89-94). Once again based on his own admission Prentice has no evidence that he was similarly situated to others and summary judgment is warranted. (Statement of Facts paragraph 101).

However even if this claim against Torres can be "pigeonholed" into an equal protection claim, there exists no genuine issue of material fact that Torres had no involvement whatsoever in the purported settlement agreement of 17- holidays. As indicated above, the City's Labor Relations Office and Otero's union negotiated the purported settlement agreement and Torres had nothing to do, whatsoever, with the negotiations and final agreement. (Statement of Facts paragraphs 77-81). The actual purported settlement agreement was not even signed by Torres and all that he did was sign two memorandum notices that published to the department the 17-day holiday punishment imposed on Otero. (Statement of Facts paragraphs 77-81). Torres was nothing more then a messenger of the penalty imposed on Otero. (In fact as stated above and in the Statement of Facts, this punishment was not even

imposed because it was rejected by the Board of Police Commissioners and after further hearings Otero was given greater punishment. (Statement of facts paragraphs 77-84). Therefore even if the alleged facts asserted by Prentice could somehow be construed to support an equal protection claim, there exits no genuine issue of material fact that Torres had nothing to do with the 17-day punishment agreement.

Finally Prentice claims that Torres violated his rights to equal protection because Prentice suffered from a medical condition of multiple sclerosis and that he therefore, needed time-off yet Torres signed off on discipline and denied his grievance that classified him as chronic sick which caused him to loose overtime opportunities. (Exhibit B Prentice Deposition pages 115-151). Prentice also claims that Torres also refused to accommodate him when Prentice requested that he be transferred out of the property room because of his health condition. (Exhibit B Prentice Deposition pages 115-151).  Once again, by his own admission, plaintiff has no evidence on these claims to show who he is similarly situated to. Therefore summary judgment is appropriate on this claim.

However, even if an equal protection claims can be culled from these facts the evidence is clear that when it came to interpreting the chronic sick policy, Torres

71

treated everyone the same way. In fact he testified that he treated everyone the

same under the sick and injury policy and he did not believe that there were any

exemptions to the sick and injury policy for officers who had certain medical

conditions; and that people with medical conditions were to be treated the same as

healthy people under the policy. (Statement of Facts paragraphs 106-114).

Moreover he believed that the sick and injury policy was self-explanatory and that

what the department was trying to do was to enforce the policy department wide and

get everybody treated and enforced the same way. Torres was concerned that some

officers with claimed health problems were being treated differently depending on

who their immediate supervisor was and that the policy was not being uniformly

applied. Torres wanted to remove decisions on the health conditions of officer from

first line supervisors, have such decisions go through the grievance process as

stated in the sick and injury policy and have such decisions on these issues made by

Labor Relations in conjunction with the Board of Police Commissioners. (Statement

of facts paragraph 113). If anything the undisputed facts reveal that Torres treated

everyone the same under the policy not differently. In fact other officers who, like

Prentice, suffered from multiple sclerosis over the years have been also placed on

the chronic sick list. (Statement of facts paragraph 114 and see entire Statement

Facts on this issue paragraphs 106-115).

On his claim that he was not given an accommodation when he requested a

transfer from the property room, even if such a claim could "fit" under an equal

protection claim, there exists no genuine issue of material fact that Torres

accommodate Prentice. In January 2000 Torres became aware that Prentice was

asking for a transfer out of the property room because of a medical condition when

Deputy Chief Kelly came to Torres and explained to him that Prentice has MS and it

would be in the Department's best interests not to keep him downstairs in the

property room. (Statement of Facts paragraph 119). Thereafter Torres immediately

accommodated Prentice and ordered that Prentice did not have to stay in the

property room, that he could work out of the first floor with Sgt. Kirkland and that he

could supervise his staff from upstairs to make sure they were doing their jobs.

(Statement of Facts paragraph 119-120).  During this time period Lt. Robert Craw

was Prentice's supervisor and after Torres ordered that Prentice be given a work

space on the first floor Lt Craw made certain that Prentice was provided a work

space in the records room located on the first floor of the department in a room that

was well ventilated and one that had windows. (Statement of Facts 119-121).

Specifically Craw instructed Sgt. Kirkland that he was going to have to share his workspace with Prentice, Kirkland removed some of his personal belongings to make room for Prentice and Craw advised Prentice that a workspace had been provided for him outside of the property room. (Statement of Facts paragraph 119-121). The undisputed evidence is that Torres acted to remove Prentice even before he obtained any medical documentation on the issue, Thereafter, Torres went further by obtaining medical documentation to make sure that is was alright for Prentice to have limited contact with the property room. (Statement of Facts paragraph 119-123). Therefore even if Prentice set-forth evidence comparing himself to someone similarly situated there is no genuine issue of material fact that Torres accommodated him.

