UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CATHERINE SANTOSSIO, ET AL | : | |
| Plaintiffs | : | |
| | : | |
| | : | CASE NO. 3:01CV1460 (RNC) |
| VS. | : | |
| | : | |
| CITY OF BRIDGEPORT, ET AL., | : | FEBRUARY 27, 2004 |
| Defendants | | |

### PLAINTIFFS' LOCAL RULE 56 (a)(2) STATEMENT

1. Admitted. (Exhibit A Santossio Deposition, page 9.)

2. Admitted, except insofar as the plaintiff, Prentice, has been a lieutenant in the Bridgeport Police Department since November, 2003.  Exhibit B Prentice Deposition, pages 4-5).

3. Admitted. (Exhibit C Otero Deposition, age 25).

4. Admitted.  (Exhibit D Sweeney Deposition Page 21 Lines 8-16.)

5. Admitted.  (Exhibit E Deposition of Hector Torres pages 12-18.)

6. Admitted.  (Exhibit F Studivant Deposition pages 10-16, 260-262).

7. Admitted.  (Exhibit G Carter Deposition page 32 and page 5-6.)

8. Admitted, with the exception that the plaintiff Santossio characterizes what happened on August 5, 1998 as an "assault" and not an "incident", as set forth in the first sentence of Paragraph 8. (Exhibit A Santossio Deposition pages 318-324 and Paragraph 14 of the Complaint.

9. The plaintiff admits that Otero claims that the "incident" was consensual and denies that it was an assault. (Exhibit C Otero Deposition pages 99-101.)

10. Admitted, with the exception that Sweeney told Santossio that if the allegations she raised fell within the purview of sexual harassment, he would have to pursue a formal investigation into the matter. (Exhibit A Deposition of Santossio, page 256.)

11. Admitted. (Exhibit A Deposition of Santossio, page 254-257.)

12. Admitted. (Exhibit A Deposition of Santossio, page 260, lines 8-13.)

13. Admitted. (Exhibit A Deposition of Santossio, page 260; Exhibit I investigation report from Chief Sweeney dated October 15, 1998 page 1 and Attachment A attached thereto).

14. Admitted. (Exhibit A Deposition of Santossio page 260-261 lines 21-2.)

15. Admitted. (Exhibit A Deposition of Santossio age 260-263; Exhibit I investigation report from Chief Sweeney dated October 15, 1998 page 2 and attachments.)

16. Admitted.  Exhibit A Deposition of Santossio page 263 and Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 2 Attachment D Carter's report September 21, 1998 report.

2

17. Denied. Carter went up to the fourth floor some time in August, but Carter was not in a position to see Santossio or Otero until Santossio had gone around Otero and gotten away from him.  As Santossio proceeded down the hallway after extricating herself, and while she was still in the records file area, Captain Carter was just entering the area, putting his foot over the ledge from the outside. Captain Carter did not see Santossio and Otero standing together in the doorway. (Exhibit A Deposition of Santossio, pages 323-326.)

18.  Denied.  Although defendants claim to have submitted testimony in support of the statement made in #18, there is no corresponding exhibit in the record that supports the statement that Carter had no knowledge that Santossio had filed a complaint with Chief Sweeney at the time Sweeney interviewed him. The testimony only indicates that Carter didn't recall asking the chief why he was requesting a report of this nature, and that if he did, he got no response at that time. Exhibit G Carter's deposition pages 117-120, dated December 3, 2002.)

19. Denied.  At the Board of Inquiry, Carter testified that he first saw Santossio and Otero in the doorway of the back hall and that Sergeant Otero was "slightly forward" of Santossio and "closer to him" than Santossio. (Exhibit J Arthur Carter's testimony at the Bridgeport Board of Police Commissioners Board of Inquiry on the Otero matter, page 18, dated November 29, 1999). Santossio testified in her deposition that based upon Carter's inability to recollect anything other than the fact

that Sergeant Otero left the storage room first, (i.e., why Carter was up there, who he went up there to see, who he was looking for) that he intended to testify falsely at the Board of Inquiry. (Exhibit A Santossio deposition pages 221-223.)

20. Admitted. (Exhibit A Santossio deposition page 264.)

21. Admitted. (Exhibit A Santossio deposition pages 264, 265.)

22. Admitted. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998, page 7 and Attachment E to the report.)

23. Admitted in part; Santossio admits that she tape recorded two conversations she had with Otero on or about September 3, 1998 and the Tuesday or Wednesday after Labor Day, 1998. Santossio recorded Otero because she wanted to document his behavior. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998, page 5-6. Exhibit A Deposition of Santossio page 338 lines 6-9., 339 lines 17-19.)

