**FILED**

2004 MAR 11  A 8 32

U.S. DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CATHERINE SANTOSSIO, ET AL          :
     Plaintiffs                              :
                                             :
                                             :        CASE NO. 3:01CV1460 (RNC)
VS.                                 :
                                             :
CITY OF BRIDGEPORT, ET AL.,         :        FEBRUARY 27, 2004
     Defendants

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

As part of their Summary Judgment Motion, the plaintiffs have filed a

detailed Rule 56(a)(2) Statement of Facts for review by the Court. In addition,

however, the court should be aware of the following pertinent background

information. The Bridgeport Police Department is still operating subject to Orders

entered by the Honorable T. F. Gilroy Daly, arising out of litigation brought in 1978 by

the Bridgeport Guardians, a fraternal organization of minority police officers within

the Department. In addition to the Guardians organization, a number of individual

minority police officers were also named as plaintiffs (including Arthur Carter, a

defendant in the instant lawsuit). The purpose of the lawsuit was to win redress and

relief from the very real and well-documented discriminatory and abusive

treatment of minority officers within the Department  See, <u>Bridgeport Guardians, Inc. v. Delmonte</u>, 553 F.Supp. 601 (D. Conn. 1982)(also known as "Guardians III").

Also by way of background, the Department's Office of Internal Affairs (OIA) and its reporting structure exist pursuant to a consent decree commonly known as the "Barros Decree" for the matter out of which it arose, <u>Barros v. Walsh</u>, B-482 (D.Conn. 12/70/73). Rather than reporting through a chain of command within the Department, OIA reports directly to the mayor's office and to the Board of Police Commissioners.  Deposition of Studivant at 18-20.  Since the advent of the <u>Guardians</u> Decree, OIA can and does communicate directly with the Special Master, designated to oversee and review disciplinary matters within the department and it initiates and performs investigations at the request of the Special Master.  Studivant Depo at 71.

It is a foundational claim of the plaintiffs that the defendants, Sweeney, Torres, Carter and Studivant, attempted to protect the defendant Otero from discipline, or to mitigate his discipline for sexually assaulting and harassing Santossio because Otero was a minority officer and member of the Guardian's organization. Plaintiff's Reponses to Interrogatories, dated August 16, 2002.  The defendants, Torres, Carter, Studivant were all, at one time, also members of the Bridgeport Guardians. The defendant Sweeney, although white and not a member of the

Guardians, had a history, as chief of police, of failing to discipline members of the Guardians organization because he wanted to avoid resulting complaints and proceedings before the Special Master by disciplined minority officers.

The campaign to shield Otero because of his status as a minority officer and Guardian member violated not only the rights of Santossio as a victim of sexual harassment but also involved systematic retaliation against Prentice, who supported Santossio's sexual harassment claim and testified on her behalf at a public hearing before the Board of Police Commssioners. It is the claim of the plaintiffs that the defendants' actions created a hostile and abusive work environment for the plaintiffs, and resulted in unconstitutional retaliated against the plaintiffs for their claims against and testimony against Otero.

## II.  STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment may not be properly granted unless there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P.56(c). It is well settled that in addressing the first of these criteria, the district court's function is not to resolve questions of fact, but solely to determine whether, as to any material fact, there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Fitzgerald v. Henderson, 251 F.3d 345 (2001). In making that determination, the court

3

must resolve all ambiguities and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is especially important and critical in a case involving a claim of discrimination, that the court should not review the record in piecemeal fashion. Washington v. Davis, 426 U.S. 229, 242 (1976) ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. Harris v. Forklift Systems, Inc., 510 U.S. at 23; Whidbee v. Garzarelli Food Specialities, Inc., 223 F.3d at 69 (vacating grant of summary judgment because "[i]n concluding that the plaintiffs had failed to demonstrate the existence of a hostile work environment, the District Court appears to have analyzed the alleged incidents of harassment without looking at the totality of the circumstances." Cruz v. Coach Stores, Inc., 202 F.2d 560 570, (2d Cir. 2000) ("Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances."); Stern v. Trustees of Columbia University, 131 F.3d. 305, 314 (2d Cir. 1997) (jury "will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination").

