must prove that (1) The conduct complained of was committed by a person acting under color of state law; (2) That the conduct deprived the plaintiff of rights privileges or immunities secured by the Constitution or laws of the United States; and (3) That the defendants' acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff. <u>Authority Paratt v. Taylor</u>, 451 U.S. 527 (1981); <u>Eagleston v. Guido</u>, 41 F.3d 865 (2d Cir. 1994). Under a 1983 claim, the plaintiff must also prove that the defendant acted intentionally or recklessly.

In this case there is no dispute that the defendants Torres, Carter, Studivant and Sweeney were acting under color of state law as sworn police officers for the City of Bridgeport. The defendants claim, however, that there exists no issue of material fact that the defendants did not deprive Prentice of his constitutional rights to free speech, equal protection and/or due process. The defendants argue that the facts as cited by Prentice do not support his legal claims.

## 1. Claims against Studivant

Prentice claims that Captain Studivant intentionally or recklessly failed to preserve evidence that was critical to the sexual harassment investigation initiated by OIA--microcassette tapes that revealed Otero making threatening and inappropriate sexual remarks during conversations with her. Santossio Deposition

31

155-156. If the tapes had not been destroyed, they would have provided support for her claim that she was being sexually harassed and abused by Otero. Id; Deposition of Thomas Sweeney at 95-96.

There is no question that Studivant should have preserved the tapes by making copies of them before sending them out to be "cleaned up". Chief Sweeney testified at his deposition that it was "formal format", "good practice" and the "practice of the Bridgeport Police Department" at the time in question to keep a copy of a tape that's being sent out to the FBI or other agency for any reason. (Deposition of Sweeney at 93). Moreoever, Studivant had previous experience with sending tapes out to outside sources for analysis. in the OIA investigation of Officer David Daniels, Studivant had reproduced copies of the subject tapes prior to sending them to an analyst and had kept a set for himself. Deposition of Prentice at 65-67. There is simply no excuse for Studivant to have failed to take this precaution in the Santossio case and for the tapes to have been destroyed.

Studivant's failure to follow established departmental policy and procedure with respect to the microcassette tapes and his failure to take steps that he had taken in the past to preserve microcassette tape evidence form the basis for an inference by a trier of fact that his actions in failing to preserve the tapes were intentional, or at the very least, reckless indifferent.

The facts presented also suggest a discriminatory motive for such behavior. Studivant, who had been a member of the Guardians organization, knew that Otero was also a member of the Guardians. Deposition of Studivant at 71-72. Studivant had favorites within the department and would attempt to inject his own opinions into investigations to manipulate the outcome. Chief Sweeney testified that Studivant was having improper <u>ex parte</u> communications with the special master, (appointed to preside over matters involving the Guardians); that he attempted to intervene and inject his opinions about what should or shouldn't happen to certain officers with cases pending or under investigation; that these communications compromised his (Sweeney's) integrity or violated his rights; that Sweeney had prepared an affidavit in this regard prior to his retirement; that Captain Studivant had personal likes or dislikes for people in the department and attempted to use his influence to obtain results that were beneficial to individuals he favored. Deposition of Thomas Sweeney, pages 137 line 14 to 141. These admissions regarding Studivant and the role he played in investigations of matters involving members of the Guardians raise the issue of intentional, discriminatory animus regarding the investigation of Otero and the attempts by Studivant to manipulate the outcome in favor of Otero.

33

Further, Studivant insisted on retaining the Otero investigation himself instead of assigning it to someone else within the OIA because he deemed the matter to be "controversial." (Santossio's request that the case be assigned to a female investigator was denied; Santossio Deposition at 85). Studivant defined "controversial cases" as cases involving high-ranking officers (lieutenant and above.) However, Otero was only a sergeant. The only other examples of "controversial cases" that Studivant testified about involved members of the Guardians Organization (David Daniels, Theophilus "Ted" Meekins, and other members of the Guardians, including Pablo Otero). Although Santossio had specifically requested that a female investigate the case; and that Captain Krasicky, a female officer could have been directed to do the investigation through Chief Sweeney, Captain Studivant felt that he should do it because it was "controversial"(Deposition of Robert Studivant pages 68-75.)(i.e., by his definition, involved a minority member of the Guardians organization).

Santossio also claims that Studivant failed to interview all of the employees on the third floor, including Glen Prentice, who might be able to provide information about her claims against Otero. Certainly, if Prentice had been interviewed, Prentice would have been able to tell Studivant what he heard on the tapes. This information would have been particularly useful to Studivant, who claims

he could not decipher what was being said on them. It is easy to understand how Prentice's input would have changed the outcome of the matter.