By his own admission Prentice compares himself only to those officers who were given less punishment for uttering a slur and he claims that on this issue Sweeney and Carter violated his rights to equal protection. This claim holds no merit because when recommending the discipline of 5-days, Carter used, in part, past discipline imposed on an Officer Killian who was given a 5-day suspension for calling a female officer a black bitch. (Statement of Facts paragraphs 91-95 and specifically paragraph 95). Additionally Prentice has no evidence to support his claim that the

discipline that was imposed was retaliation by Carter and Sweeney. The hearing, recommended discipline and the imposition of the discipline imposed occurred in April and July 1999 months before Prentice gave any testimony in the Santossio-Otero matter before the Board of Police Commissioners. (See Statement of Facts paragraphs 91-97; Prentice testified at the Board on November 16, 1999). Therefore any claim by Prentice that the discipline imposed was in retaliation for his Board testimony is misplaced. To get around the fact that the discipline imposed on Prentice occurred months before his testimony in front of the Police Commissioners, he claims that the discipline was imposed as retaliation because Sweeney and Carter knew in April-July 1999 that Prentice had knowledge of the Otero matter and that the discipline was imposed as a message to him to keep his mouth shut. (Prentice deposition pages 175-176 lines 14-6). However, Prentice has no evidence to support this claim other then that it is his "firm belief" "gut feeling" and in his "heart" he believes that the discipline was recommended and imposed by Carter and Sweeney because they knew that Prentice knew what had transpired in the Otero matter and that they wanted to keep his mouth shut. (Statement of Facts paragraph 96).

Also Prentice cannot support his case here because he has no first hand knowledge of the facts of those whom he is comparing himself to, i.e. Officers Lambert, Studivant, Kozlowski and Killian. (Statement of Facts paragraph 103). To prove his equal protection claim, plaintiff must prove that 1. That he was treated differently from other similarly situated individuals; and 2 That such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Harlen Associates v. The Incorporated Village of Mineola*, et al, 273 F. 3d at 499 (2001). Prentice has no first hand evidence on how those he compares himself to were similarly situated to him other then the fact that they were police officers. He has no evidence on the specifics of their cases or on what occurred. (Statement of Facts 103). Additionally to the extent Prentice attempts to compare himself to Officers Koskuba and Armeno, two officers who were allegedly arrested for assault and received discipline of 4-holidays, by his own admission he is not similarly situated to these officers because their alleged conduct was an assault, not the utterance of a slur. They are two different situations, which are not comparable.

Additionally in this area Prentice, who is white, claims that Sweeney who is also white treated white officers differently then black officers who were members of the Bridgeport Guardians citing to a matter involving a black officer Daniels. (Prentice deposition pages 241-242 liens 13-2). However, once again, Prentice has no evidence to support this claim stating that "Its my firm belief." (Statement of Facts paragraph 105). For these reasons summary judgment for Carter and Sweeney is appropriate.

Prentice additionally claims that Carter would surreptitiously question the civilian employees who worked under him and he claims that this was part of the retaliation against Prentice. For the reasons stated above this claim does fit under an equal protection claim because Prentice is not comparing himself to a similarly situated person or group. (Statement of Facts paragraph 101). As such summary judgment should enter. Even if this factual allegation "fits" under an equal protection claim plaintiff has no evidence that such conduct was done in some fashion to retaliate against plaintiff. In fact such conduct was Carter's management style and he would speak to all people under his chain of command (from the top to the bottom) and inquire about how things were going and if there were issues that he

should be made aware of.  He did not just do this with the individuals that Sgt. Glenn Prentice supervised. (Statement of Facts paragraph 116).

Prentice claims that Carter and Sweeney further retaliated against him for his support of Santossio with respect to an incident involving civilian employee, Sheryl Birosack. (Exhibit B Prentice deposition 201-203). Once again by his own admission this factual claim does not support Prentice's equal protection claim. (Statement of Facts paragraph 101). Moreover, even if this claim could be proffered to support Prentices's equal protection claim, by his own admission, Prentice has no evidence to support his claim that Carter and Sweeney retaliated against him because of his support of Santossio. The claimed incident involving Birosack allegedly occurred in October 1998, which is the time period immediately after Santossio reported the Otero matter to Sweeney, during Sweeney's and OIA's investigations and a year before Prentice even testified before the Police Commissioners. (Statement of Facts paragraphs 8-36, 84). Prentice has no evidence to support his claim here because when asked at his deposition what evidence he had that Carter and Sweeny were aware in October 1998 that Prentice would be involved in the Santossio/Otero matter he testified because of his working relationship with Santossio he is assuming and believes in his "heart" that the

78

defendants would have believed that Santossio would have told Prentice about the Otero incident.  (Statement of Facts paragraph 102).