24. Admitted. (Exhibit A Deposition Santossio page 338-341.)

25. Admitted. (Exhibit A Deposition Santossio page 338-340 lines 6-17.)

26. Admitted. (Exhibit A Deposition Santossio page 341-343.)

27. Admitted in part. Santossio said the tape had background noise but it clearly recorded; that if you listened to it, you would hear with certainty; that if you trained your ears you could hear Otero say "If they don't take me off the third floor, I'm going to rape your ass." (Exhibit A Santossio Deposition pages 345-346.)

28.  Admitted.  (Exhibit A Santossio Deposition pages 348-354.)

29.  Admitted in part; Santossio turned over the tapes to Sweeney and he took custody of the tapes, breaking the two plastic prongs on each tape that prevent the tapes from being erased or recorded over. Santossio denies that Sweeney "preserved" the tapes; they no longer exist.  (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998; page 6; Exhibit A Deposition of Santossio page 164.)

30. Admitted in part; denied in part. Santossio admits that on October 7, 1998, Sweeney and Scanlon reviewed the tapes.  (Exhibit I Investigative report of Chief Sweeney dated October 15m 1998; page 6; Santossio denies that the tapes were of such poor quality that they were largely unintelligible.  Santossio testified the tape had background noise but it clearly recorded; that if you listened to it, you would hear with certainty; that if you trained your ears you could hear Otero say "If they don't take me off the third floor, I'm going to rape your ass." (Exhibit A Santossio Deposition pages 345-346.) Santossio admits that Sweeney was able to decipher the term "beaming" (a reference to Santossio's breasts) (Exhibit A Santossio Deposition p. 157 lines 7-12) and references to a "red garment worn yesterday" on the tape recorded outside the police department record room. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998; page 7}. The remainder of the statement is admitted. (Exhibit I Investigative report of Chief Sweeney, dated October 15, 1998,page 7 and 8.)

31. Admitted. (Exhibit A Santossio Deposition, pages 265-267).

32. Admitted. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1009, page 8 and Attachment F thereto).

33. Admitted. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998, page 8.)

34. Admitted. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998, page 8 and Attachment F thereto.)

35. Admitted. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1989, page 8-9 and Attachment H thereto.)

36. Admitted. (Exhibit I Investigative report of Chief Sweeney dated October 15, 1998 and Exhibit K cover memorandum Sweeney to Studivant; Exhibit A Santossio deposition page 268 lines 17-20.)

37. Admitted. (Exhibit A Santossio deposition page 268-269.)

38. Denied. Santossio testified that Chief Sweeney's actions resulted in an incomplete and inadequate internal affairs investigation and a hostile discriminatory and retaliatory work environment. (Exhibit A Santossio deposition page 253-254.) It wasn't normally Chief Sweeney's function to conduct investigations into matters such as the Santossio case. (Deposition of Sweeney at page 42.) It was not the normal course of business for Chief Sweeney to interview witnesses and take statements in matters that he intended to refer to Internal Affairs. Id. at 87. The usual

course of events when a complaint such as this came to the attention of Chief Sweeney was to refer it directly to the Office of Internal Affairs. In this case, thirty days elapsed between the time of Ms. Santossio's complaint to Chief Sweeney and his referral of the matter to Internal Affairs. Id. at 89. During that thirty day time period, Sergeant Otero remained on the third floor doing his normal job as Chief Sweeney's aide. Id. at 89. During that time, Santossio also remained on the floor doing her usual duties. Id. at 89. During that period of time, during the Chief's investigation, no steps were taken to remove Sergeant Otero from the floor. Deposition of Sweeney at page 79. Sergeant Otero was acting as Chief Sweeney's aide at the time Ms. Santossio made her complaint. If Sergeant Otero had been disciplined in connection with this matter, Chief Sweeney would have had to find a new aide. Deposition of Sweeney at 81. There is nothing that would have prevented Chief Sweeney from referring Santossio's complaint directly to Captain Studivant in Internal Affairs. Id. at 81. Chief Sweeney admits that his investigation of Santossio's complaint would have added nothing to the conclusions of Internal Affairs Id.

       39. Admitted.  (Exhibit A Santossio Deposition page 269-270.)

       40. Admitted. (Exhibit F Deposition of Robert Studivant pages 10-18.)

       41. Admitted. (Exhibit F Deposition of Robert Studivant pages 18-20.)

       42. Admitted.  (Exhibit F Deposition of Robert Studivant ; page 17.)

       43. Admitted.  (Exhibit F Deposition of Robert Studivant, pages 27-28.)

44. Admitted. (Exhibit F Deposition of Robert Studivant, pages 27-28.)

45. Denied. Prior to sending the tape in the Daniels matter out for analysis, Studivant had it duplicated and kept a copy of it. Deposition of Prentice, page 68.

46. Denied. There is nothing in the department's rules pertaining to collecting and storing of evidence indicating that they are not applicable to evidence in OIA investigations.

47. Admitted. (Exhibit F Deposition of Robert Studivant page 56, 57.)

48. Denied. Prior to the OIA investigation, Studivant knew Otero and was as friendly with him as he was with any other police officer. Exhibit F Deposition of Robert Studivant page 58. The remainder of said statement is admitted. (Exhibit F Deposition of Robert Studivant, page 58-59.)