The Second Circuit has held that "if a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of a lack of an adverse employment decision is inappropriate." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2001); Whidbee v. Garzarelli Food Specialities, Inc., 233 F.3d at 71 (where reasonable jurors may disagree as to whether the incidents of harassment "would negatively alter the working conditions of a reasonable employee, the potential for ....disagreement renders summary judgment inappropriate." Fitzgerald, supra, quoting "Richardson v. New York State Department of Correctional Service, 180 F.3d. at 439.)

## III. EQUAL PROTECTION UNDER 1983

A Section 1983 claim has two essential elements:  (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. Eagleston v. Guido, 41 F. 3d 865 872 (2d.Cir. 1994); Annis v. County of Westchester 136 F.3d 239, 245 (2nd Cir. 1998).  An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other similarly situated employees, thus suffering disparate treatment because of gender. Id. at 245. A supervisor may be liable when he has been deliberately

indifferent to an employee's complaints of sex discrimination. Id.; Southard v. Texas Board of Criminal Justice, 114 F.3d 539, 553-54 (5th Cir. 1997).

An analysis whether conduct is unlawfully discriminatory under Section 1983 requires the burden-shifting framework of Title VII claims. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993.) A plaintiff alleging discriminatory disparate treatment must show that she is a member of a protected class; that she was qualified for the position; that she experienced an adverse employment action and; the adverse action occurred under circumstances giving rise to an inference of discrimination. Id. An adverse employment action need not entail economic loss, but there must be a link between the discrimination and "compensation, terms, conditions or privileges" of employment. Karibian v. Columbia University, 14 F.3d 773, 779 (2nd Cir. 1994).

A plaintiff alleging a hostile work environment must show that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). The misconduct must create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. Harris v. Forklift Sys. Inc., 510

U.S. 17, 21 (1993). Sexual harassment cases brought pursuant to Section 1983 are analogous to those brought under Title VII, and therefore, courts have applied the same requirements of severity and pervasiveness to cases under 1983. McPhaul v. Madison County, 226 F.3d 558, 556 (7th Cir. 2000).

A review of Santossio's work environment must include facts in support of her claim that she was assaulted by the defendant, Sergeant Pablo while he was on duty and in uniform in the records room of the Bridgeport Police Department. This encounter involves a host of material facts that are in dispute, including Otero's claim that the contact between himself and Santossio was consensual. The details of Otero's conduct are extensively documented throughout the record, and essentially involve Santossio's claim that on August 5, 1998, Otero grabbed her by the back of the neck, pushed her up against a wall, started manhandling her, kissing her, unzipping his pants, grabbing her left hand, putting it on his penis and telling her that she had to have his "chocolate." Defendant's Exhibit I, Attachment A. After this incident, Santossio feared for her safety and started carrying a recording device with her. Santossio taped Otero threatening to rape her if he was not moved off the third floor of the Department and making ongoing comments about her breasts and attire. Defendant's Exhibit I at pages 4-5. Otero continued to

stalk and intimidate Santossio for over a year after she made her initial complaint. Defendant's Exhibit A at 79-83, 88-89, 198-200.

Santossio's claim of a retaliatory, hostile and abusive environment begins with Otero's conduct and ends with the ensuing conduct of the defendants who have opposed this motion. For organizational purposes, the conduct of each defendant will be discussed separately; however, it is critical to appreciate that the conduct of all the defendants must be considered together in evaluating Santossio's claims. Washington v. Davis, 426 U.S. 229, 242 (1986).

**A. Torres**

With respect to the defendant Acting Chief Hector Torres, Santossio has put into issue numerous facts supporting her claim of sexual discrimination, disparate treatment and retaliation as a result of her making a claim of sexual harassment against Otero. Shortly after he assumed the position of Acting Chief in July, 1999, Santossio testified Captain Robinson told her that Torres was "already gunning for [you], and he's going to find out what it is you do on the third floor". The tone of this communication was negative.( Exhibit A Santossio Deposition page 69.) In addition, Santossio testified that former Bridgeport City Council Woman Mary Bruce visited her within days of Acting Chief Torres taking over the department and asked her what she had done to "piss him [Torres] off." Bruce also said that Torres was

8

"gunning for the two white bitches on the third floor." Deposition of Santossio at pages 71, 76. There is a genuine issue of material fact with respect to whether these statements were made; Chief Torres denies that he said these things; Captain Robinson doesn't deny making the statements but says he doesn't recall making them. Statement of Facts 87-88. A trier of fact is entitled to determine the credibility of these witnesses and draw appropriate inferences and conclusions about Torres' discriminatory animus and the environment it created for Santossio. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51.