## 2. Claims against Torres

Prentice claims that his rights were violated by Torres in a number of different ways. First, Prentice claims that Torres violated his rights by transferring him to the property room shortly after he gave testimony against Otero in front of the Board of Police Commissioners. Prentice Deposition at pages 83-86. Prentice claims that Torres violated his rights when Torres refused to accommodate him after Prentice submitted medical evidence that his assignment to the property room was contraindicated because of his medical condition, multiple sclerosis.

Prentice claims that Torres violated his rights by participating in the effort to settle the charges against Otero by circumventing a Board of Inquiry in front of the Board of Police Commissioners and mitigate his discipline by imposing a of a loss of 17 holidays. Under the Bridgeport City Charter and the Collective Bargaining Agreement between the police union and the City of Bridgeport, the Board of Police Commissioners has sole jurisdiction over disciplinary matters in cases where there is the possibility of more than a 15 day suspension without pay.

There are numerous facts in dispute with respect to the scope of Torres' role in connection with this matter. Torres attempts to minimize his role by

35

claiming that he was neither a participant nor a signatory to the proposed final

settlement of the disciplinary matter against Otero. (Defendants' Statement of

Facts at 79.) He claims that "all he did" was to sign off on two memorandum

notices that published to the department the discipline imposed on Otero for his

conduct. Defendants' Statement of Facts at 80.)

       In contrast, the plaintiffs have put into issue numerous facts in support

of their position that Acting Chief Torres was part of a conspiracy to protect Otero

and to mitigate his discipline.  Defendant's Exhibit E, Torres Deposition at 52-63. First,

Torres claims he was not a participant in the proposed final settlement.  Id.

However, Torres clearly knew that discussions were taking place prior to the

finalization of any documents memorializing the proposed settlement, and was

aware of terms of the proposed settlement. Id. There is no question that he was

aware of the details of the agreement because Acting Chief Torres admits that he

had labor personnel Larry Osborne, Edward Winterbottom and Harry Elliot present in

his office discussing the resolution of the charges against Otero.  Id. While in Torres'

office, with Torres present, labor relations personnel directed the Chief's Secretary,

Charlene Panullo, to type up on police department official memo paper a letter for

Torres to sign.  Id. This "letter" was a department-wide memorandum notice

announcing the discipline to be imposed on Otero. Id.

Torres was the acting chief of police at the time Mr. Osborne, Mr. Winterbottom and Mr. Elliot were in his office dictating to his secretary. He testified in his deposition that he did not approve of the agreement to impose a loss of 17 holidays on Otero. Id. He also admits that he knew that the Otero matter should properly go before the Board of Police Commissioners. Id. He further acknowledged that as acting chief, he could have refused to sign off on a purported settlement agreement if he did not approve of it and/or if he knew that only the Board of Police Commissioners had jurisdiction to impose the proposed discipline. Id.

Despite the fact that he knew that the settlement agreement was improper, and despite his claims that he didn't approve of the agreement, Acting Chief Torres signed off on the memorandum publicizing to the entire department the terms and conditions of the proposed settlement agreement regarding Otero. Id. at 52-61.

The two memoranda signed by Torres provide further evidence of improper discriminatory motive. Torres signed two memoranda notices publishing the discipline purported imposed on Otero. The first, dated August 23, 1999, only reported the proposed discipline for Sergeant Otero. Noticeably absent in that document was any reference to the specific conduct resulting in the proposed

37

discipline. Torres admits that he knew it was the usual practice in issuing such memoranda to report both the discipline imposed and the conduct that had resulted in the discipline.  Deposition of Torres at 62. The second memorandum, dated August 25, 1999, was amended to include the offending conduct that resulted in Sergeant Otero's discipline.  Exhibit U.

Torres attempts to minimize the import of these memoranda, claiming that in signing them, he was acting as a "messenger" of information regarding Sergeant Otero.  However, as Acting Chief of Police, Torres had the authority, and indeed, the duty, to refuse to sign memoranda effectuating and publishing unauthorized and improper discipline on an officer under his command.  Torres declined to exercise this authority.  Despite his efforts to distance himself from the ill-conceived efforts to protect Sergeant Otero, there are numerous facts put into issue by the plaintiffs that would permit a trier to conclude that Torres was more than a mere "messenger" in this matter. Deposition of Torres at 56-57. These same facts would assist a trier in drawing material inferences about Torres' improper, discriminatory motives in facilitating the proposed settlement and publishing it in a department-wide memorandum.