Finally Prentice claims that his rights to equal protection were violated because Sweeney blundered the investigation claiming that the tapes were missing and that if they were preserved he would not have had to testify. (Exhibit B Prentice Deposition page 245 lines 2-23). To support this claim he testified that he does not know if Sweeny gave Studivant the correct tapes because he claims that Studivant could not make out anything on the tapes. Once again by his own admission this factual allegation does not fit into Prentice's equal protection claim and therefore summary judgment is appropriate. (Statement of Facts paragraph 101). Even if this matter did fit into an equal protection claim Prentice has no evidence to support his claim by virtue of his testimony that, "Its an assumption. It's a possibility" that Sweeney not give Studivant the tapes. In fact on this issue Prentice admits that he has no specific facts or evidence to support this claim. ( Statement of Facts paragraph 105).

For all of the above reasons summary judgment is appropriate for the moving defendants on plaintiff Prentice's equal protection claim.

**b. Free Speech claim**

Plaintiff Prentice also claims that the claimed actions described above by the defendants violated his right to free speech. (See Exhibit B Prentice Deposition page 269 lines 3-17). The speech that plaintiff Prentice alludes to here is his testimony that he gave to the Board of Police Commissioners and that because of exercising his "free speech" rights he was retaliated against. To advance this claim plaintiff must prove: 1. That his speech was constitutionally protected; 2. That he suffered an adverse employment decision; and 3) a casual connection exists between his speech and the adverse employment determination against him so that it can be said that his speech was the motivation factor. *Morris v. Lindau,* 196 F.3d 102, 110 (2nd Cir 1999). In the present case the speech at issue is not protected speech and therefore, the plaintiff cannot prove the first element cited above.

A claim of first amendment retaliation by a public employee is only established when the plaintiff's speech can be fairly characterized as constituting speech on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983). The question of public concern is a matter of law for the judge to decide and its resolution depends upon the time, place and context of the speech. *Id at 147- 148.* *O'Brien v. City of Greers Ferry,* 873 F. 2d 1115 (8th Cir. 1989). Speech pertaining to

internal personnel disputes and working conditions ordinarily will not involve matters

of public concern. See _Connick_ at 148; _Hellstom v. VA,_ 46 Fed. Appx. 651; 2002

U.S. Lexis 18473 (2nd Cir. 2002).  Prentice's testimony at the Board of Police

Commissioners did not involve speech on a matter of public concern. Instead, he

was a factual witness on internal charges brought by a police department against

one of its officers and his testimony was given on issues pertaining to those internal

charges. As such his speech related to an internal personal dispute claimed by

Santossio and the Department against Otero. It therefore is not protected speech

under the First Amendment.

   Even if this court were to determine that the speech at issue was protected,

nevertheless the plaintiff Prentice cannot satisfy the remaining elements of his

retaliation claim. This is so because Prentice has no evidence that he sustained an

adverse employment decision/action. It is true that Prentice was transferred to the

property room in January 2000 and this transfer is his claim that he suffered an

adverse employment action. When considering whether a plaintiff has suffered an

adverse employment action, courts have stopped short of treating transfers as

immunizations against retaliation claims. _Garber v. New York City Police_

_Department,_ 1998 U.S. App. Lexis 20181 (2nd Cir. 1998); _Bernheim v. Litt_, 79 F. 3d

81

318, 325 (2nd Cir 1996). If a reassignment is, in truth, a demotion, actionable harm

exists. *Id.*   A court should evaluate allegations of harm to a plaintiff's reputation,

opportunities for advancement and earning potential. If a transfer involves a

dramatic downward shift in skill level required to perform job responsibilities it can

rise to the level of and adverse employment action even if the time to perform the

duties remains constant. *Garber*. However and importantly a plaintiff's subjective

perception that a demotion has occurred is not enough. *Garber* citing *Forsyth v. City*