49. Admitted. (Exhibit F Deposition of Robert Studivant, page 59.)

50. Plaintiffs admit that Studivant testified that he never discussed his investigation with Carter. (Exhibit F Deposition of Robert Studivant, pages 258-259.)

51. Plaintiffs admit that Studivant testified that he didn't discuss the matter with Carter after the matter went to the Board. (Exhibit F Deposition of Robert Studivant, page 261.)

52. Plaintiffs admit that Studivant testified that he never spoke to Torres about the Santossio/Prentice matter. (Exhibit F Deposition of Robert Studivant at 262.)

53. Admitted. (Exhibit F Deposition of Robert Studivant Page 59-60.

54. Denied. Studivant had previously received tapes in 1996 in connection with the investigation of Officer David Daniels. Exhibit F Deposition of Robert Studivant, Page 60-61.)

55. Admitted in part. Santossio admits that Sweeney recommended that the tapes be sent to the FBI and that Sweeney gave Studivant the name and number of FBI agent Kives. Exhibit F Deposition of Robert Studivant Page 63; Santossio testified on November 22, 2002 that she had no evidence that Sweeney believed or thought Studivant was not capable of preserving evidence; however, Chief Sweeney testified at his deposition on July 29, 2003, that it was "formal format" "good practice" and the practice of the Bridgeport Police Department at the time in question to keep a copy of a tape that's being sent out to the FBI or other agency for any reason; (Deposition of Sweeney at 93); that Captain Studivant "did not work for him," was having improper *ex parte* communications with the special master, attempted to intervene and inject his opinions about what should or shouldn't happen to certain officers with cases pending, or under investigation; that these communications compromised his integrity or violated his rights; that he had prepared an affidavit in this regard prior to his retirement; that Captain Studivant had personal likes or dislikes for people in the department and attempted to use his influence to obtain results that were beneficial to individuals he favored. Deposition of Thomas Sweeney, pages 137 line 14 to 141.

56.  Plaintiffs admit that in a criminal investigation it is normal to log evidence in the property room of the police department.  Plaintiffs admit that that procedure was not followed in this OIA investigation. (Exhibit F Deposition of Robert Studivant Pages 65-66.)

57.  Plaintiffs admit that Studivant knew, at some point that Otero was a member of the Guardians organization. (Exhibit F Deposition of Robert Studivant, Page 71-72.)

58.  Admitted. Exhibit N.

59.  Admitted in part. Studivant defined  "controversial cases" as cases involving high-ranking officers (lieutenant and above.) However, Otero was only a sergeant. The only other examples of "controversial cases" that Studivant testified about involved members of the Guardians Organization (David Daniels, Theophilus "Ted" Meekins, and other members of the Guardians, including  Pablo Otero). Although Santossio had specifically requested that a female investigate the case; and that Captain Krasicky, a female officer could have been directed to do the investigation through Chief Sweeney, Captain Studivant felt that he should do it because it was "controversial"(Deposition of Robert Studivant pages 68-75.)(i.e., by his definition, involved a minority member of the Guardians organization).

60.  Denied.  Although Santossio had specifically requested that a female investigate the case; and that Captain Krasicky, a female officer could have

been directed to do the investigation through Chief Sweeney, Captain Studivant felt that he should do it because it was "controversial."(Deposition of Robert Studivant pages 68-75.)

61. Plaintiffs admit that Studivant listened to the tapes and that he could hear people talking; plaintiffs deny that Studivant could not discern what they were saying. (Exhibit F Deposition of Robert Studivant, pages 75-76.)

62. Admitted, with the exception that plaintiffs deny that Perez could not discern what was being said on the tapes. (Exhibit O Affidavit of A.J. Perez.)

63. Denied. Studivant did not personally send the tapes to the FBI. He testified that Officer A.J. Perez hand-delivered them. He does not recall the exact date he gave the tapes to Officer Perez, although he testified that it was within two weeks of receiving them from Chief Sweeney. He does not recall sending a letter of transmittal to the FBI.(Deposition of Robert Studivant, pages 267-268.)

64. Admitted. (Exhibit F Deposition of Robert Studivant Page 268.)

65. Admitted. (Exhibit F Deposition of Robert Studivant Page 270.)

66. Denied. Studivant does not recall what Agent Kives said about his inquiry regarding the tapes. He did not take notes during his conversation with Kives; he did not keep a telephone log of the conversation; he did not send a letter of transmittal regarding the conversation; he did not ask Agent Kives to give him any kind of receipt or written acknowledgement that he received the tapes; he has nothing in

writing to indicate that Agent Kives ever received the tapes. Deposition of Studivant at 268-273.