Santossio claims that during the Otero hearings before the Board of Police Commissioners, Torres called Santossio into his office and told her he thought it would be better if she worked in the Training Academy at the University of Bridgeport Campus with Captain Karen Krasicky. Defendants' Exhibit A, Santossio Deposition at 146-147. Although Torres denies that he issued an order in this regard, Santossio initially perceived his comments to be an order. However, because Deputy Chief Kozlowski intervened on her behalf with Acting Chief Torres, the transfer was never made. Exhibit A Santossio Deposition page 146, 147. Torres admits that Deputy Chief Kozlowsky told Chief Torres, "Hector, I am going to give you a heads-up. If I were you, I wouldn't force Cathy to go down to the training

academy. You are just looking for trouble if you do that." Deposition of Torres at page 97-98.

Santossio also says that she went to Torres upset on several occasions because Otero continued to "stalk" her in the department after Torres became acting chief. She told Torres that Otero was "stalking" her and claims he did nothing about it. Deposition of Santossio at pages 79-89. Santossio reported a "stalking" incident in the property room, that she was forced to sit in her car directly across the street from police headquarters while Otero stood outside the building for 45-50 minutes without moving; and an incident with Otero around Christmas, 1999 outside the building. Id. Santossio gave Torres other examples of Otero's behavior and comments that she felt constituted continued stalking by Otero. Deposition of Santossio at pages 79-89. The fact that Santossio did not report a stalking incident between Christmas, 1999 and Torres' retirement does not warrant the conclusion that Torres must actually have done something about the complaints she made, as argued by the defendant. There is a genuine issue of material fact whether Santossio reported stalking incidents to Torres and whether he failed to take any action to stop it between the time he became acting chief and the time of his retirement. Interpreting the facts in favor of Santossio, more than one year after Santossio reported the sexual harassment to Chief Sweeney, Otero was still

engaging in ongoing harassment of her.  The continuation of this conduct suggests an environment permeated with discriminatory intimidation and deliberate indifference on the part of Torres, who was Santossio's superior and the Acting Chief of Police, to her situation. Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998).

Santossio also claims that Torres would not speak with her about the Otero matter or the Board without a witness present.  Torres admits that it was not his custom to refrain from speaking with anyone one-on-one without a witness present. Torres Deposition at 101; however, he admits that he would not speak to Santossio alone without a witness present. Id.

Santossio also claims that Torres tried to protect Otero from discipline and/or mitigate his discipline in connection with his sexual harassment claim. After the Otero matter was referred to the Board by Chief Sweeney, the case appeared on an agenda for a hearing before the Board but was postponed at the request of Sergeant Otero's counsel. The matter was rescheduled for a hearing on May 5, 1999 and was again rescheduled at the request of Otero's counsel. The case was rescheduled to August of 1999, after Torres, became acting Chief. Defendant's Exhibit A, Santossio Deposition at 125-138, 248-249.

Acting Chief Torres became aware of the discussions to settle the Otero matter, but testified that he couldn't recall specifically when. Defendant's Exhibit E.,

Deposition of Torres at 53-61. Deposition Acting Chief Torres had labor personnel in his office discussing the resolution of the charges against Otero. Labor relations personnel directed the Chief's Secretary, Charlene Panullo, to type up on police department official memo paper a letter for him to sign. Id. Torres was the acting chief of police at the time Mr. Osborne, Mr. Winterbottom and Mr. Elliot were in his office dictating to his secretary. Id. Although Acting Chief Torres testified in his deposition that he did not participate in the negotiations, did not approve of the agreement, and knew the matter should properly go before the Board of Police Commissioners, he elected to sign off on the all commands memorandum despite his claimed objections. Id. As acting chief, he could have refused to sign off on a purported settlement agreement that he claimed he did not approve of and knew was improper. Id. Acting Chief Torres was informed of the terms of the purported settlement agreement in his office, allowed his secretary to type it up, signed off on the department-wide memorandum publishing the agreement as Acting Chief of Police when he knew that matters of discipline involving more than 15 days were to be handled by the Board of Police Commissioners. Id. From these disputed facts, a jury could conclude that Torres was more directly involved in attempting to protect Otero by facilitating the mitigation of his discipline than he admits.