After the settlement agreement was published, Prentice, as department clerk, brought it to the attention of the Board of Police Commissioners,

38

which refused to accept the 17 holiday discipline and proceeded with its own

hearings in this matter. Defendant's Statement of Facts at 82-83. It is Prentice's

claim that his thwarting of the settlement agreement angered Torres, who

proceeded to retaliate against Prentice in a variety of different ways. Deposition of

Prentice at 89-94.

Prentice held the position of department clerk since early 1997, when

Chief Sweeney transferred him to the clerk's office and placed him on permanent

light duty after his diagnosis of multiple sclerosis. Prentice Deposition at 198-199.

Prentice testified about what he heard on the tapes in front of the Board of Inquiry

on November 19, 1999. Prentice Deposition at 188-189. Within a week, around

Thanksgiving, 1999, Torres and Carter began interviewing other officers in the

department to replace Glen Prentice as department clerk. Prentice Deposition at

189, 399. Sergeant Aida Remele, Lieutenant Lynn DiSarli and Lieutenant Adam

Radzmirski were interviewed for the position at this time, after Prentice's testimony.

Id. Torres notified Prentice that he would be transferred on December 30, 1999.

Prentice Deposition at 190. Torres would not give Prentice a reason for the transfer,

other than he had a "vision"; the transfer was not related to job performance. Id. at

194.

39

The property room was located in the basement of headquarters at 300 Congress Street in Bridgeport. Torres Deposition at 121. Sergeant Prentice's office in the property room consisted of a "desk" which was really a crate with an old piece of cardboard for a top located three feet from an air conditioning/heating unit and an elevator shaft. Id. There were no windows. Id. The work area was filthy, full of mold and bacteria, smelling of decaying rape kits that had not been properly refrigerated and decomposing drugs; evidence and property were strewn about the area. Prentice Deposition at 302; Torres Deposition at 125. Torres admits that the condition of the property room at the time he became acting chief and was "deplorable." Torres Deposition at 124.

Torres was approached by Carter in November of 1999 regarding transferring someone else into the department clerk's position. Torres Deposition at 127. Torres asked Carter to solicit some replacements for Prentice as the department clerk, asking Carter to get back to him with the names of "somebody we both can work with." Deposition of Torres at 128. By November or early December, 1999, Carter had "narrowed down the field" to Lieutenant Radzmirski. Torres Deposition at 138. Torres made the decision to transfer Prentice to the property room; he delegated to Carter the task of finding a replacement for Prentice. Id at 138-139; Torres Deposition at 148.

Torres was aware that Prentice had a medical condition even before he became acting chief, and knew that that Prentice was working in the department clerk's office on the third floor of the building because of a medical condition that partially affected his ability to work. Torres Deposition at 118-119. After Prentice was transferred into the property room on or about January 11, 2000, he requested an accommodation pursuant to the Americans with Disabilities Act (ADA) through Loretta Williams, the ADA liaison for the City of Bridgeport. Torres Deposition at 152. Torres became aware that he was seeking a transfer out of the property room due to his medical condition. Id at 153.

**3. Claims against Carter and Sweeney**

Prentice claims that Carter violated his rights for essentially the same reasons as alleged against Torres—particularly with respect to his transfer to the property room, as described, supra. Prentice alleges that when Carter was inspecting the horrible conditions in the property room, where Prentice's desk and office were to be located, he stated to Officer Sharon Jefferson, "its good enough for him [Prentice]." Deposition of Prentice at 191-193.

Prentice also claims that Carter treated him differently with respect to issuing discipline for using the word "bitch" in a private conversation with Chief Sweeney. Defendants' statement of facts at 91. Carter heard the matter and on

41

May 23, 1998, recommended to Chief Sweeney a 5 day suspension for violating the department slur policy. Although Carter had no authority to issue discipline, but Sweeney delegated the matter to him. Defendants' Statement of Facts at 94. The defendants claim that this discipline was in line with previous discipline meted out in a similar case (Killian) ; however, this is not the case.

The Killian incident, as cited by defendants involved Officer Killian, a male officer, calling a superior African-American female officer, Nina Thomas, a "black bitch" to her face in front of numerous civilians and other officers. The five-day discipline was for an insubordinate act and a racial and sexist slur violation. Deposition of Glen Prentice, pages 184-185. In contrast, Sergeant Prentice was using the word "bitch" in a conversation with Chief Sweeney that he thought was private. Prentice was not insulting a superior office to her face in front of other officers and civilians. Prentice was not charged with insubordination. The violation committed by Killian was not comparable to the violation Prentice was charged with.