*of Dallas* 91 F.3d 769, 774 (5th cir 1996). Absent a change in job description, job title,

days and hours worked, salary benefits or opportunity for promotion courts are hard

pressed to characterize a plaintiff's change in position as a demotion. *Garber*. To be

actionable plaintiff's transfer must constitute a materially adverse change in the

terms and conditions of employment. *Garber*; *Torres v. Pisano*, 116 F.3d 625, 640

(2nd Cir. 1997). Also not every unpleasant matter creates a cause of action for

retaliatory discharge and not everything that makes an employee unhappy is an

actionable adverse action. A purely lateral transfer that does not involve a demotion

in form or substance cannot rise to the level of a materially adverse employment

action. A transfer involving no reduction in pay and no more than a minor change in

working conditions would not do either. *Garber, Williams v. Bristol-Myers Squib Co.* 85 F. 3d 270, 274 (7th Cit. 1996).

In the present case Prentice's transfer did not cause him any demotion. He remained a sergeant in the police department after he was transferred to the property room working the same hours that he worked when he was a clerk. (Statement of Facts paragraph 139) The transfer did not interfere with any promotional opportunities because he was eligible to take any promotional tests offered. (Statement of Facts paragraph 139). Additionally, his pay and benefits remained the same. Moreover, Prentice was still a supervisor when he was transferred to the property room because just like his assignment as clerk he supervised a staff. (Statement of Facts paragraph 139). Undoubtedly Prentice will claim that because of the transfer he lost overtime opportunities associated with the clerk's position. However the loss of overtime opportunities alone is not enough to show an adverse employment action. In *Joiner v. Ohio Depart. of Transportation*, 949 F. Supp. 562, 567 (1996) the plaintiff claimed that he experienced adverse employment action in that he lost the opportunity at overtime, was deprived of supervisory authority, and that his responsibilities were "significantly reduced." That the Plaintiff experienced some job changes is not enough to establish that he was

subjected to adverse employment action. _Id;_ See also _Smith v. Hamilton County_ 34 Fed. Appx. 459; 2002 U.S. App. Lexis 7559 (6th Cir 2002). (loss of opportunity for overtime and loss of supervisory responsibility insufficient to establish that lateral transfer was an adverse employment action). Prentice appeared unhappy with the transfer. However this unhappiness is not enough to show an adverse employment action.[2]

### c. Due Process claim

Like Santossio's due process claim it is entirely unclear based on the facts that he has submitted what deprivation of due process Prentice suffered at the hands of the defendants. In his deposition Prentice testified that all of the "facts" that he testified to which support his claim that defendants violated his right to equal protection are also the facts that supports his due process claim. (Exhibit B Prentice deposition page 269 lines 3-17). All of those facts have been identified and discussed above and simply put, they do not support a due process violation claim. Under the law, ordinarily, due process requires that a state or local government afford persons some kind of hearing prior to depriving them of a significant liberty or property interest. _Hodel v. Va. Surface Mining & Reclamation Association_, 452 U.S.

---

[2] It is submitted to this court that the lack of an adverse employment action is also applicable in the equal protection claim because Prentice cannot show that he suffered any damages because of defendants' alleged conduct.

264, 299 (1981). Under the claimed facts set-forth above, Prentice does not claim or assert that these defendants deprived him of liberty or a property right, nor does he allege that he was denied some kind of hearing. Summary judgment is therefore appropriate for the defendants on Prentice's due process claim.

## C. Intentional Infliction of Emotional Distress

Both plaintiffs claim that the defendants' conduct constituted intentional infliction of emotional distress under Connecticut common law. (See plaintiffs complaint paragraph one and response to interrogatory number 2, which identifies the common law action as intentional infliction of emotional distress Statement of Facts 142). To prove intentional infliction of emotional distress under Connecticut law a plaintiff must show: 1. The defendants intended to inflict emotional distress; 2. Defendants' conduct caused plaintiffs' stress; 3. That the distress suffered by the plaintiff was severe. *Petyan v. Ellis,* 200 Conn. 243, 253 (1986). Conduct is extreme and outrageous where it exceeds all bounds usually tolerated by a decent society. *Appleton v. Brd. of Ed. Stonington,* 254 Conn 205, 210 (2000). Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim,

'Outrageous!'" 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).
Conduct on the part of the defendant that is merely insulting or displays bad
manners or results in hurt feelings is insufficient to form the basis for an action
based upon intentional infliction of emotional distress." *Mellaly v. Eastman Kodak
Co.,* 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991).