67. Denied. Although Studivant testified in his deposition that he did not know whether it was customary practice to reproduce tapes prior to sending them out to the FBI or other agency for transcription or clean up, and "this was his first time doing this", Studivant had, in 1996 sent out micro cassette tapes in the Daniels matter and duplicated the tapes and retained a set before sending them out to be analyzed. (Deposition of Prentice at page 65-67; Exhibit F Deposition of Robert Studivant Page 272.) It was the policy of the Bridgeport Police Department at the time to preserve evidence in this fashion. Deposition of Thomas Sweeney at 93.

68. Denied. Sergeant Glen Prentice and Captain Thomas Sweeney listened to the tapes and testified that they were able to discern specific things said by Santossio and Otero. Both testified at the Board of Police Commissioners in this regard. Sweeney heard a pager going off, references to a red garment worn yesterday, and the term "beaming" on the tape made outside the Record Room. He heard references to "what you said" and "what you did" by Santossio and references to an apology by Sergeant Otero on the tape that was recorded on the fourth floor of Headquarters. (Exhibit I Investigative report of Chief Sweeney, dated October 15, 1998, page 7 and 8.)

Deposition of Glen Prentice at 66. This is inconsistent with Studivant's testimony that the FBI was "unable to clean the tapes and could not get any information off of them."

69. Plaintiffs admit that Studivant testified that he was shocked that the tapes were destroyed and that he didn't know that in order to be cleaned up the tapes had to be destroyed and that Kives didn't tell him what the process was. However, in view of Studivant's previous experience with the successful preservation of tapes in the Daniels matter, the plaintiffs deny the veracity of these statements. (Deposition of Glen Prentice at 65-67.)

70. Plaintiffs admit that Studivant testified in this fashion at his deposition. The veracity of these statements is denied.

71. Denied, in view of Studivant's previous experience in the Daniels matter. Deposition of Prentice at 65-67.

72. Admitted in part. Studivant interviewed some people who Santossio expressed would have information about the matter. He did not interview other employees on the third floor who worked on the third floor in close proximity to Santossio and Otero, including Prentice, Pat Collins, Andrea or Candace. Exhibit F Deposition of Robert Studivant pages 282-283.

73. Admitted. (Exhibit P complete OIA Report dated February 16, 1999.)

74. Admitted, except to the extent that only one of the four departmental rules cited as having been violated, Rule 4.2, may be considered

13

sufficient cause for discharge, demotion or suspension.  (Exhibit P complete OIA Report dated February 16, 1999.) No such action was taken.

75. Admitted.  (Exhibit Q Chief Sweeney's referral dated February 23, 1999.)

76. Admitted. (Exhibit R Collective Bargaining Agreement between the City and Police Union Article 6 Section 3.)

77.  Denied. After the matter was referred to the Board by Chief Sweeney the case appeared on an agenda for a hearing but was postponed at the request of Sergeant Otero's counsel. The matter was rescheduled for a hearing on May 5 and was again rescheduled at the request of Otero's counsel. The case was rescheduled for August of 1999, after Torres, a member of the Guardians, became acting Chief. Several days prior to the scheduled hearing, then acting Chief Torres posted an order that Sergeant Otero had received the discipline of a loss of 17 holidays. At the meeting, counsel for Otero stated that the settlement was binding and that the Board no longer had jurisdiction of the matter. At no time did the Board of Police Commissioners relinquish their jurisdiction over the Otero matter. There is no entity in the Bridgeport Police Department that has authority to issue discipline of more than 15 holidays or a 15 days suspension other than the Board of Police Commissioners. The purported settlement agreement was in violation of department regulations. The attempt to "settle" the charges against Otero involved Otero's

14

brother-in-law, Pete Reyes, who was the president of the union at the time in question. The attempt to "settle" the charges in violation of department regulations was part of an attempt to circumvent the Board of Police Commissioners and avoid a Board of Inquiry in the Otero matter to protect Sergeant Otero. Deposition of Glen Prentice, pages 89-96; Exhibit S.

      78.  Admitted. (Exhibit S)

      79.  Denied. Acting Chief Torres became aware of the discussions, but testified that he couldn't recall specifically when. Acting Chief Torres had labor personnel in his office discussing the resolution of the charges against Otero. Labor relations personnel directed the Chief's Secretary, Charlene Panullo, to type up on police department official memo paper a letter for him to sign. Torres was the acting chief of police at the time Mr. Osborne, Mr. Winterbottom and Mr. Elliot were in his office dictating to his secretary. Although Acting Chief Torres testified in his deposition that he did not participate in the negotiations, did not approve of the agreement, and knew the matter should properly go before the Board of Police Commissioners, he elected to sign off on the memorandum despite his claimed objections. As acting chief, he could have refused to sign off on a purported settlement agreement that he claimed he did not approve of and knew was improper. Acting Chief Torres was informed of the terms of the purported settlement agreement in his office, allowed his secretary to type it up, signed off on the department-wide memorandum publishing

the agreement as Acting Chief of Police when he knew that matters of discipline involving more than 15 days were to be handled by the Board of Police Commissioners. Deposition of Hector Torres, pages 51-61.