Torres also signed two memoranda notices publishing the discipline purported to be imposed on Otero; the first, dated August 23, 1999 did not report the conduct resulting in the proposed discipline on Otero, despite the fact that Torres knew it was the usual practice in issuing such memoranda to report the discipline imposed and the conduct that had resulted in the discipline. Deposition of Torres at 62. The second, dated August 25, 1999, was amended to include the offending conduct. Defendants' Exhibit U. As Acting Chief of Police, Torres had the authority to refuse to sign the memorandum and did not; he was therefore not a mere "messenger" in this matter. Deposition of Torres at 56-57.

Several days prior to the scheduled hearing, Acting Chief Torres posted an order that Sergeant Otero had received the discipline of a loss of 17 holidays. Defendants' Exhibit U. At the hearing scheduled before the Board of Police Commissioners in August, 1999, counsel for Otero stated that the settlement was binding and that the Board no longer had jurisdiction of the matter. At no time did the Board of Police Commissioners relinquish its jurisdiction over the Otero matter. Deposition of Glen Prentice at 89-96. In fact, there is no entity in the Bridgeport Police Department that has authority to issue discipline of more than 15 holidays or a 15 days suspension other than the Board of Police Commissioners. Deposition of

Torres at 52-61. The purported settlement agreement was in violation of department procedure.

The attempt to "settle" the charges in violation of department regulations was part of an attempt directly involving Torres to circumvent the Board of Police Commissioners, avoid a Board of Inquiry in the Otero matter and to mitigate Sergeant Otero's discipline. Deposition of Glen Prentice, pages 89-96; Exhibit S. The Board of Police Commissioners refused to accept the proposed agreement and conducted hearings into the matter.

Santossio also claims that Torres assigned her to report directly to Arthur Carter when he knew that they did not have a good working relationship. Torres claims he was "reorganizing" the department and that his "plan" took several months to implement; however, Santossio was reassigned to Carter "very quickly" after Torres assumed the position of Acting Chief. Defendants' Exhibit A Santossio Deposition at 101.

Santossio suffered adverse employment action after her transfer to Carter, which is discussed in detail at pages 17-29, infra. After Torres assigned Santossio to report to Carter, she was relegated to a "Typist I" and her position was marginalized

Looking at the totality of the facts with regard to Santossio's working environment, as created and influenced by the defendant Acting Chief Torres from July 1999 to July 2000, the plaintiff, Santossio, has raised numerous issues of material fact for resolution by the trier of fact. Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. Harris v. Forklift Systems, Inc., 510 U.S. at 23; Whidbee v. Garzarelli Food Specialities, Inc., 223 F.3d at 69 (vacating grant of summary judgment because "[i]n concluding that the plaintiffs had failed to demonstrate the existence of a hostile work environment, the District Court appears to have analyzed the alleged incidents of harassment without looking at the totality of the circumstances." Cruz v. Coach Stores, Inc., 202 F.2d 560 570, (2d Cir. 2000) ("Determining whether workplace harassment was severe of pervasive enough to be actionable depends on the totality of the circumstances."); Stern v. Trustees of Columbia University, 131 F.3d. 305, 314 (2d Cir. 1997) (jury "will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination"). It would be improper for the court to analyze each act of Torres in a vacuum. There are issues of material fact relative to each of Santossio's claims against Torres, as presented herein, and as against the other defendants. These facts, if resolved in favor of the plaintiff suggest a pervasive environment of abuse and discrimination and of deliberate indifference

to the claims of the plaintiff. Annis v. County of Westchester, 136 F.3d 239, 245 (2d. Cir. 1994).

**B. Studivant**

Santossio claims that Studivant violated her right to equal protection by failing to preserve evidence that was crucial to the investigation of her case— microcassette tapes she used to record Otero making threatening and inappropriate sexual remarks during conversations with her. Santossio Deposition 155-156. There can be little doubt that if the tapes had not been destroyed, they would have provided support for her claim that she was being sexually harassed and abused by Otero. Id.