In addition, other department members charged with committing crimes were given much less severe penalties. Deposition of Prentice at 183-186. Sergeant Robert Kolosuba was arrested for assault and was given a loss of four holidays. Deputy Chief Armeno was arrested for assaulting another police officer

42

and was given a loss of four holidays. Officer Lambert and Sergeant Stilts were given a loss of two holidays for using racial slurs over the police radio. Prentice was ultimately vindicated. Deposition of Prentice, pages 183-186.  In his capacity as department clerk, Prentice has personal knowledge of other members of the Bridgeport Police Department being disciplined in a much less severe manner than he was after being charged with much more serious conduct, including crimes, than his conduct. The discipline imposed on Prentice took place during the investigation of the Santossio/Otero matter. Deposition of Prentice, pages 183-186.

Prentice also claims that Sweeney imposed excessive discipline on him in connection with the slur charge, as discussed, supra. Sweeney as chief had the final decision-making authority whether to impose discipline against him. The slur discipline was imposed on Prentice after the commencement of the investigation against Otero. Because of Sergeant Prentice's working relationship with Ms. Santossio, and the fact that they had worked on projects together, Carter and Sweeney knew that Santossio and Prentice were close and that she would have confided in him.  Exhibit B Prentice Deposition pages 201-204. Prentice alleges that the excessive discipline was imposed as a "warning" to keep his mouth shut in the investigation of Otero.

Prentice cites the Daniels case in support of his position that Chief Sweeney treated minority/Guardian officers more leniently than white officers. Daniels, a president of the Guardians organization, was investigated by Internal Affairs, discipline was recommended, and Sweeney declined to discipline him. Prentice Deposition, pages 241-243. Sweeney was not comfortable imposing discipline on members of the Guardians organization because of his concern that the City would appear to be going "after" minority officers, "to prosecute them or otherwise" (Deposition of Sweeney at 132;) and that disciplined Guardian members would appeal their cases to the Special Master, who would not sustain the discipline imposed and who would reverse the case against the City. Id. at 133; See, generally, Deposition of Sweeney at 128-133. Prentice claims that Sweeney treated white officers differently than the guardians, was more "lenient" to the Guardians, "pandered" to the Guardians and didn't want to have to "answer" to Special Master Clendenen. Deposition of Prentice at 242. In support of his claims, he cites the case of David Daniels, a minority officer and President of the Guardians, who Sweeney declined to prosecute after an internal affairs investigation recommended bringing Daniels up on charges after Daniels had made a false claim that someone was taping his voice and playing the tape into his girlfriend's answering machine. Deposition of Sweeney at 128. The analyst who

44

reviewed the tape concluded that there was a 99% chance that Daniels had

staged the tapings himself; however, Sweeney felt that a 99% probability was "not

good enough"…"when you are dealing with the Special Master".  Deposition of

Sweeney at 130. Captain Studivant, who was the investigating officer for Internal

Affairs regarding the Daniels matter was asked during his deposition why Sweeney

did not bring charges against Daniels. Studivant indicated that "Officer Daniels, I

believe at that time, was president of the Bridgeport Guardians."  Studivant

Deposition at 37.  Studivant explained that Daniels was a very "controversial"

person and that he was the head of an organization that was individually bringing

complaints against the chief with the special master."  Studivant Deposition at 39.


**Prentice's equal protection claims are viable**.

             The Equal Protection Clause requires that the government treat all

similarly situation individuals alike.  Harlen Associates v. The Incorporated Village of

Mineola, 273 F.3d 494, 499 (2d Cir. 2001), citing City of Cleburne Living Center, 473

U.S. 432, 389, (1985).  Equal protection guarantees extend not only to members of a

vulnerable class, but also to individuals who allege no specific class membership,

but who are nonetheless subjected to invidious discrimination at the hands of

government officials.  Harlen Associates v. The Incorporated Village of Mineola, 273

F.3d 494, 499 (2d Cir. 2001); <u>LeClair v. Saunders</u>, 627 F.2d 606, 608-10 (2d Cir. 1980).

The Supreme Court has affirmed the validity of these types of "class of one" claims

where the plaintiff alleges that he has been intentionally treated differently from

others and that there is no rational basis for the diffrerence in treatment. <u>Village of</u>

<u>Willowbrook v. Olech</u>, 528 U.S. 562, 564.

In this case, Prentice is asserting a claim in part based upon

unconstitutional selective enforcement.  In order to prevail, he must show that (1)

he was treated differently from other similarly situated individuals; and (2) such

differential treatment was based on impermissible considerations such as race,

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or

bad faith intent to injure a person. <u>Harlen Associates v. The Incorporated Vliiage of</u>

<u>Mineola</u>, 273 F.3d at 499(2001).  A plaintiff may allege an equal protection violation

by asserting that state action was motivated solely by a "spiteful effort to 'get' him

for reasons wholly unrelated to any legitimate state objective.'" <u>Village of</u>

<u>Willowbrook v. Olech</u>, 528 U.S.562, 564, quoting <u>Esmail v. Macrane</u>, 53 F.3d 176 180

(7th Cir. 1995).  Whether or not individuals are similarly situated is an issue of fact for

resolution by the trier and is therefore not an appropriate subject for summary

judgment. Id. at 499.  Only where no reasonable jury could find that a plaintiff is

"similarly situated" may a claim be resolved by way of summary judgment.  Id.  .