For the reasons set-forth above, (under equal protection analysis) it is
submitted to this court that plaintiffs claim under this cause of action cannot be
sustained because the alleged facts do not support this cause of action. Therefore,
summary judgment should enter for the moving defendants.


**Summary Judgment City of Bridgeport**

If this Court grants summary judgment for the individual defendants on the
plaintiffs' δ1983 claim then it must grant summary judgment for the City because the
City cannot be held liable unless its employee is first liable. *Pembaur v. City of
Cincinnati* 475 U.S. 469 (1986); *Monell v. Department of Social Services of the City
of New York* 436 U.S. 658 (1978).

Moreover to the extent that there is an award in favor of the plaintiffs against
the defendant Otero the City should not be responsible for his conduct and summary

judgment should enter for the City. This is so because there exists no genuine

question of fact that the conduct of Otero was not part of an official policy of the City

of Bridgeport and secondly, there exists no genuine issue of material fact that under

a Title VII analysis the City acted appropriately and is therefore not liable for the

conduct of Otero.

Under *Monnell* it was established that a local government may not be sued

under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is

when execution of a government's policy or custom, whether made by its lawmakers

or by those whose edicts or acts may fairly be said to represent official policy, inflicts

the injury that the government as an entity is responsible under § 1983. In the

present case there exists no genuine issue of material fact that it was not the official

policy of the City of Bridgeport to sanction sexual assaults, harassment or

discrimination by one employee on another nor was it official policy of the City to

sanction any type of sexual harassment or discrimination. In 1998 the City had a

sexual harassment policy that was in effect and distributed to all employees. (See

Statement of Facts Paragraph 143)

Secondly, to the extent that this Court undertakes a Title VII analysis since

the law has held that one may bring a claim under δ1983 for sexual

harassment/discrimination; _Saulpagh v. Monroe Community Hospital_ 4 F.3d 134,

143-44 (2nd Cir); _Hernandez v. Clementoni, et, al_ 99 F. 3d 402 (1995); and in

analyzing whether conduct was unlawfully discriminatory for purposes of §1983 the

burden-shifting framework of Title VII is used _Id.;_ _St. Mary's Honor Ctr. V. Hicks,_

509 U.S. 502, 506 (1993); there exists no genuine issue of material fact that the City

acted reasonably under the requirements established in the case law and therefore

is not liable for any wrongful conduct of Otero.

First the law recognizes that an employer will be liable for harassment under

taken by a supervisor on an employee if in fact a tangible employment action is

taken. _Id._ at 760. In the present case there is no genuine issue of material fact that

Otero did not supervise Santossio. (Statement of Facts paragraph 138). Secondly,

where the harassment was done by a co-employee without supervisory authority

over the plaintiff, liability will be imputed to the employer "only if it is negligent, that

is, if it either provided no reasonable avenue for complaint or knew of the

harassment but did nothing about it." Richardson v. New York State Dep't of Corr.

Serv., 180 F.3d 426, 441 (2d Cir. 1999) (internal quotation marks omitted); see

Faragher v. City of Boca Raton, 524 U.S. 775, 799, (1998). In the present case there

is no doubt that the once the City knew of the incident between Otero and Santossio

incident between Otero and Santossio by virtue of the complaint filed by her with Chief Sweeney, the City acted immediately and thoroughly investigated the matter and issued appropriate discipline. A review of the defendants Statement of Facts supports this claim. Defendants' Statement of Facts paragraphs 8-84 set-forth in detail what the City did once the matter was reported. Three separate investigations/hearings were conducted by the City. (Chief Sweeney's investigation; OIA investigation and seven (7) days of hearings were conducted by the Board of Police Commissioners into the Otero matter with discipline being imposed on Otero). It cannot be disputed that there exists no genuine issue of material fact that the City acted immediately and appropriately when Santossio filed her complaint and therefore the City is not liable for Otero's conduct.

## IV. CONCLUSION

For the reason set forth above summary judgment should enter for the moving defendants.

89

THE DEFENDANTS

BY:
John R. Mitola
Associate City Attorney
Office Of The City Attorney
999 Broad Street
Bridgeport, Connecticut 06604
Telephone No.: (203) 576-7647
CT FED BAR NO.: 04017

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, to Susan King Shaw, Esq., King & Shaw, 94 Prospect Street, 1st floor, New Haven, Connecticut 06511 and Thomas W. Bucci, Esq., Willinger, Willinger & Bucci, 855 Main Street, Bridgeport, Connecticut 06604, on this 4th day of November, 2003.

John R. Mitola
Commissioner of the Superior Court