80. Denied in part; Torres signed two memoranda notices publishing the discipline purported imposed on Otero; the first, dated August 23, 1999 did not report the conduct resulting in the proposed discipline on Otero, despite the fact that Torres knew it was the usual practice in issuing such memoranda to report the discipline imposed and the conduct that had resulted in the discipline. Deposition of Torres at 62. The second, dated August 25, 1999, was amended to include the offending conduct. Exhibit U. As Acting Chief of Police, Torres had the authority to refuse to sign the memorandum and not; he was therefore not a mere "messenger" in this matter. Deposition of Torres at 56-57.

81. Denied. Santossio testified at her deposition on November 22, 2002 that she did not have, at that time, any specific facts supporting her claim that Torres was a participant in reaching the settlement agreement. Torres testified in his deposition on July 25, 2003 that members of Labor Relations were in his office discussing the settlement agreement and dictating to his secretary. Torres Deposition, pages 51-61. See response to #79, generally.

82. Admitted. (Exhibit A Deposition of Santossio page 128; Exhibit V. See, generally, response to 79.)

16

83. Admitted. (Exhibit V.)

84. Admitted. (Exhibit W.)

85. Santossio admits that she told Torres she thought she was being treated differently throughout the department during the hearings being held by the Board of Police Commissioners. Santossio admits that Torres never issued a formal "order" transferring her to the Training Academy at the University of Bridgeport campus. However, Torres called Santossio into his office and told her he thought it would be better if she worked in the Training Academy with Captain Karen Krasicky. Santossio initially perceived his comments to be an order; however, Deputy Chief Kozlowski intervened on her behalf and the transfer was never made. Exhibit A Santossio Deposition page 146, 147. Deputy Chief Kozlowsky told Chief Torres, "Hector, I am going to give you a heads-up. If I were you, I wouldn't force Cathy to go down to the training academy.  You are just looking for trouble if you do that." Deposition of Torres at page 97-98.

86. Admitted. (Exhibit A Santossio deposition, pages 145-147.)

87. Denied. Santossio testified that shortly after Torres became acting chief, Captain Robinson told her that Torres was "already gunning for [you], and he's going to find out what it is you do on the third floor". The tone was negative. (Exhibit A Santossio Deposition page 69.)  Robinson does not deny saying these things; he has

said only that he does not recall saying them. Exhibit X, Affidavit of Former Captain Robert Robison).

88. Denied. Santossio testified that former Bridgeport City Council Woman Mary Bruce visited her within days of Acting Chief Torres taking over the department and asked her what she had done to "piss him [Torres] off." Bruce also said that Torres was "gunning for the two white bitches on the third floor." Council Woman Bruce was walking from the area of City Hall at the time of her comments to Ms.Santossio. Deposition of Santossio at pages 71, 76.

89. Admitted in part. Santossio admits that she went to Torres upset on several occasions. She told Torres that Otero was "stalking" her. Deposition of Santossio at pages 79-89.

90. Denied. In addition to the "stalking" incident in the property room, in her car, and an incident around Christmas, 1999, Santossio gave other examples of Otero's behavior, including comments that she felt were stalking behaviors. Deposition of Santossio at pages 79-89.

91. Admitted. (Exhibit B Deposition of Glenn Prentice page 167 and Exhibit Z.)

92. Admitted. (Exhibit AA.)

93. Admitted. (Exhibit D Deposition of Sweeney pages 117-124.)

94. Admitted. (Exhibit D Sweeney deposition page 123; Exhibit BB, May 23, 1998 memo from Carter to Sweeney; Exhibit CC, Memo from Chief Sweeney to All Commands indicating discipline imposed on Prentice.)

95. Denied. The Killian incident involved Officer Killian, a male officer, calling a superior African-American female officer, Nina Thomas, a "black bitch" to her face in front of numerous civilians and other officers. The five-day discipline was for an insubordinate act and a racial and sexist slur violation. Deposition of Glen Prentice, pages 184-185. In contrast, Sergeant Prentice was using the word "bitch" in a conversation with Chief Sweeney that he thought was private. Prentice was not insulting a superior office to her face in front of other officers and civilians. Prentice was not charged with insubordination. The violation committed by Killian was not comparable to the violation Prentice was charged with. Other department members charged with committing crimes were given much less severe penalties. Sergeant Robert Kolosuba was arrested for assault and was given a loss of four holidays. Deputy Chief Armeno was arrested for assaulting another police officer and was given a loss of four holidays. Officer Lambert and Sereant Stoltz were given a loss of two holidays for using racial slurs over the police radio. Prentice was ultimately vindicated. Deposition of Prentice, pages 183-186.