Studivant listened to the tapes and decided they were hard to understand. Cihef Sweeney therefore suggested to him that they be sent to the FBI in an attempt to have them "cleaned up." Studivant claims he sent the tapes to the FBI, however, when he contacted the FBI to inquire about their status, he was told that the tapes had been destroyed. Statement of Facts 23-31. Studivant had failed to keep a copy of the tapes when he allegedly sent them to the FBI.

Studivant should have preserved the tapes by making copies of them before sending them out; Chief Sweeney testified at his deposition that it was "formal format" "good practice" and the "practice of the Bridgeport Police Department"

at the time in question to keep a copy of a tape that's being sent out to the FBI or other agency for any reason; Deposition of Sweeney at 93. Moreoever, Studivant had previous experience with sending tapes out for analysis; in the OIA investigation of Officer David Daniels, Studivant had reproduced copies of the subject tapes prior to sending them to an analyst and had kept a set for himself. Deposition of Prentice at 65-67. There is simply no excuse for Studivant to have failed to take this precaution in the Santossio case and for the tapes to have been destroyed.

Studivant, who had been a member of the Guardians organization, knew that Otero was also a member of the Guardians. Deposition of Studivant at 71-72. Studivant had favorites within the department and would attempt to inject his own opinions into investigations to manipulate the outcome. Deposition of Sweeney at 137-141. Chief Sweeney testified that Studivant was having improper ex parte communications with the special master, (appointed to preside over matters involving the Guardians); that he attempted to intervene and inject his opinions about what should or shouldn't happen to certain officers with cases pending, or under investigation; that these communications compromised his (Sweeney's) integrity or violated his rights; that he had prepared an affidavit in this regard prior to his retirement; that Captain Studivant had personal likes or dislikes for people in the department and attempted to use his influence to obtain results that were

beneficial to individuals he favored. Deposition of Thomas Sweeney, pages 137 line 14 to 141. Further, Studivant insisted on retaining the Otero investigation himself instead of assigning it to someone else within the OIA because he deemed the matter to be "controversial." (Santossio's request that the case be assigned to a female investigator was denied; Santossio Deposition at 85). Studivant defined "controversial cases" as cases involving high-ranking officers (lieutenant and above.) However, Otero was only a sergeant. The only other examples of "controversial cases" that Studivant testified about involved members of the Guardians Organization (David Daniels, Theophilus "Ted" Meekins, and other members of the Guardians, including Pablo Otero). Although Santossio had specifically requested that a female investigate the case; and that Captain Krasicky, a female officer could have been directed to do the investigation through Chief Sweeney, Captain Studivant felt that he should do it because it was "controversial"(Deposition of Robert Studivant pages 68-75.)(i.e., by his definition, involved a minority member of the Guardians organization).

Santossio also claims that Studivant failed to interview all of the employees on the third floor, including Glen Prentice, who might be able to provide information about her claims against Otero. Certainly, if Prentice had been interviewed, Prentice would have been able to tell Studivant what

he heard on the tapes. This information would have been particularly useful to Studivant, who claims he could not decipher what was being said on them. It is easy to understand how Prentice's input would have changed the outcome of the matter.

These admissions regarding Studivant's private agenda and his reckless and unexplained failure to preserve evidence crucial to an investiation, together with the role he played in investigations of matters involving members of the Guardians raise the issue of discriminatory conduct regarding the investigation of Otero and the attempts by Studivant to manipulate the outcome in favor of Otero and at the expense of Santossio and, ultimately, Prentice. These facts, if resolved in favor of the plaintiffs, constitute evidence of a hostile, discriminatory and abusive environment.

### C. Carter

Santossio claims that the defendant, Deputy Chief Arthur Carter created a hostile, discriminatory and  retaliatory environment in a variety of different ways. First, Santossio claims that after she was transferred to his supervision, he stripped her of many of her duties as Director of Planning and marginalized her position to that of a typist, causing her to suffer an adverse employment action. Exhibit A Santossio Deposition pages 153-154.