46

The defendant Prentice claims that the defendants, acted jointly and in concert to protect a follow member of the Department from disciplinary action. The defendants Otero, Studivant, Carter and Torres, were all members of the Bridgeport Guardians, a fraternal organization of black and Hispanic police officers. The defendants Carter, Studivant and Torres operated to protect a fellow guardian member, Otero, from disciplinary action and accusations of improper conduct.

The defendant, Sweeney, although not a member of the Guardians himself, was not comfortable imposing discipline on member of the Guardians organization because of his concern that the City would appear to be going "after" minority officers, "to prosecute them or otherwise" (Deposition of Sweeney at 132;) and that disciplined Guardian members would appeal their cases to the Special Master, who would not sustain the discipline imposed and who would reverse the case against the City. Id. at 133; See, generally, Deposition of Sweeney at 128-133. Prentice claims that Sweeney treated white officers differently than the guardians, was more "lenient" to the Guardians, "pandered" to the Guardians and didn't want to have to "answer" to Special Master Clendenen. Deposition of Prentice at 242. In support of his claims, he cites the case of David Daniels, a minority officer and President of the Guardians, who Sweeney declined to prosecute after an internal affairs investigation recommended bringing Daniels up

on charges after Daniels had made a false claim that someone was taping his voice and playing the tape into his girlfriend's answering machine. Deposition of Sweeney at 128. The analyst who reviewed the tape concluded that there was a 99% chance that Daniels had staged the tapings himself; however, Sweeney felt that a 99%probability was "not good enough"..."when you are dealing with the Special Master". Deposition of Sweeney at 130. Captain Studivant, who was the investigating officer for Internal Affairs regarding the Daniels matter was asked during his deposition why Sweeney did not bring charges against Daniels. Studivant indicated that "Officer Daniels, I believe at that time, was president of the Bridgeport Guardians." Studivant Deposition at 37. Studivant explained that Daniels was a very "controversial" person and that he was the head of an organization that was individually bringing complaints against the chief with the special master. Studivant Deposition at 39. The ultimate decision to bring charges rested with Sweeney as Chief of Police. Studivant Deposition at 46. The Daniels investigation took place during 1996-1997.

Therefore, Prentice's claim that Sweeney violated his rights to equal protection is not limited to Sweeney's failure to preserve Santossio's microcassette tapes and the ensuing necessity for his testimony before the Board of Police Commissioners. Prentice clearly stated in his deposition that his equal protection

claim against Sweeney includes his claim that Sweeney treated minority officers and members of the Guardians organization more leniently that white officers.

Prentice also claims that his rights to equal protection were violated by Torres and Carter in connection with the decision to transfer Prentice out of the department clerk's office and into the property room because of his testimony against Otero and in favor of Santossio in front of the Board of Police Commissioners. After the transfer, Prentice filed a grievance where in he claimed that the property room assignment was a biddable position, which should have been put out to bid pursuant to the Collective Bargaining Agreement between the police union and the City of Bridgeport. Torres Deposition at 1540158. Despite winning the grievance, Chief Torres never put the position out to bid. Torres Deposition at 154-158. Chief Torres' blatant disregard of the favorable decision on Prentice's grievance is another example of a willful department-sanctioned campaign to treat protect minority officers and Guardian members from discipline at the expense of non-minority officers and civilian personnel, and to punish and retaliate against those who interfered with this agenda.

Prentice denies that Carter and Torres did not know the substance of his testimony before the Board of Police Commissioners.  As the hearings continued before the Board of Police Commissioners, and while they were underway, more

details of the allegations and the testimony before the Board became widespread and came to the attention of everybody in the department. Deposition of Hector Torres, page 42-46. That Sergeant Prentice had given testimony about what he had heard on the tapes and that the rumors about his testimony were common knowledge throughout the department. Deposition of Hector Torres, pages 42-46. Torres admitted in his deposition that it was a fair assessment that "after there was testimony at the board of inquiry, you would then hear about what the character of the testimony had been and that's how you were getting this information about details"; Torres also admitted that "as the process continued, more information was made available for everybody" Torres Deposition at 42-43. Torres admitted that he was aware of Sergeant Prentice's testimony while the Board of Inquiry was still underway. Torres Deposition at 43. Torres knew that there had been a taped conversation between Santossio and Otero and that tape was a subject at the Board of Inquiry. Id. He admitted that he knew that there was a claim that the tapes had been destroyed. Id. He admitted that he new that Chief Sweeney had had the opportunity to hear those tapes before they were destroyed. Id at 44-45. He knew that Sergeant Prentice had had the opportunity to hear the tapes before they were destroyed. Id. at 45. Torres also testified as follows:

        Q. [And that] Sergeant Prentice had also given testimony about what he had had the opportunity to hear on those tapes?

A. Yes.

Q. All right. And would it be fair to say that while the board of inquiry was still going on, these rumors made their way around the department?

A. Yes.

Q. Okay. And that they were common knowledge all the way from the patrol officers on the street all the way up to the chief of police?

A. I—If I heard them, I would imagine other people heard them as well.

By Torres' own admission, the subject matter of the Board of Inquiry and the testimony given by Prentice in connection therewith was the subject of discussion throughout the Bridgeport Police Department. Id. These admissions are in sharp contrast to Torres' contradictory statements in his deposition that he did not know the content of the testimony. These self-serving and contradictory denials by Torres should not be taken at face value, especially in a case involving discriminatory animus. Based on the facts put into issue by the plaintiffs, a jury should be permitted to determine whether Torres and Carter knew the subject matter of the testimony, despite their denials to the contrary. The plaintiffs in this case have the burden of proving intentional discrimination from indirect evidence. In such cases, it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of an employer's explanation. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 147 (2000). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

51

that is probative of intentional discrimination and it may be quite persuasive. Id. In

appropriate circumstances, the trier of fact can reasonably infer from the falsity of

the explanation that the employer is dissembling to cover up a discriminatory

purpose. Such an inference is consistent with the general principle of evidence law

that the fact finder is entitled to consider a party's dishonesty about a material fact

as "affirmative evidence of guilt." Id.,, quoting Wright v. West, 505 U.S. 277, 296

(1992); 2 J. Wigmore, Evidence Section 278(2). 133. In determining whether to grant

summary judgment, the court must review the record taken as a whole. Reeves at

150. In doing so, the court must draw all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the

evidence. Id., quoting Lytle v. Household Mfg., Inc., 494 U.S.545, 554-55 (1990);

Continental Ore Co. v. Union Carbide & Carbon Corp. 370 U.S. 690, 696, n. 6 (1962).

"Credibility determination, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986). The court must disregard

all evidence favorable to the moving party that the jury is not required to believe.

Reeves, supra at 151; Wright & Miller, at 299. Under all the circumstances, the

plaintiffs have raised issues of material fact with respect to the credibility of Torres

and Carter on the issue of whether they knew of the subject matter of Prentice's

testimony before the Board of Police Commissioners. If the jury is not required to believe Torres' and Carter's assertions, they should not be the basis for the granting of summary judgment.

The defendants argue that Prentice's equal protection claim against Torres must fail because there is no genuine issue of material fact that Torres was not involved in the purported 17- day holiday settlement. However, Prentice has put into issue numerous fact suggesting that Torres knew about the settlement, knew about it terms, knew it was improper and outside the scope of the authority of any entity other than the Board of Police Commissioners and still attempted to push it through by signing off on the memorandum formalizing and publicizing the discipline. From these facts, a trier could reasonably infer that Torres was part of a conspiracy to protect Otero a member of the Guardians, from discipline.

The defendants argue that Prentice cannot prevail on an equal protection claim against Torres based on Torres' designation of him as "chronic sick" shortly after his testimony in front of the Board of Police Commissioners and his transfer to the property room. Santoro was the sick and injured management officer at the time Sergeant Prentice was transferred to the Department Clerk's office after his initial diagnosis of multiple sclerosis. Santoro knew why Prentice had been transferred to the Department Clerk's office. After his transfer, there were

53

times when Prentice needed to take time off for medical reasons and Santoro would tell him not to worry, that his medical condition was well documented and that he was exempt from the sick and injured policy. Deposition of Prentice at 115. It was only after Prentice testified at the Board of Inquiry and was transferred to the property room that Lieutenant Santoro sent him a letter designating him as chronic sick between the period February 1, 1999 and January 31, 2000, with seven absences. Prentice Deposition at 117. If the department had a concern about Prentice's status as chronic sick, it would have so designated him after the fifth incident, in accordance with its policy, instead of "waiting" for the seventh incident to make the designation. Id. at 132. The policy was created to curtail the abuse of sick time, not to punish those employees with a medically documented chronic illness. Id. at 144; (Exhibit FF, Sick and Injury Policy Section G and H.)