96. Denied. Prentice has personal knowledge of other members of the Bridgeport Police Department being disciplined in a much less severe manner than he

was after being charged with much more serious conduct, including crimes, than his conduct. The discipline imposed on Prentice took place during the investigation of the Santossio/Otero matter. Deposition of Prentice, pages 183-186;

       97. Admitted. (Exhibit V.)

       98. It is admitted that Carter was not present when Prentice testified in front of the Board of Police Commissioners. It is denied that to this day, Carter is not aware of the content of Prentice's testimony. As the hearings continued before the Board of Police Commissioners, and while they were underway, more of the details of the allegations and the testimony became widespread and came to the attention of everybody in the department. Deposition of Hector Torres, page 42-46; That Sergeant Prentice had given testimony about what he had heard on the tapes and that the rumors about his testimony were common knowledge throughout the department. Deposition of Hector Torres, pages 42-46.

       99. It is admitted that Torres was not present when Prentice testified in front of the Board of Police Commissioners. It is denied that Torres does not know the nature of his testimony. As the hearings continued before the Board of Police Commissioners, and while they were underway, the details of the allegations and the testimony became widespread and came to the attention of everybody in the department. Deposition of Hector Torres, page 42-46; That Sergeant Prentice had given testimony about what he had heard on the tapes and that the rumors about his

testimony were common knowledge throughout the department. Deposition of

Hector Torres, pages 42-46.

100. Denied. As the hearings continued before the Board of Police

Commissioners, and while they were underway, the details of the allegations and the

testimony became widespread and came to the attention of everybody in the

department. Deposition of Hector Torres, page 42-46; That Sergeant Prentice had

given testimony about what he had heard on the tapes and that the rumors about his

testimony were common knowledge throughout the department. Deposition of

Hector Torres, pages 42-46.

101. Denied.

102. Denied. Because of Sergeant Prentice's working relationship with

Ms. Santossio, the fact that they had worked on projects together, Carter would have

known that Santossio and Prentice were close and that she would have confided in

him. (Exhibit B Prentice Deposition pages 201-204.)

103. Denied. In his capacity as department clerk, Prentice had first-

hand knowledge of the claimed slurs uttered by Studivant, Lambert, Kozlowski and

Killian. (Exhibit B Prentice Deposition pages 226-231)

104. Denied. Prentice cited the Daniels case in support of his position

that Chief Sweeney treated minority/Guardian officers more leniently than white

officers. Daniels, a president of the Guardians organization, was investigated by

21

Internal Affairs, discipline was recommended, and Sweeney declined to discipline him. Prentice Deposition, pages 241-243. Sweeney was not comfortable imposing discipline on members of the Guardians organization because of his concern that the City would appear to be going "after" minority officers, "to prosecute them or otherwise" (Deposition of Sweeney at 132;) and that disciplined Guardian members would appeal their cases to the Special Master, who would not sustain the discipline imposed and who would reverse the case against the City. Id. at 133; See, generally, Deposition of Sweeney at 128-133. Prentice claims that Sweeney treated white officers differently than the guardians, was more "lenient" to the Guardians, "pandered" to the Guardians and didn't want to have to "answer" to Special Master Clendenen. Deposition of Prentice at 242. In support of his claims, he cites the case of David Daniels, a minority officer and President of the Guardians, who Sweeney declined to prosecute after an internal affairs investigation recommended bringing Daniels up on charges after Daniels had made a false claim that someone was taping his voice and playing the tape into his girlfriend's answering machine. Deposition of Sweeney at 128. The analyst who reviewed the tape concluded that there was a 99% chance that Daniels had staged the tapings himself; however, Sweeney felt that a 99% probability was "not good enough"…"when you are dealing with the Special Master". Deposition of Sweeney at 130. Captain Studivant, who was the investigating officer for Internal Affairs regarding the Daniels matter was asked during his deposition

why Sweeney did not bring charges against Daniels. Studivant indicated that "Officer Daniels, I believe at that time, was president of the Bridgeport Guardians." Studivant Deposition at 37. Studivant explained that Daniels was a very "controversial" person and that he was the head of an organization that was individually bringing complaints against the chief with the special master." Studivant Deposition at 39.

       105. Admitted.

       106. Admitted. (Exhibit EE.)

       107. Admitted. (Exhibit FF Sick and Injury Policy Sections G and H.)

       108. Denied. The Affidavit of Santoro does not state that the City/Bridgeport Police Department never had an agreement which exempted Prentice from the Department's chronic sick designation policy. The Affidavit only states that Santoro was not aware of such an agreement while he was in charge of the sick and injury office. (Exhibit EE.) Santoro was the sick and injured management officer at the time Sergeant Prentice was transferred to the Department Clerk's office after his initial diagnosis of multiple sclerosis. Santoro knew why Prentice had been transferred to the Department Clerk's office. After his transfer, there were times when Prentice needed to take time off for medical reasons and Santoro would tell him not to worry, that his medical condition was well documented and that he was exempt from the sick and injured policy. Deposition of Prentice at 115. It was only after Prentice testified at the Board of Inquiry and was transferred to the property room that

Lieutenant Santoro sent him a letter designating him as chronic sick between the period February 1, 1999 and January 31, 2000. Prentice Deposition at 117. If the department had a concern about Prentice's status as chronic sick, it would have so designated him after the fifth incident, in accordance with its policy, until "waiting" for the seventh incident to make the designation. Id. at 132. The policy was created to curtail the abuse of sick time, not to punish those employees with a medically documented chronic illness. Id. at 144; (Exhibit FF, Sick and Injury Policy Section G and H.)