Santossio had a degree in English and had had previously researched, written and edited departmental policy under Chief Sweeney. Prior to coming under Carter's supervision, her job duties included assisting the department in revamping its entire policy and procedure manual, as well as working on special projects, such as a monthly newsletter, grant writing, organization of projects and paperwork, and acting as the project coordinator for the Youth Firearm Initiative. Santossio Deposition at 11-13, 111-113. 397-399; Deposition of Sweeney at 44. She was a member of the Policy Committee. Santossio Deposition at 11-13. The City's policies and procedures dated back to the late eighties and needed to be redone. Deposition of Sweeney at 44.

Santossio admits that she was not a trained police officer and never took any criminology courses while in college. Defendant's Exhibit A, Santossio Deposition at 398-99, 190-94. However, she denies the only research that she ever did on police procedure and policy was to obtain from the Internet the International Association of Chiefs of Police online policy and procedures and to study the New York Police Department Patrol Guide, as alleged by the defendants. Id. This particular research pertained only to her area of study at an online seminar she attended, and not to the breadth of her research experience while working as the Director of Planning. Id. She was no longer allowed to attend meetings of the

Policy Committee, of which she was a member. Santossio Deposition at 193-194. Carter admits that she was qualified to edit and relied on her facility with the English language, generally (Defendants' Statement of Fact 131).

There can be no doubt that Santossio was not the only one who believed she was qualified to draft policy and procedure, as alleged by the defendants. Chief Thomas Sweeney clearly regarded her as someone who was competent and qualified to draft policy and procedure and to carry out a full range of ancillary duties, such as involvement with special projects and grants. Deposition of Sweeney at 43-44. She had writing skills that were sorely lacking in the department. Deposition of Sweeney at 44. She offered input into the language that was to be used in re-drafting policy and procedure. Id. She made suggestions. Id. She was doing more than typing things others told her to. Id. Chief Sweeney had considered her skills as a writer and her suggestions and her input valuable. Deposition of Sweeney at 45. As the person who did the actual writing of policy and procedure, she had a lot of influence over what went into the document. Deposition of Sweeney at 45. She also had decision-making authority in connection with her work with grants. Id at 45, 50. Chief Sweeney had praised her highly for assisting him and others in the department with writing grants and with writing, generally. Deposition of Carter at 92.

Santossio had been a member of the Policy Committee, along with Carter, Captain Karen Krasicky, the deputy chiefs, someone from the City Attorneys' office, labor relations, and policy and management. Deposition of Carter at 92. Carter himself admits that her role within that committee was to format the policies and procedures, and to contribute her ideas and recommendations. Id. at 93. He acknowledges that her input was as welcome as anyone else's. Id. Carter had an opportunity to observe Santossio's work and thought that her work and her contribution to the committee were excellent. Deposition of Carter at 94.

Santossio also lost a week of vacation time as a result of Carter's failure to process her requests. Santossio Deposition at 102. He was hostile to Santossio in the workplace--when he would pass her on the third floor of the department, he would hold his arms and hands up in the air and flatten himself against the wall. Santossio Deposition at 27. He did not want to be alone in the same room with her. Id. at 111-114-195. Carter did not require other civilian employees to fill out sick reports; however, he required that Santossio do so. Plaintiff's Statement of Facts at 136. Santossio's union representative had her poll other employees on the floor and they were never asked once by Carter to fill out a sick report. Id. Greg Osipow, the union representative told Carter it was necessary

to Santossio to file sick reports.  Santossio Deposition at 104.Despite this, Carter

asked Santossio to fill out sick reports on more than one occasion; she complained

to her union and was told not to fill them out. Id. at 104-108.

The marginalization of Santossio's position and the limitations on the scope

of her employment with the City of Bridgeport as imposed by Carter, constituted an

adverse employment action, even though her job title, benefits, and pay stayed

the same. Karabian v. Columbia University, 14 F.3d 773, 779 (1994).  These facts,

together  with inappropriate gestures and his failure to process the plaintiff's request

for vacation pay, if resolved in favor of the plaintiff suggest a pervasive

environment of abuse and discrimination and of deliberate indifference to the

claims of the plaintiff. Annis v. County of Westchester, 136 F.3d 239, 245 (2d. Cir.

1994).

**D. Sweeney**

Santossio testified that Chief Sweeney's actions resulted in an incomplete

and inadequate internal affairs investigation and a hostile discriminatory and

retaliatory work environment. (Exhibit A Santossio deposition page 253-254.)