Torres used the sick and injury policy to retaliate against Prentice after his testimony against Otero before the Board of Police Commissioners. Prior to his testimony, Prentice was never designated as chronic sick, despite having more than five absences in a calendar year, as defined by the policy. Prentice's medical condition was widely known and well documented prior to his testimony before the Board of Police Commissioners. The policy, on its face, did not contemplate treating persons with documented medical conditions the same way it treated healthy

persons who were chronically absent, as defined by the policy. It was only after his testimony and his transfer to the property room that Prentice was designated as chronic sick in violation of the policy. (Prentice Deposition at 117; Exhibit FF Sick and Injury Policy.)

Officers Carr and Zaleta were given a chronic sick designation, but only after failing to provide medical verification for their absences. In contrast, Sergeant Prentice's medical diagnosis was well known and well documented by his physicians. Exhibit KK. Carr and Zaleta were not designated as chronic sick during the tenure of Chief Torres, as was Prentice. (Exhibits KK and EE.)

Torres did not accommodate Prentice and did not order that Prentice did not have to stay in the property room. Torres required Prentice to submit medical documentation in support of his claim that he should be transferred out of the property room. Torres did not move Prentice out of the basement office even after receiving the medical documentation that he requested. Prentice filed a grievance in connection with the transfer. Torres did not tell Prentice that he would have workspace on a different floor, nor did anyone in the department. Prentice deposition at 106-107. It would have been impossible for Prentice to supervise his staff from a different floor. Prentice deposition at 107. Prentice denies that Lieutenant Craw told him that when he needed a break from the property room,

Prentice could come and sit in Craw's office and relax for a little while. No one set aside a desk, room or office for Prentice to work from Prentice Deposition at 106-108.

Acting Chief Torres did not move Prentice out of the property room even after receiving two detailed letters from Prentice's treating physician documenting Prentice's illness and the need for an accommodation. Prentice remained assigned to the property room. Prentice Deposition at 106-108; letters of Dr. Peter MacAllister. (Exhibit MM.) Despite receiving medical letters and speaking with Prentice's physician, Torres never transferred Prentice out of the property room. Dr. MacAllister's reports do not assure Torres that it would be all right to have Prentice enter the property room only occasionally. (Exhibit MM.) The reports indicate that Prentice was immunocompromised and that he shouldn't be in a basement area with no windows and inadequate ventilation. Exhibit MM. Prentice was never offered a different workspace by Torres or anyone else in the department orally or in writing. Prentice Deposition at 108. Prentice was not notified of or given a copy of Exhibit OO, Memorandum from Torres to Kelly, dated February 28, 2000.

56

Deputy Chief Carter talked with all subordinates under his command, including Sergeant Prentice. However, Carter repeatedly attempted to inject negativity into and to sabotage Prentice's relationship with his subordinates, such as Pilar Velez. Prentice Deposition 233-235.

**Free Speech Claim**

Prentice claims that the defendants violated his rights to free speech by retaliating against him for testifying against Otero. In support of his free speech claim, the plaintiff relies in part on the facts as submitted in support of his equal protection claim. The plaintiff, Prentice has set forth genuine issues of material fact in support of his equal protection claim, which are incorporated herein by reference in connection with the free speech aspect of his claim.

The defendants argue that Prentice free speech claim must fail because his speech was not a matter of public concern. To successfully prosecute a free speech retaliation claim, Prentice must prove that (1) His speech was constitutionally protected; (2) He suffered an adverse employment decision; and (3) There is a causal connection between his speech and the adverse employment determination against him so that it can be said that the speech was the motivation factor. <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999). A claim of first amendment retaliation by a public employee is only established when the plaintiff's

speech can be fairly characterized as constituting speech on a matter of public concern. Connick v. Myers, 416 U.S. 138. 146 (1983).

The defendants claim that Prentice's testimony before the Board of Police Commissioners was not speech on a matter of public concern because it involved an internal personnel dispute relative to working conditions. The theory underlying this suggestion by the defendants is that sexual harassment generally is not a matter of public concern within the meaning of Connick. The defendants' position also ignores Prentice's claims that the retaliation against him was part of a larger policy within the department to shield members of the Guardians organization from discipline, or to mitigate that discipline in an improper and discriminatory manner.

The mere fact that Prentice is a government employee does not result in the evisceration of his First Amendment Rights. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) quoting Hale v. Mann, 219 F.3d 61 (2d Cir. 2000) and Connick v. Meyers 416 U.S. 138, 140, (1983). Speech by a public employee is on a matter of public concern if it is related "to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record" Connick, 461

58

U.S. at 147-48, and presents a question of law for the court to resolve. Morris v.