109. Admitted. See, generally response to #108, supra.

110. Admitted.  (Exhibit HH; Prentice Appeal, dated March 14, 2000.)

111. Admitted. (Exhibit II May 8, 2000, memo from Torres denying appeal.)

112. Admitted.  (Exhibit JJ.)

113.  Denied. Torres used the sick and injury policy to retaliate against Prentice after his testimony against Otero before the Board of Police Commissioners. Prior to his testimony, Prentice was never designated as chronic sick, despite having more than five absences in a calendar year, as defined by the policy. Prentice's medical condition was widely known and well documented prior to his testimony before the Board of Police Commissioners. The policy, on its face, did not contemplate treating persons with documented medical conditions the same way it treated

healthy persons who were chronically absent, as defined by the policy. It was only after his testimony and his transfer to the property room that Prentice was designated as chronic sick in violation of the policy. (Prentice Deposition at 117; Exhibit FF Sick and Injury Policy.)

114. Denied. Officers Carr and Zaleta were given a chronic sick designation after failing to provide medical verification for their absences. In contrast, Sergeant Prentice's medical diagnosis was well known and well documented by his physicians. Exhibit KK. Carr and Zaleta were not designated as chronic sick during the tenure of Chief Torres, as was Prentice. (Exhibits KK and EE.)

115. Admitted. (Exhibit LL.)

116. Plaintiffs admit that Deputy Chief Carter talked with all subordinates under his command, including Sergeant Prentice. However, Carter repeatedly attempted to inject negativity into and to sabotage Prentice's relationship with his subordinates, such as Pilar Velez. Prentice Deposition 233-235

117. Admitted. Torres made the decision after the recommendation of Carter. (Exhibit E Torres Deposition.)

118. Denied. Torres knew the condition of the property room at the time he transferred Prentice there from conversations with Lieutenant Craw and Deputy Chief Kelly and also knew that the conditions required immediate attention. Torres

knew the condition of the property room was deplorable at the time he became acting chief. Torres deposition, pages 124, 149-150.

119. Admitted. Exhibit E Torres deposition, page 1552-153. The fact that Glen Prentice had suffered from multiple sclerosis was widely known throughout the department and was medically documented in early 1998, well prior to his transfer to the property room in January 2000. Deposition of Prentice at 18-19.

120. Denied. Torres did not accommodate Prentice and did not order that Prentice did not have to stay in the property room. Torres required Prentice to submit medical documentation in support of his claim that he should be transferred out of the property room. Torres did not move Prentice out of the basement office even after receiving the medical documentation that he requested. Prentice filed a grievance in connection with the transfer. Torres did not tell Prentice that he would have workspace on a different floor, nor did anyone in the department. Prentice deposition at 106-107. It would have been impossible for Prentice to supervise his staff from a different floor. Prentice deposition at 107.

121. Denied. Lieutenant Craw told Prentice that when he needed a break from the property room, Prentice could come and sit in Craw's office and relax for a little while. No one set aside a desk, room or office for Prentice to work from Prentice Deposition at 106-108.

122.  Denied.  Acting Chief Torres did not move Prentice out of the property room even after receiving two detailed letters from Prentice's treating physician documenting Prentice's illness and the need for an accommodation. Prentice remained assigned to the property room.  Prentice Deposition at 106-108; letters of Dr.Peter MacAllister. (Exhibit MM.)

123.  Denied. Despite receiving medical letters and speaking with Prentice's physician, Torres never transferred Prentice out of the property room. Dr. MacAllister's reports do not assure Torres that it would be all right to have Prentice enter the property room only occasionally. (Exhibit MM.)  The reports indicate that Prentice was immuno compromised and that he shouldn't be in a basement area with no windows and inadequate ventilation. Exhibit MM. Prentice was never offered a different workspace by Torres or anyone else in the department orally or in writing. Prentice Deposition at 108. Prentice was not notified of or given a copy of Exhibit OO, Memorandum from Torres to Kelly, dated February 28, 2000.

124.  Admitted.

125.  Santossio admits that Torres would not speak with her about the Otero matter or the Board without a witness present. It was not Torres' custom to refrain from speaking with anyone one-on-one without a witness present. Torres Deposition at 101.

27

126. Santossio admits that Torres testified that he never witnessed Carter backing up against a wall and throwing his hands in the air when he walked past Santossio. Torres Deposition pages 100-101.