The Office of Internal Affairs (OIA) and its reporting structure exist pursuant to

a consent decree commonly known as the "Barros Decree" for the matter out of

which it arose, *Barros v. Walsh*, B-482 (D.Conn. 12/70/73). Rather than reporting

through chain of command within the Department, OIA reports directly to the mayor's office and the Board of Police Commissioners. Studivant Depo at 18-20. Since the advent of the *Guardians* Decree, OIA can and does communicate directly with the Special Master, and it initiates and performs investigations at the request of the Special Master. Studivant Depo at 71.

It is clear from his deposition testimony that Chief Sweeny was deeply dissatisfied with the existence of OIA outside of his regular command structure and its direct access to the office of the special master. This attitude yields a convincing rationale for Chief Sweeney's desire to maintain control over the initial stages of the investigation, and to obtain key witness statements prior to turning the matter over to OIA, especially given that Otero was Chief Sweeney's personal aide and a member of the Guardians

The immediate result of Sweeney's decision to conduct his own preliminary investigation before turning the matter over to Captain Studivant of OIA was that Santossio was forced to spend the next month (the length of Sweeney's investigation) working on the same floor in close proximity to Pablo Otero *after* Otero had been advised of the accusations of the sexual misconduct made against him. Defendant's Exhibit D at 88-89. In light of Chief Sweeney's admission that his own, separate investigation could not have had an effect on the outcome

of the eventual OIA investigation, Chief Sweeney's conduct is particularly inexcusable, as discussed below.

It wasn't normally Chief Sweeney's function to conduct investigations into matters such as the Santossio case. (Deposition of Sweeney at page 42.) It was not the normal course of business for Chief Sweeney to interview witnesses and take statements in matters that he intended to refer to Internal Affairs. Id. at 87. The usual course of events when a complaint such as this came to the attention of Chief Sweeney was to refer it directly to the Office of Internal Affairs. In this case, thirty days elapsed between the time of Ms. Santossio's complaint to Chief Sweeney and his referral of the matter to Internal Affairs. Id. at 89. During that thirty day time period, and despite the nature of the allegations, Sergeant Otero remained on the third floor doing his normal job as Chief Sweeney's aide. Id. During that time, Santossio also remained on the floor doing her usual duties. Id. at 89. During that period of time, during the Chief's investigation, no steps were taken to remove Sergeant Otero from the floor. Deposition of Sweeney at page 79. Sergeant Otero was acting as Chief Sweeney's aide at the time Ms. Santossio made her complaint. If Sergeant Otero had been disciplined in connection with this matter, Chief Sweeney would have had to find a new aide. Deposition of Sweeney at 81. There is nothing that would have prevented Chief Sweeney from referring Santossio's

complaint directly to Captain Studivant in Internal Affairs rather than electing to investigate the matter himself for one month prior to making the referral. Id. at 81. Chief Sweeney admits that his investigation of Santossio's complaint could have added nothing to the conclusions of Internal Affairs. Id.

The actions of the defendants Torres, Studivant, Carter and Sweeney, individually, and especially when viewed together, must be viewed in the light most favorable to Santossio. When so viewed, a picture emerges of a hostile, intimidating, abusive work environment permeated by improper, discriminatory motives and retaliation as a result of her claim against Otero. Santossio was subjected to humiliation, scorn, the worsening of her working conditions, and the marginalization of her job duties. The Second Circuit has held that "if a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of a lack of an adverse employment decision is inappropriate." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2001); Whidbee v. Garzarelli Food Specialties, Inc., 233 F.3d at 71 (where reasonable jurors may disagree as to whether the incidents of harassment "would negatively alter the working conditions of a reasonable employee, the potential for ....disagreement renders summary judgment inappropriate." Fitzgerald, supra,

quoting "Richardson v. New York State Department of Correctional Service, 180 F.3d. at 439.) The defendants' motion for summary judgment should be denied.

## IV. FREE SPEECH CLAIMS

Santossio claims that the defendants violated her rights to free speech by retaliating against her for filing the complaint against Otero. In support of her free speech claim, the plaintiff relies on the facts as submitted in support of her equal protection claim. The plaintiff, Santossio, has set forth genuine issues of material fact in support of her equal protection claim, which are incorporated herein by reference in connection with the free speech aspect of her claim.