Lindau, 196 F.3d 102, 110 (2d Cir. 1999). "Discussion of government policies and

activities is perhaps the paradigmatic matter of public concern." Harman v. City of

New York, 140 F.3d 111, 119 (2d Cir. 1998). Matters of public concern include

speech aimed at uncovering wrongdoing. Glass v. Dachel, 2 F.3d 733, 741, (7th Cir.

1993). Clearly, Prentice, in giving testimony before the Board on a matter of

potentially criminal wrongdoing perpetrated by a uniformed member of the

Department, was "speaking" on a matter of public concern within the meaning of

the relevant caselaw.

Prentice also claims that he was subjected adverse employment

action as a result of his testimony and that the retaliation commenced within days

after his testimony before the Board. Prentice has alleged facts suggesting

retaliation and injury because of a systematic, departmental policy (reflected in the

testimony of Chief Sweeney, and  Captain Studivant, cited supra) to protect

members of the Guardians organization from discipline or to mitigate their discipline

generally. This aspect of his claim implicates system-wide discrimination within the

department that would unquestionably involve a matter of broader public

concern. Marshall v. Allen, 984 F.2d 787 (7th Cir. 1993).  Prentice seeks relief not only

as a result the "pervasive or systemic misconduct by a public agency or public

59

officials" that resulted from his testimony. <u>Yatvin v. Madison Metro. School Dist</u>. 840 F.2d 412, 420; <u>Salpaugh v. Monroe Community Hosp.</u> 4 F.3d 134, (1993).

Prentice has alleged numerous facts in this regard. Prentice suffered adverse employment action when he was transferred to the property room. He lost overtime opportunities as a result of the transfer and sustained a loss of pay in one year of approximately $20,000.00. He was not permitted to request overtime while in the property room because after he was transferred there by Torres he was designated by the department as chronic sick and therefore became ineligible to seek overtime. His conditions of employment in the property room were unhealthy and by Torres' admission, deplorable and terrible. Exhibit MM, Deposition of Torres pages 124, 199, Deposition of Prentice 328-330. Chronic Sick Policy. His repeated chronic sick designations, and the denial of his grievances, all constitute adverse employment actions within the meaning of the caselaw.

In sum, Prentice has alleged facts sufficient to establish that his speech was protected under the First Amendment. He has also put into issue numerous facts suggesting that he suffered an adverse employment action as a result of the conduct of the defendants herein. Summary judgment should be denied on Prentice's First Amendment claims.

60

**Intentional Infliction of Emotional Harm**

Both plaintiffs claim that the defendants' conduct constituted intentional infliction of emotional distress under Connecticut common law. The plaintiffs must prove that (1) the defendants intended to inflict emotional distress on the plaintiffs; (2) defendant's conduct caused plaintiffs' stress; (3) The distress suffered was severe. Petyan v. Ellis, 200 Conn. 243, 253 (2000). Conduct is extreme and outrageous when it exceeds the boundaries tolerated by a decent society. Appelton v. Brd. of Education of Stonington. 254 Conn. 205, 210 (2000). The plaintiffs have alleged facts sufficient submit to the trier on this burden of proof. Summary judgment on this claim must be denied.

**Summary Judgment City of Bridgeport**

Summary judgment against the City of Bridgeport must be denied. The plaintiffs have submitted extensive evidence that the execution of a government's policy or custom by those whose edicts or acts may fairly be said to represent official policy, have inflicted injuries upon the plaintiffs. Monnell v. Department of Social Services of the City of New York, 436 U.S. 658, (1978). The acts of Chiefs Sweeney and Torres, as well as the acts of Carter and Studivant, as documented herein, and if interpreted in the light most favorable to the plaintiffs, would bind the City under Section 1983.

61

**Conclusion**

       For all the foregoing reasons, the defendants' Motion for Summary Judgment should be denied.

THE PLAINTIFFS

By: _____
            Susan King Shaw
            King and Shaw, LLC
            94 Prospect Street
            New Haven, CT 06511
            (203) 784-0329
            Their Attorneys
            Federal Bar No. CT 00418

**C E R T I F I C A T I O N**

       This is to certify that I have caused a copy of the foregoing to be mailed, U. S. Mail, postage prepaid, to: John R. Mitola, Esq. Office of the Corporation Counsel, 999 Broad Street, 2nd Floor, Bridgeport, CT 06604; and to Thomas W. Bucci, Esq., Willinger, Willinger & Bucci, P.C., 855 Main Street, Bridgeport, CT 06604.

Dated: February 27,2004

_____
           Susan King Shaw