127. Santossio admits that as a third floor employee, policies regarding attire and smoking would have pertained to her but denies inappropriate conduct with respect to either issue. Torres Deposition pages 82-90.

128. Denied. Even though Torres claims that the "plan" took several months to implement, Santossio was reassigned to Carter almost immediately after Torres assumed the position of Acting Chief. Santossio Deposition at 101.

129. Denied. Even though Torres claims that the "plan" took several months to implement, Santossio was reassigned to Carter almost immediately after Torres assumed the position of Acting Chief. Santossio Deposition at 101.

130. Santossio cannot admit or deny what Torres believed about her relationship with Carter as expressed in Exhibit DD.

131. Denied. After she was assigned to Carter, he relegated her to a Typist I and her position was marginalized. Instead of researching and drafting policies, as she had previously done, and as she was qualified to do, Carter limited her to merely typing. She was no longer allowed to attend meetings of the Policy Committee, of which she was a member.   Santossio Deposition at 398, 399, 190-194.

132. Denied. Carter held his arms and hands in the air and backed up against the wall when he and Santossio would pass each other. Santossio Deposition page 194, 110-113.

133. Admitted. Santossio deposition at 111-113.

134. Denied. Santossio's position as Director of Planning was marginalized to a typing position by Carter. She was no longer allowed to attend meetings of the policy committee of which she was a member, she was no longer allowed to research policy, as she had previously done, she was not allowed to give input to the formation of policy, as she had previously done. She became a Typist 1 under Carter. She lost the opportunities she once had to research, write and edit departmental policy under Carter. Santossio's previous job duties included assisting the department in revamping their entire policy and procedure manual, as well as working on special projects, such as a monthly newsletter, grant writing, organization of projects and paperwork, and acting s the project coordinator for the Youth Firearm Initiative. Santossio Deposition at 11-13; Sweeney Deposition at 44. After Carter left the department, Santossio resumed her former duties under Chief Chapman. Santossio Deposition at 11-13, 111-113. 397-399. Santossio also lost a week of vacation time as a result of Carter's failure to process her requests. Santossio Deposition at 102.

135. Admitted.

136. Santossio denies that Carter believed he was required to fill out sick reports for civilian employees. Carter did not require other civilian employees to fill out sick reports; Santossio's union representative had her poll other employees on the floor and they were never asked once by Carter to fill out a sick report. Greg Osipow, the union representative told Carter it was necessary to Santossio to file sick reports. Santossio Deposition at 104.Despite this, Carter asked Santossio to fill out sick reports on more than one occasion; she complained to her union and was told not to fill them out. Id. at 104-108.

137. Sweeney removed Otero from the floor on or about October 15, 1998, approximately four weeks after Santossio reported the assault and gave the tapes to Sweeney.  Exhibit D pages 88-89.

138. Santossio admits that she did not report directly to Otero.

139. Denied. Prentice suffered adverse employment action when he was transferred to the property room. He lost overtime opportunities as a result of the transfer and sustained a loss of pay in one year of approximately $20,000.00. He was not permitted to request overtime while in the property room because after he was transferred there by Torres he was designated by the department as chronic sick and therefore became ineligible to seek overtime. His conditions of employment in the property room were unhealthy and by Torres' admission, deplorable and terrible.

Exhibit MM, Deposition of Torres pages 124, 199, Deposition of Prentice 328-330.

Chronic Sick Policy.

140. Denied. If Studivant had interviewed Prentice, who also worked on the third floor, Prentice would have been able to give Studivant information about what he heard on the tapes that would have impacted the results of the OIA investigation. It was not Santossio's role to tell Studivant how to conduct his investigation and direct him who to interview. Santossio Deposition, pages 404-407.

141. Santossio admits that she was not a trained police officer and never took any criminology courses while in college. She denies the only research that she ever did on police procedure and policy was to obtain from the Internet the International Association of Chiefs of Police online policy and procedures and to study the New York Police Department Patrol Guide---this research pertained to her attendance at a seminar only, not the breadth of her research experience while working as the Director of Planning. Santossio Deposition at 193-194.

142. Admitted.

143. Plaintiffs admit that in1998, the City had a sexual harassment policy. The remainder of the statement is denied.

THE PLAINTIFFS

By: _____

     Susan King Shaw
     King and Shaw, LLC
     94 Prospect Street
     New Haven, CT 06511
     (203) 784-0329
     Their Attorneys
     Federal Bar No. CT 00418

## C E R T I F I C A T I O N

    This is to certify that I have caused a copy of the foregoing to be mailed,

U. S. Mail, postage prepaid, to:  John R. Mitola, Esq. Office of the Corporation Counsel,

999 Broad Street, 2nd Floor, Bridgeport, CT  06604; and to Thomas W. Bucci, Esq.,

Willinger, Willinger & Bucci, P.C., 855 Main Street, Bridgeport, CT  06604.

Dated:  February 27, 2004        _____

                        Susan King Shaw