The defendants argue that Santossio's free speech claim must fail because her filing of a sexual harassment claim with the department is not protected speech under a free speech analysis. To successfully prosecute a free speech retaliation claim, Santossio must prove that (1) Her speech was constitutionally protected; (2) She suffered an adverse employment decision; and (3) There is a causal connection between her speech and the adverse employment determination against her so that it can be said that the speech was the motivation factor. Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). A claim of first amendment retaliation by a public employee is only established when the

27

plaintiff's speech can be fairly characterized as constituting speech on a matter of public concern. Connick v. Myers, 416 U.S. 138. 146 (1983).

The defendants claim that Santossio's sexual harassment complaint was not speech on a matter of public concern because it involved an internal personnel dispute relative to working conditions. The theory underlying this suggestion by the defendants is that sexual harassment generally is not a matter of public concern within the meaning of Connick. The defendants' position also ignores Santossio's claims that the retaliation against her was part of a larger policy within the department to shield members of the Guardians organization from discipline, or to mitigate that discipline in an improper and discriminatory manner.

The mere fact that Santossio is a government employee does not result in the evisceration of her First Amendment Rights. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) quoting Hale v. Mann, 219 F.3d 61 (2d Cir. 2000) and Connick v. Meyers 416 U.S. 138, 140, (1983). Speech by a public employee is on a matter of public concern if it is related "to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record" Connick, 461 U.S. at 147-48, and presents a question of law for the court to resolve. Morris v.

Lindau, 196 F.3d 102, 110 (2d Cir. 1999). "Discussion of government policies and activities is perhaps the paradigmatic matter of public concern." Harman v. City of New York, 140 F.3d 111, 119 (2d Cir. 1998). Matters of public concern include speech aimed at uncovering wrongdoing. Glass v. Dachel, 2 F.3d 733, 741, (7th Cir. 1993).

The fact that Santossio had a personal interest in speech involved in making her sexual harassment complaint does not remove her complaint from the protection of the First Amendment, nor should it. Johnson v. Ganim, 342 F.3d 105 at 114, (2d Cir. 2003). "Mixed motivations are involved in most actions we perform everyday"....plaintiffs will not be held to "Herculean standards of purity of thought and speech." Moore v. City of Kilgore, 877 F.2d 364, 371072 (5th Cir. 1989). The Second Circuit has recently acknowledged that speech regarding sexual harassment may raise issues of public concern.  See Grillo v. New York Transit Authority, 291 F.3d 231, 235-236 (2d Cir. 2002).

Santossio also claims that she was subjected to retaliation and injury because of a systematic, departmental policy (reflected in the testimony of Chief Sweeney, and  Captain Studivant, cited supra)to protect members of the Guardians organization from discipline or to mitigate their discipline generally.  This aspect of her claim implicates system-wide discrimination within the department

that would unquestionably involve a matter of broader public concern. <u>Marshall v.</u>

<u>Allen</u>, 984 F.2d 787 (7th Cir. 1993). Santossio's suit seeks relief not only as a result of

sexual harassment in the workplace arising out of the conduct of Otero, but also,

against "pervasive or systemic misconduct by a public agency or public officials."

<u>Yatvin v. Madison Metro. School Dist.</u> 840 F.2d 412, 420; <u>Salpaugh v. Monroe</u>

<u>Community Hosp.</u> 4 F.3d 134, (1993).

      In sum, Santossio has alleged facts sufficient to establish that her

speech was protected under the First Amendment. She has also put into issue

numerous facts suggesting that she suffered an adverse employment action as a

result of the conduct of the defendants herein. As stated previously, Santossio

need not have suffered an economic loss in order for her to have suffered an

adverse employment action. <u>Karabian v. Columbia University</u>, 14 F.3d 773, 779

(1994). Summary judgment should be denied on Santossio's First Amendment

claims.

**V. SUMMARY JUDGMENT ON CLAIMS OF GLEN PRENTICE**

      Plaintiff Glen Prentice claims under Section 1983 that the defendants

engaged in retaliation against him because of testimony that he gave in favor or

Santossio, violating his constitutional rights to equal protection of the laws, free

speech and due process of the law. To prevail in a Section 1983 claim, Prentice